UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN SECTION

CIVIL ACTION NO. *05- 30090 MAP*

| | |
|---|---|
| NORTHAMPTON INTERNAL MEDICINE ASSOCIATES, P.C., | ) ) ) |
| Plaintiff | ) ) |
| vs. | ) ) |
| GENERAL ELECTRIC COMPANY d/b/a GE Healthcare Technologies, GE Medical Systems Information Technologies, and Clinical Information Systems, | ) ) ) ) ) ) |
| Defendant | ) |

## COMPLAINT AND DEMAND FOR JURY TRIAL

## THE PARTIES

1. The plaintiff, Northampton Internal Medicine Associates, P.C. ("NIMA"), is a professional corporation organized under the laws of Massachusetts with a principal place of business at 190 Nonotuck Street, Florence, Hampshire County, Massachusetts.

2. The defendant, General Electric Company d/b/a GE Healthcare Technologies, GE Medical Systems Information Technologies and Clinical Information Systems ("GE"), is upon information and belief a New York corporation with a principal place of business at 1 River Road, Schenectady, NY. GE is a corporate successor of Millbrook Associates.

## JURISDICTION AND VENUE

3.    This court has subject matter jurisdiction over this matter pursuant to 28 USC § 1332 since this civil action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000.

4.    Venue properly lies in this court pursuant to 28 USC § 1391(a)(2) since a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this judicial district.

5.    GE is subject to the personal jurisdiction of this Court under the Massachusetts Long Arm Statute, M.G.L. c. 223A, §§ 3(a) and (b).

## FACTS COMMON TO ALL COUNTS

6.    In or about October, 2002, NIMA was solicited by Millbrook Associates ("Millbrook"), GE's predecessor, to purchase practice management software for its medical office in Florence, Massachusetts.

7.    In or about November, 2002, Patrick O'Mahoney of Millbrook gave a sales presentation to NIMA's staff which included a demonstration of the Millbrook Practice Manager ("MPM") software and its supposed capabilities.

8.    Mr. O'Mahoney also provided NIMA with a sales brochure, product manuals and other literature which contained glowing presentations concerning the capabilities of the MPM software.

9.    On December 13, 2002, Patrick O'Mahoney wrote a letter to Roxanne Haber, NIMA's office manager and contact person, in an attempt to induce NIMA to enter into an agreement to implement the MPM software. Mr. O'Mahoney attached to the letter ". . . a revised proposal which represents an aggressive incentive for your organization to partner with Millbrook in

396384

moving forward with a system implementation for a 'go live' date in March, 2003 based on a commitment on or before 12/20/2002."  In the letter, Mr. O'Mahoney also represented the following:  (a) that Millbrook had taken many proactive steps through its nine-year history to not only insure that its program works properly with third party applications and programs but also that Millbrook works well with third party organizations that are an important part of the success of both Millbrook's installation and the customer's practice; (b) that Millbrook's product had been scrutinized for quality, consistency, and integration with Microsoft architecture and design specifications and that NIMA should have confidence in the quality of the products and its ability to work integrally with other Microsoft applications and its database and operating system components; (c) that NIMA would be freed from the need to have expertise in or undue reliance on Millbrook for designing and maintaining its information technology infrastructure; (d) that Millbrook assists customers to solve their problems without diverting issues to a third party and that Mr. O'Mahoney, as NIMA's account manager, would be responsible for making sure that NIMA "was seeing Millbrook's best consistently" and would work with NIMA "to solicit how Millbrook can facilitate the support process for NIMA's needs"; (e) that Millbrook is committed to increasing productivity in physician's offices through technological innovation; (f) that Millbrook has the processes and the people in place to address all of NIMA's needs as a practice in working towards continued mutual success; and (f) that "offices using Millbrook are seeing accelerated cash flows, increased revenues, reduced expenses and better morale within their office staff."  A true and correct copy of Mr. O'Mahoney's letter is attached hereto as Exhibit A.

10. On or about December 30, 2002, NIMA agreed in writing to purchase from Millbrook the MPM software along with related software and services, including technical support.  The terms of the purchase are set forth in the December 30, 2002 agreement ("the Agreement"), a true and

correct copy of which is attached hereto as Exhibit B. In addition to the MPM software, NIMA agreed to purchase, among other items, an end user direct support 10-pak, on-site Millbrook training, Millbrook PM project management, a Millbrook PM integration software kit and database conversion services. In accordance with the terms of the Agreement, NIMA paid Millbrook the sum of $51,154 for these goods and services.

11. On or about March 7, 2003, NIMA executed a Technical Support Agreement with Millbrook, a true and correct copy of which is attached as Exhibit C.

12. During February and March, 2003, Millbrook personnel visited NIMA's offices and assisted NIMA in converting its database so that it would be compatible with the MPM software. Millbrook personnel also installed all necessary software and trained NIMA personnel as part of the conversion process.

13. NIMA "went live" with the Millbrook Practice Management software in April, 2003. NIMA immediately began experiencing numerous problems with the MPM software. For example, the system was not capable of producing health insurance claims in a form acceptable to certain third party payers, such as Blue Cross Blue Shield and Medicare. In addition, service codes had not been set up properly by Millbrook, resulting in rejection of numerous claims by third party payers.

14. During the months of April, May and June, NIMA personnel made numerous telephone calls to Millbrook seeking technical support and solutions to these and other problems which were causing claim forms submitted by NIMA to be rejected by third-party payers but was unable to reach a live person. Although NIMA left many urgent messages, calls were usually not returned for several days, if they were returned at all. In the meantime, while NIMA waited for

Millbrook to respond, it would receive additional batches of rejected claims from third-party payers.

15. Between April, 2003 and June, 2003, as a direct result of defects in the MPM software and Millbrook's failure to provide necessary technical support and corrective solutions, NIMA had numerous claims rejected by third-party payors. In many of cases, rejected claims had "timed out" and could not be resubmitted for payment by NIMA. As a result of these rejected claims, NIMA's billings and collections decreased sharply while its accounts receivable increased.

16. Unbeknownst to NIMA, in or about January 21, 2003, GE acquired Millbrook Associates and succeeded to its obligations under the various agreements between NIMA and Millbrook. The acquisition by GE had been in the works for several months and was, upon information and belief, first announced by GE on November 25, 2002. GE's acquisition of Millbrook Associates and the transition from Millbrook to GE had a marked negative impact on Millbrook and later GE's ability and willingness to support the MPM software and respond to NIMA's numerous requests for technical support and solutions in a timely and effective manner.

## CAUSES OF ACTION

### COUNT I

### (Breach of Contract)

17. The plaintiff repeats and realleges the allegations contained in paragraphs 1 through 16 of its complaint and incorporates them herein by reference.

18. GE is a successor to Millbrook's obligations under the Agreement.

396384

19. GE materially breached the Agreement by, among other acts and failures to act, failing to provide promised technical support and training; failing to properly convert NIMA's existing database and failing to properly and adequately furnish other services and support under the Agreement.

20. As a direct result of GE's material breaches of the Agreement, NIMA suffered lost revenues, lost profits, loss of business goodwill, lost employee time and other incidental and consequential damages.

## COUNT II
### (Breach of Express and Implied Warranties)

21. The plaintiff repeats and realleges the allegations contained in paragraphs 1 through 20 of its complaint and incorporates them herein by reference.

22. GE is a successor to any and all express and implied warranties made by Millbrook to NIMA.

23. Millbrook expressly warranted that the MPM software would produce "accelerated cash flows, increased revenues, reduced expenses and better morale within [NIMA's] office staff" and would otherwise perform as represented in Mr. O'Mahoney's December 13, 2002 letter (Exhibit A) and as represented in product manuals, product demonstrations and sales presentations given to NIMA.

24. Millbrook impliedly warranted that the MPM software and associated software and components were merchantable and fit for ordinary use.

25. Millbrook impliedly warranted that the MPM software and associated software and components were fit for the particular purpose for which NIMA intended to use them.

396384

26. GE breached these express and implied warranties by furnishing practice management software and associated software and components which were not adequate to manage the billing and collection functions of NIMA's medical practice.

27. As a direct result of GE's breach of these express and implied warranties, NIMA sustained lost revenues, lost profits, loss of business goodwill, lost employee time and other incidental and consequential damages.

## COUNT III
### (Misrepresentation)

28. The plaintiff repeats and realleges the allegations contained in paragraphs 1 through 27 of its complaint and incorporates them herein by reference.

29. Millbrook made glowing representations at sales presentations, product demonstrations and in product manuals regarding the capabilities of the MPM software, including but not limited to the claim that medical offices using the Millbrook software "were seeing accelerated cash flows, increased revenues, reduced expenses and better morale within their office staff."

30. Millbrook's representations were material to NIMA's decision to purchase the MPM software along with related software and services, including technical support.

31. Millbrook knew that NIMA considered these representations material.

32. Millbrook knew or should have know when it made these representations that the software still had defects and shortcomings which created doubt that it would function as successfully as had been represented and also knew that Millbrook was in the process of being acquired by GE, a fact which was never disclosed to NIMA.

33. Millbrook made these representations in order to induce NIMA to purchase the MPM and other associated goods and services.

34. NIMA reasonably relied on Millbrook's representations, promises, assurances and product specifications regarding the MPM software in deciding to purchase the software and related goods and services.

35. As Millbrook's successor, GE is liable for Millbrook's actionable misrepresentations.

36. As a proximate result of Millbrook's misrepresentations and failures to disclose material facts, NIMA suffered lost revenues, lost profits, loss of business goodwill, lost employee time and other incidental and consequential damages.

**COUNT IV**
**(Violations of M.G.L. c. 93A)**

37. The plaintiff repeats and realleges the allegations contained in paragraphs 1 through 36 of its complaint and incorporates them herein by reference.

38. At all relevant times, Millbrook and GE were involved in trade or commerce within the Commonwealth of Massachusetts.

39. The aforementioned conduct of Millbrook and GE, as Millbrook's successor, and in its own right, including their breaches of express and implied warranties and misrepresentations, constitute unfair and deceptive acts and practices in violation of M.G.L. c. 93A, § 9.

40. GE's violations of the MGL c. 93A were knowing and willful.

41. On April 5, 2004, NIMA, through its attorneys, sent GE a notice of demand pursuant to M.G.L. c. 93A, § 9 by certified mail. The notice of demand was received by GE Medical Systems Information Technologies in Hillsborough, Oregon on April 8, 2004. A true and correct copy of the notice of demand is attached hereto as Exhibit D.

42. GE responded in writing to the notice of demand on May 5, 2004, but failed to make a reasonably acceptable settlement offer within 30 days, as required under the statute.

43. As a proximate result of GE's violations of M.G.L. c. 93A, § 9, NIMA has suffered lost revenues, lost profits, loss of business goodwill, lost employee time, other incidental and consequential damages plus attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff, Northampton Internal Medicine Associates, P.C., requests that the Court enter judgment against the defendant, General Electric Company d/b/a GE Healthcare Technologies, GE Medical Systems Information Technologies and Clinical Information Systems, which shall include the following items of relief:

    a.  compensatory damages for lost revenues, lost profits, loss of business goodwill and lost employee time;

    b.  two or three times actual damages pursuant to M.G.L. c. 93A, § 9, based on GE's "knowing and willful" conduct;

    c.  incidental and consequential damages;

    d.  reasonable attorney's fees and costs pursuant to M.G.L. 93A, § 9;

    e.  prejudgment interest at the annual rate of 12% pursuant to M.G.L. c. 231, §§6B and 6C; and

    f.  whatever other relief the Court deems just and proper.

## JURY DEMAND

THE PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

THE PLAINTIFF
NORTHAMPTON INTERNAL
MEDICINE ASSOCIATES, P.C.

By _____

Keith A. Minoff, Esq., of
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301  Fax (413) 785-4658
BBO No.:  551536

396384

EXHIBIT A

# MILLBROOK™
practice management solutions

Friday, December 13, 2002

Roxanne Haber
Northhampton Internal Medicine
190 Nonotuck Road
Florence, MA 01062

Dear Roxanne:

As a result of our conversation earlier this week, I wanted to forward on a letter to you outlining our commitment to the "best of breed" approach to our software distribution and also presenting an aggressive offer to gain your business. It is our desire to provide clarification of our qualifications to meet your organizational requirements and to address any outstanding concerns that you may have so that we can move forward with a mutually beneficial agreement.

The "Best of Breed" approach is a dedication to focus on being the best at what you do and a commitment to put both standards and processes in place to make working with other vendors of this philosophy both easy and cost effective. For Millbrook, that is a focus on developing and supporting our Practice and Office Management application, Millbrook Practice Manager®, to be the best in its class and we have received many independent awards and recognitions which validate our success to date. Millbrook has taken many proactive steps through our nine year history to not only insure that our program works properly with third party applications and programs, but also that our company works well with third party organizations that are an important part of the success of both our installation and your practice.

Since our inception in 1993, Millbrook has had our product designed to be compliant with the highest level of certification available from Microsoft and we proudly display the "Designed for Microsoft BackOffice™" and "Microsoft Certified Partner" logos on our marketing material. Millbrook is also "WindowsXP Certified" and as Microsoft is changing the nature of their certification naming structure you will shortly see the "Gold Certified Partner" logo on both our website and printed materials. These designations insure that our product has been scrutinized for quality, consistency and integration with Microsoft's architecture and design specifications. As a result, you should have confidence in the quality of the product, in its ability to work integrally with other Microsoft applications and their database and operating system components. See the attached "Designed for Microsoft® BackOffice™ Logo Program" explanation for more information.

Our effort in maintaining the highest level of certification and exclusive design for the Microsoft "backbone"(Windows2000®, Microsoft SQL Server®) also frees your office from the need to have expertise in or undue reliance on Millbrook for designing and maintaining your information technology(IT) infrastructure which is a common frustration with proprietary database solutions on unfamiliar operating system technologies such as AIX/Unix or Novell. These proprietary system vendors were often forced reluctantly to offer hardware sales and support which is not the focus of their organization. The services generally provided by these vendors would not go

3330 KELLER SPRINGS ROAD, SUITE 201
CARROLLTON, TEXAS 75006
(972) 663-2000
FAX (972) 663-2099
WWW.MILLBROOK.COM



beyond the direct needs of the practice management system causing practices to look elsewhere for networking assistance for common technologies like email, and internet connectivity resulting in fees in addition to the fees they were paying their practice management system vendor for what was often less than state of the art hardware and network solutions. With Millbrook, your organization is free to partner with a vendor of your choosing to provide expertise in network design and on-going network maintenance with a proven local presence, not only for your practice management needs, but also for other IT projects such as network access to hospital applications, secure internet access and secure messaging systems. One such vendor that provides these important criteria to practices in the Springfield/Holyoke area is MP Consulting, Inc. This organization was first introduced to Millbrook by a several practices in the area that were very pleased with their response times to on-site needs and proven expertise. These practices wished to continue their relationship with them when evaluating a new practice management application which is high praise and the type of commitment to customer satisfaction that we look for. In working with MP Consulting, Inc. and other networking companies across the country, we have put processes in place to make sure that we address any and all issues in an expedited fashion. The hardware integrator is maintained as a contact at your customer level in our support database so that the vendor can call us and be recognized by our 800 support staff for his role and expertise in diagnosing issues, working with system upgrades and making changes to the network environment that may effect our application. We realized long ago that the secret to a happy customer base, as reflected in our vendor ratings by organizations like KLAS and others, is to assist customers to solve their problems without diverting issues to a third party. As your account manager I would also be responsible for making sure that you are seeing our best consistently and to work with you to solicit how we can facilitate the support process for your needs.

Millbrook's focus has also led us to develop standards for communication between systems that has now been embraced by the Microsoft Healthcare Users Group (MSHUG) as the preferred method of communication among disparate systems. Our work to further develop and continue the proliferation of the ActiveX for Healthcare initiative has led our organization to collaborate with over 50 Certified Partners who have formal agreements with Millbrook to maintain these standards which result in better supportability of integration and easier sharing of data among other complimentary or "best of breed" programs including Electronic Medical Records (EMR) vendors. This provides your organization with unparalleled choice and flexibility when you are ready to evaluate clinical applications for your practice. Additional information is included on the ActiveX for Healthcare program.

Millbrook is committed to increasing productivity in physicians' offices through technological innovation. Our commitment is fueled by a clear understanding of the unique business challenges facing today's physicians and we feel strongly that we have the processes and more importantly the people in place to address all of your needs as a practice in working towards our continued mutual success. Using a Microsoft-based solution in your practice means you are using the same familiar technology you use at home at a far more affordable price than you've been paying. No longer is it necessary for you to pay premium dollars for non-premium technology. Instead, offices using Millbrook are seeing accelerated cash flows, increased revenues, reduced expenses and better morale within their office staff.

I have included as an attachment to this document a revised proposal which represents an aggressive incentive for your organization to partner with Millbrook in moving forward with a system implementation for a "go live" date in March of 2003 based on a commitment on or

before 12/20/2002. Please do not hesitate to contact me at 508-887-9610 if you would like additional information on any of the areas addressed here or information on other aspects of our product or service offerings. I look forward to speaking further with you.

Sincerely,

Patrick O'Mahoney
Northeast Sales Executive

EXHIBIT B

www.millbrook.com



**MILLBROOK**
practice management solutions

| | Millbrook Salesperson | Patrick O'Mahoney |
|---|---|---|
| | Phone | 508-251-5217 |
| | Fax | 508-462-8009 |
| | Email | patrick@millbrook.com |
| | Date Prepared | December 26, 2002 |
| | | Quote Valid For 30 Days |

Millbrook Practice Manager - Order Form 4.4D

**Customer Information (if leasing, please provide info at bottom of page)**

Company Name Northhampton Internal Medicine

Contact: Roxanne Haber

Address 190 Nonotuck Road

City, State, Zip Florence, MA 01062

County Hampshire

Phone 413-584-9511

Fax 413-584-4218

Email:

Millbrook ID 22181

**Millbrook Corporation**
Accounts Receivable
PO Box 678077
Dallas, TX 75267
Phone 972-663-2000
Fax 972-663-2484

Practice Specialty Internal Medicine

Software Replacing MED-i

Estimated Go Live Date March 26, 2003

If signed on the date this quote was prepared

MIK Partner N/A

| Item # | MBC Part # | Product Description | QTY | SRP Unit Cost | Ext SRP Cost |
|---|---|---|---|---|---|
| 1 | PLS | Millbrook Practice Manager (PM) Physician License Software | 7 | $ 5,000.00 | $ 35,000.00 |
| 2 | PLSOP | Millbrook Practice Manager Other Provider License Software | 1 | $ 2,500.00 | $ 2,500.00 |
| 3 | EDIS1 | One Time EDI Access Fee (per Provider to be enrolled)* | 1 | $ 2,500.00 | $ 2,500.00 |
| 4 | CODES | Annual CPT, ICD9 codes and insurance carriers (per license)** | 8 | $ 250.00 | $ 2,000.00 |
| 5 | ASM | Annual Millbrook PM Software Updates (per License) | 8 | $ 50.00 | $ 400.00 |
| 6 | ASMOP | Annual Millbrook PM Other Provider Software Updates | 7 | $ 900.00 | $ 6,300.00 |
| 7 | SUP10-PAK | End-User Direct Support 10pak (Ten incidents to customer support during normal business hours) | 1 | $ 450.00 | $ 450.00 |
| 7 | TRAIN | Onsite Millbrook PM training (per day, travel expenses not included)*** | 1 | $ 1,600.00 | $ 1,600.00 |
| 8 | PM | Millbrook PM Project Management  See attached. | 9 | $ 1,000.00 | $ 9,000.00 |
| 9 | MIK | Millbrook PM Integration Software Kit (MIK) | 1 | $ 2,500.00 | $ 2,500.00 |
| 10 | MIKASC | Annual (MIK) Software Updates | 0 | $ 3,500.00 | $ - |
| 11 | MPDPC1 | Database conversion, Demographics Only | 0 | $ 630.00 | $ - |
| | | (Conv. price can vary depending on source and size of data base) | 1 | $ 4,000.00 | $ 4,000.00 |
| 12 | MAMCDHCF | MA Medicaid HCFA form (one-time fee) | 1 | $ 300.00 | $ 300.00 |
| 13 | MAMCDHCF | MA Medicaid HCFA form annual maintenance | 1 | $ 54.00 | $ 54.00 |
| Special Notes | | Adjustment Based on Full Time Equivalency of 7 Docs | 1 | -$2,950.00 | -$2,950.00 |
| | | Incentive Based on Decision on or before 12/30/2002 | 1 | -$10,000.00 | -$10,000.00 |

Order Total (plus applicable sales tax) $ 51,154.00

**Payment Terms:** 50% on order acceptance - 50% prior to final licensing.

**Make all payments to:** Millbrook Corporation, Accounts Receivable, P.O Box 678077, Dallas, TX 75267

All sales are subject to sales tax unless Millbrook receives a valid sales tax exemption certificate.

Second and Subsequent Years  Maintenance: $ 6,354.00

*See Attached for Claim Submission Options

Note  Optional plans available that require analysis of claim volume and payors to determine pricing

**This is an annual fee, released in January of each year

***Travel expenses will be billed separately

**Customer Acceptance**

Name (print) Roxanne J. Haber

Title Office Manager

Signature [signature]    Date 12-30-02

Estimated go live date is based on 90 days
from order acceptance and 50% deposit
has been received by Millbrook.

**Leasing Company Information**

Company

Address

City, State, Zip

Contact

Phone

**Note:** Hardware must meet minimum
requirements as set forth in documentation.

Millbrook Corporation    3330 Keller Springs Road Suite 201    Carrollton, Texas 75006

**EXHIBIT C**

# MILLBROOK
practice management solutions

# Technical Support Agreement

## Requirements

✓ Remote access/direct connection to the SQL Server is required. This can be through Virtual Private Networking (VPN), Remote Access Service (RAS) or Internet IP. PCAnywhere or other third party dial up connection utilities are not acceptable and cannot be substituted for the above.
   o If the direct connection of choice is by way of modem, it must be installed on the server where the Millbrook database resides.
   o We strongly recommend the phone line be a dedicated modem/fax line and not accessible through the phone system. This prevents someone from interrupting a connection by attempting to make an outbound call.

✓ Support is provided for the Millbrook Practice Manager™ software. Limited support is provided for Microsoft SQL Server™, hardware and networking only where directly related to the Millbrook Practice Manager software.

✓ Supportability document will be forwarded to you by Millbrook Technical Support and must be completed to access Millbrook support.

✓ Each customer must designate a primary and a secondary contact. All support questions must be filtered through these contacts.

## Support Policy

✓ Millbrook Technical Support reserves the right to refer customers to specific sections of:
   1. the software manual or help system
   2. knowledge base articles
   3. Millbrook website
   4. any other pertinent reference materials
   when Millbrook Technical Support believes the case resolution resides therein.

✓ Use applies to regular Support hours 7:30am-5:30pm Central Standard Time.

✓ After hours support is billable at our normal after hours rate, must be paid in advance and is not considered part of the customer's Unlimited Support agreement.

✓ Database upgrades are not included in the unlimited support agreement and will be billed separately. This only applies to customers who either request our assistance walking a user through the upgrade process or we perform the upgrade remotely. However, any problems or question pertaining to an upgrade are covered.

✓ Customer acknowledges that Millbrook Technical Support is not a substitute for, or replacement of, end user training.

Millbrook maintains monthly statistics of support cases logged by all Millbrook End Users. These support cases are trended based on a number of criteria, including number of cases logged per license for each customer. Should Millbrook determine that a customer's support cases logged for a particular quarter fall outside a reasonable average for all Millbrook customers (deemed "Excessive Use"), Millbrook shall notify the customer in writing of its Excessive Use. Should the customer receive two such notices in any twelve-month period, Millbrook reserves the right to adjust the annual or quarterly support fee. *If Project Management (PM) was purchased, cases will not be counted until PM expires.*

Millbrook Technical Support also reserves the right to refer any customer deemed to have Excessive Use for additional end user training. If such end user training is necessary, training fees will apply.

## Acknowledgement

I have read and agree to the above terms and conditions:

_Northampton Internal Medicine Assoc._        _[signature]_        _3/7/03_
Organization Name                P.C.    Organization's Officer or Owner        Date

_Roxanne Hahn or Elizabeth Russell_
Organization's Support Contact        Date                Millbrook Corporation        Date

Please return this form via fax to (972) 663-2097 or mail to Millbrook Corporation 3330 Keller Springs, Ste 201 Carrollton, TX 75006 Attn: Support.

Millbrook Corporation - Confidential

Revision Date 09/06/2002

## DOHERTY, WALLACE, PILLSBURY AND MURPHY, P.C.

ATTORNEYS AT LAW
ONE MONARCH PLACE, SUITE 1900
SPRINGFIELD, MASSACHUSETTS 01144-1900

TELEPHONE (413) 733-3111

PAUL S. DOHERTY
PHILIP J. CALLAN, JR
GARY P. SHANNON
ROBERT L. LEONARD
A. CRAIG BROWN
L. JEFFREY MEEHAN
JOHN J. McCARTHY
DAVID J. MARTEL‡
WILLIAM P. HADLEY
BARRY M. RYAN
DEBORAH A. BASILE†
PAUL M. MALECK
CLAIRE L. THOMPSON
W. GARTH JANES**
GREGORY A. SCHMIDT
MICHAEL K. CALLAN*
MICHAEL D. SWEET*‡
BERNADETTE HARRIGAN‡
BRENDA S. DOHERTY
MICHELE A. ROOKE
THOMAS E. DAY*
KAREN K. CHADWELL·†
JOHN E. BONINI*
MICHAEL J. BONANNO

TELECOPIER (413) 734-3910

WWW.DWPM.COM
E MAIL WGJANES@DWPM.COM

SAMUEL A. MARSELLA
MATTHEW J. RYAN, JR.
OF COUNSEL

DUDLEY B. WALLACE
(1900-1987)
LOUIS W. DOHERTY
(1898-1990)
FREDERICK S. PILLSBURY
(1919-1996)
ROBERT E. MURPHY
(1919-2003)

† REGISTERED PATENT ATTORNEY
* ALSO ADMITTED IN CONNECTICUT
‡ ALSO ADMITTED IN NEW YORK
** ALSO ADMITTED IN DISTRICT OF COLUMBIA

**Certified Article Number**

7160 3901 9844 9045 8750

**SENDERS RECORD**

March 8, 2004

## VIA CERTIFIED MAIL

Catherine Pompei
GE Medical Systems Information Technologies
20540 NW Evergreen Parkway
Hillsboro, OR 97124-7111

Re:    Northampton Internal Medicine Associates, P.C.
190 Nonotuck Street
Northampton, MA 01062-1999

Dear Ms. Pompei:

This office represents Northampton Internal Medicine Associates, P.C. ("NIMA"), and this matter has been referred to us for possible legal action.

In April, 2003, NIMA purchased practice management software and computer hardware (the "System") from Millbrook Practice Management Solutions of Carrollton, Texas ("Millbrook"). Shortly thereafter, Millbrook was purchased by GE Medical Systems ("GE"). In addition, NIMA was required to purchase hardware to support the System (the "Hardware").

The System was sold to NIMA as a solution for billing of services rendered by NIMA to service health insurers, including but not limited to Medicare. In reliance upon Millbrook's assertions regarding the capabilities of the System, NIMA committed the sum of $54,647.00 to purchase and install the System and the Hardware. The System "went live" on April 4, 2003 (the "Live Date").

Following the Live Date, NIMA encountered problems with the System, including but not limited to the System's inability to produce health insurer claims in a form acceptable to certain of NIMA's health insurers. Despite repeated requests by NIMA, Millbrook and then GE failed to begin to address these issues until November, 2003.

As a result of the System's failure, as well as GE's failure to respond to the problems in a timely and appropriate fashion, NIMA suffered significant damages, including the loss of income

DOHERTY, WALLACE, PILLSBURY AND MURPHY, P.C.

Catherine Pompei
March 8, 2004
Page 2

due to the System's inability to produce health insurer claims in the correct form and in a timely fashion. NIMA has now been notified that many health insurance claims submitted to insurers between April, 2003 to November, 2003 will not be paid.

It is NIMA's intention to resolve this matter if possible in an amicable fashion. However, you should be advised that the recent matter of VMark Software, Inc. v. E.M.C. Corp., 37 Mass. App. Ct. 610 (1994) addressed a similar situation wherein the vendor of computer hardware and services was held liable under the Massachusetts Consumer Protection Statute, G.L. c.93A, for its "inept blend of hopeful dissembling and dogged bumbling" when the purchaser of the equipment and software requested the vendor to correct the system's shortcomings. A complete copy of the case is attached as Exhibit A. In accordance with the VMark Software case, NIMA requests GE to make "earnest efforts to make good on its contractual obligation by overcoming its products' recognized problems and making it perform to expectations."

Therefore, NIMA demands the following:

1.    GE shall conduct a review of the System and make any changes necessary to ensure that NIMA's invoices will be accepted by NIMA's health insurer carriers.

2.    On a going forward basis, GE shall respond to software problems noted by NIMA within 24 hours, with all contacts being made via telephone. If any problem is not resolved within 24 hours, a GE technician shall visit NIMA's site within 48 hours to address the software problems.

3.    GE shall pay NIMA an amount equal to any outstanding insurance claims that have been rejected by reason of error in the System.

4.    GE shall reimburse or credit NIMA the amount of $250,000.00, which figure conservatively represents the actual damages suffered by NIMA through increased costs and additional staffing which has been required since the software conversion.

5.    GE shall reimburse or credit NIMA the sum of $10,000.00, which figure represents the reasonable attorney's fees incurred as a result of the above-cited activities.

6.    Pursuant to Massachusetts General Laws Chapter 93A, you are required to respond to this demand within thirty (30) days of receipt of this letter. If you do not agree to the demands submitted herein, or to make some reasonably acceptable settlement offer within that time, I will advise my client to pursue all avenues of relief which may include legal action. If a court should find in favor of NIMA in such a legal proceeding, NIMA may recover its actual damages plus reasonable expenses, including attorney's fees and the costs of the legal proceeding. In addition, if the court should find that the actions of GE complained of herein

214506-1

DOHERTY, WALLACE, PILLSBURY AND MURPHY, P.C.

Catherine Pompei
March 8, 2004
Page 3

were willful or knowing, or if the court finds that GE failed to make a reasonable offer of
settlement in relation to the damages sustained by NIMA, the court may award double or treble
the amount of NIMA's actual losses.

Very truly yours,

W. Garth Janes

WGJ/es
Enclosure
cc:   Lawrence Schiffman, M.D.

214506-1

VMARK SOFTWARE, INC. vs. EMC CORPORATION.

No. 92-P-1825.

Middlesex. January 7, 1994. - November 18, 1994.

Present: FINE, PORADA, & LAURENCE, JJ.

*Fraud. Damages.* Deceit. Consumer protection case. *Consumer Protection Act,* Unfair or deceptive act, Businessman's claim. *Damages.*

At a civil trial, the judge properly ruled in the defendant's favor, but he should have made an award of damages on the counts of the counterclaim alleging misrepresentation and violation of G. L. c. 93A, where his unchallenged findings of fact, based on undisputed evidence, supported such an award. [616-620]

The evidence at a civil trial on claims for misrepresentation and violation of G. L. c. 93A did not support an award of multiple damages. [620-624]

CIVIL ACTION commenced in the Superior Court Department on January 11, 1991.

The case was heard by *Herbert Abrams,* J.

*Anthony A. Bongiorno* for the plaintiff.

*James C. Burling* for the defendant.

LAURENCE, J. A common but foreseeable frustration of modern life — the failure of new computer hardware or software to work properly — produced this commercial altercation, which the parties unfortunately failed to anticipate by a contractual dispute resolution mechanism that might have avoided their time-consuming and expensive litigation. The controversy arose out of the June, 1990, grant by VMark Software, Inc. (VMark), of a license to EMC Corporation (EMC) to use VMark's software product, a relational database management system called "uniVerse."[1] EMC

---

[1] The parties and the trial judge assumed, without discussion, that the parties' computer software license agreement is governed by art. 2 of the Uniform Commercial Code, G. L. c. 106, §§ 2-101 et seq. Although the

looked upon uniVerse as a vital product for its expanding business. According to VMark's representations, uniVerse would enable EMC to replace existing computer hardware that no longer had the capacity to meet its computing needs, while allowing it to retain its valuable application software, which uniVerse would render compatible with many different types of more efficient or versatile hardware.

When uniVerse failed to function as VMark had represented and EMC had anticipated, despite at least twenty remedial efforts by VMark, EMC unilaterally declared the license agreement terminated and refused to pay the license fee. VMark's suit to recover that fee provoked a counterclaim by EMC seeking damages for VMark's failure to deliver a functional product, founded upon counts for breach of contract, breach of warranty, promissory estoppel, misrepresentation, and violation of G. L. c. 93A.

Following a ten-day bench trial, a judge of the Superior Court — in a fifty-five page opinion containing 144 separate findings of fact that are unchallenged by the parties — ruled against VMark on its claim for payment, against EMC on its breach of warranty, misrepresentation, and c. 93A counts, but for EMC on its breach of contract and promissory estoppel claims. The judge awarded EMC $316,901 in what he termed "reliance damages."[2] That figure essentially reflected

---

[2] issue has not been definitively decided in Massachusetts, we accept the assumption, particularly since the applicability and provisions of the U.C.C. are not critical to our analysis. See *USM Corp. v. First State Ins. Co., ante* 471, 477-479 (1994). See generally Note, Computer Programs as Goods Under the U.C.C., 77 Mich. L. Rev. 1149 (1979); Note, Computer Software as a Good Under the Uniform Commercial Code: Taking a Byte Out of the Intangibility Myth, 65 B.U.L. Rev. 129 (1985).

The long-established general rule for breach of contract recovery in Massachusetts is that the wronged party should receive the benefit of his bargain, i.e., be placed in the same position as if the contract had been performed. *John Hetherington & Sons, Ltd. v. William Firth Co.,* 210 Mass. 8, 21 (1911). However, in an appropriate case, Massachusetts law permits, as an alternative to such "expectation" damages, the recovery of "reliance" damages, i.e., expenditures made in reliance upon a contractual obligation that was not performed. See *Albre Marble & Tile Co. v. John Bowen Co.,* 338 Mass. 394, 398-399 (1959); *Brennan v. Carvel Corp.,* 929 F.2d 801, 810-811 (1st Cir. 1991); Restatement (Second) of Contracts

614

VMark Software, Inc. v. EMC Corp.    37 Mass. App. Ct. 610

continue to use dynamic files and alternate indices in its database, and being able to convert to the DEC system by October, 1990, because of the limitations of its Prime system.

VMark officials assured EMC that the uniVerse product supported the use of both dynamic files and alternate indices, that the conversion from Prime to uniVerse would be straightforward and nonproblematic, and that the conversion process could be completed before the end of the summer. At one of the demonstrations, the VMark sales representative additionally assured EMC that, if uniVerse did not function as promised, VMark would be responsible for the cost of the DEC hardware. By late June, 1990, EMC, relying on VMark's several representations as to uniVerse's performance and capabilities, had decided to obtain a license for uniVerse and to purchase the DEC Ultrix computer system. EMC would not have purchased the DEC hardware had it not also acquired what it perceived to be fully functional uniVerse software.

At the time VMark personnel made their several representations regarding uniVerse, they were confident of EMC's successful application of the software but knew that there had been some prior problems with the performance of uniVerse when used with a DEC Ultrix system. They were also aware that such a combined system had thus far operated more slowly than it was designed to do; that there had been relatively little experience with uniVerse's ability to support the alternate indices function, which even the developer of uniVerse was concerned might not work as represented to EMC; that VMark had not actually attempted to use uniVerse to achieve compatibility between Madic application software and DEC hardware; and that difficulties had been encountered with the ability of uniVerse operationally to convert dynamic files to the DEC/uniVerse system. The necessary conversion process required, at the then-current stage of development, an extra, time-consuming step that both VMark's creator and its engineering vice president recog-

37 Mass. App. Ct. 610

VMark Software, Inc. v. EMC Corp.    615

nized would make it difficult to meet EMC's initially desired timetable.

None of these problems was explicitly communicated by VMark to EMC during the demonstration and negotiation period. Instead, in keeping with VMark's apparent general policy of not mentioning or minimizing negative factors regarding uniVerse's capabilities to prospective customers, VMark personnel assured EMC that there would be no serious performance or conversion problems. Nor did the manuals and technical documents supplied by VMark to EMC highlight any of these problems relating to the use of uniVerse.

Unaware of these difficulties, and encouraged to act quickly by VMark's June 26, 1990, offer to give a twenty percent discount on the license fee if EMC signed up before the end of June, EMC soon thereafter executed a license agreement for the uniVerse software. This agreement contained various provisions limiting VMark's warranties and damage liability, which VMark asserts preclude any recovery by EMC.[*]

Despite VMark's assurance that the conversion and transfer of EMC's data stored in its Prime system to the DEC system via uniVerse would occur uneventfully, difficulties in using uniVerse to load and convert EMC's data were encountered almost immediately. When EMC performed test functions in uniVerse on the few files that were successfully converted, the results were not uniformly complete or accurate. The DEC/uniVerse system turned out to operate much more slowly than the Prime system. None of VMark's repeated efforts to solve the various performance problems over the summer and fall of 1990 succeeded in overcoming them. By December, 1990, EMC concluded that uniVerse was too unreliable to permit EMC to conduct business activities on it. By that time VMark, after failing to correct the defects in

[*]The parties addressed most of their analytical efforts here, as below, to the interaction and implications of these restrictive provisions, but they do not occupy our attention on our view of the case. See infra at 616-617 & 622.

the software despite delivering over twenty different but equally unsatisfactory versions of uniVerse to EMC, also conceded that uniVerse was not yet a fully functional product for EMC's purposes.

VMark told EMC at that point that its future efforts had to be directed to correcting fundamental problems with the software and that it would be unable to address EMC's specific performance issues until sometime thereafter. Immediately following that concession by VMark of uniVerse's inability to perform as represented, EMC halted the uniVerse conversion effort and purchased a larger Prime system to address its computing needs. EMC communicated this action to VMark and demanded reimbursement for the cost of the DEC hardware and for the time EMC employees had spent on the failed conversion effort. VMark refused EMC's claim, demanded payment under the license agreement, and the instant litigation ensued as described earlier.[7]

The parties and the judge devoted most of their trial and appellate energies to the question of the extent to which the license agreement, particularly its liability limitation provisions, restricts EMC's ability to recover damages for VMark's undisputed breach of its limited contractual warranty obligations to deliver a functional product conforming to specifications and to repair any defects so that the product would work as promised. Discussion of those contractual and quasi-contractual issues is not necessary in view of our determination that the judge's damage award in favor of EMC was correct because of VMark's actionable misrepresentations regarding uniVerse. The damage award did not, however, go far enough, and EMC is entitled to additional recovery.

1. *Misrepresentation.* Although the judge entered judgment for VMark on count IV (intentional misrepresentation)

[7] "Experienced lawyers often caution clients not to sue customers who refuse to pay an invoice because of a reasonable complaint about the product. This case may be cited as an illustration of the soundness of that advice." *Alcan Aluminum Corp. v. Carlton Aluminum of New England, Inc.*, 35 Mass. App. Ct. 161, 162 n.4 (1993).

of EMC's counterclaim, he did not treat that count separately in his extensive memorandum. His dismissal of the misrepresentation claim appears to have emanated from his brief discussion and rejection of EMC's c. 93A claim, count VI. Without any amplification, he ruled that "'VMark's representations [regarding uniVerse's capabilities] were neither intentional nor negligent, and its conduct did not 'attain a level of rascality that [would constitute a c. 93A violation]. . . .'" This conclusory observation clashes discordantly with the judge's detailed factual findings.[8] Those unchallenged subsidiary facts demonstrate that VMark did make material misstatements during its negotiations with EMC, which relied on them to its detriment.[9]

The judge found, on undisputed evidence (much of it from VMark's own witnesses) that prior to execution of the license agreement: (a) VMark made glowing representations (at sales presentations, product demonstrations, and in product manuals) regarding the capabilities of the uniVerse software, particularly its supposed ability to make EMC's Madic applications software compatible with the DEC Ultrix hardware system, to convert EMC's data from Prime to a DEC system easily in a few weeks, and to support computer functions (including dynamic files and alternate indices) essential to EMC's business operations; (b) EMC considered those representations to be material to its decision to license uniVerse, purchase the DEC computer, and undertake the substantial conversion process; (c) VMark knew that EMC con-

[8] An appellate court may reach its own ultimate conclusions based on a trial judge's findings and may set aside a trial judge's ultimate ruling that is inconsistent with the judge's own subsidiary factual findings. *Simon v. Weymouth Agric. & Industrial Soc.*, 389 Mass. 146, 148-149, 151-152 (1983); *Delano Growers' Coop. Winery v. Supreme Wine Co.*, 393 Mass. 666, 684 (1985).

[9] The familiar elements of an action for misrepresentation are that the defendant made a false representation of a material fact for the purpose of inducing the plaintiff to rely upon it, and that the plaintiff did rely upon the representation as true, to his damage. See *Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 77 (1991). The party making the representation need not know that the statement is false if the fact represented is susceptible of actual knowledge. *Ibid.*

618

37 Mass. App. Ct. 610

VMark Software, Inc. v. EMC Corp.

sidered those representations material and that EMC needed to replace its Prime computer system with a DEC system, while retaining its Madic software, within a relatively short period of time; (d) the uniVerse software did not at the time work as represented by VMark; (e) VMark knew (or should have known) when it made the unqualified representations to EMC regarding uniVerse's capabilities that the software still had defects and shortcomings which created doubt that it would function as successfully as had been represented, particularly with respect to (i) uniVerse's performance on DEC Ultrix systems, (ii) its ability to convert dynamic files, and (iii) its ability to support the alternate indices function; (f) VMark in good faith expected uniVerse eventually, when fine-tuned, to function as represented; (g) VMark did not disclose uniVerse's known problems to EMC so as to modify its unqualifiedly positive statements about uniVerse; (h) VMark feared that if EMC were told about uniVerse's current performance problems, EMC might not license the software; (i) as further inducement to EMC's entering into the license transaction and attempted corroboration of VMark's positive representations regarding uniVerse's capabilities, VMark promised that it would buy back from EMC the DEC hardware if uniVerse did not perform as represented; and (j) EMC reasonably relied on VMark's representations, promises, assurances, and product specifications regarding uniVerse, which were material influences on its decision to license the uniVerse software and purchase the DEC computer equipment.[10]

These specific findings by the judge satisfy EMC's burden in sustaining its claim of actionable misrepresentation by

[10]The judge expressly found that EMC performed reasonable investigations, prior to entering the license agreement, in an effort to determine the ability of uniVerse to function in conjunction with a DEC system as represented. The judge's holding that EMC failed to establish that the withholding by VMark of material information, disclosure of which might have dissuaded it from licensing the defective uniVerse product, is logically inconsistent with his finding that EMC reasonably relied on VMark's unqualified representations to the effect that uniVerse suffered no functional drawbacks and would satisfy EMC's time-constrained needs.

619

37 Mass. App. Ct. 610

VMark Software, Inc. v. EMC Corp.

VMark.[11] EMC was accordingly entitled to all damages it had suffered as a proximate result of VMark's misleading representations, *Rice v. Price,* 340 Mass. 502, 510-511 (1960), including all "out of pocket" expenses incurred in connection with the transaction, so as to restore the status quo ante, as if the transaction had never occurred. *Zimmerman v. Kent,* 31 Mass. App. Ct. 72, 82 (1991). Under this standard, the judge correctly awarded EMC $316,901, representing the remaining value of the DEC computer equipment which it would not have purchased but for VMark's misleading representations regarding uniVerse, and which it was unable to sell in mitigation of its damages.

The judge should have applied the same measure of recovery with respect to the value of the lost time of EMC's employees in the failed conversion process. He found that EMC had reasonably committed these employee resources in July, 1990, in reliance upon VMark's assurance; as to the ease of implementation of conversion and had discontinued that commitment only in December, 1990, when uniVerse's inability to perform as represented was acknowledged by VMark. Just as the DEC computer hardware had no value to EMC in the circumstances, the time of those EMC employees dedicated to the futile attempt to convert to the DEC

[11]VMark's contentions that any misrepresentations do not aid EMC because they either contradict or are identical to an express provision of the license agreement, or amount only to a breach of contract, are not only to long-standing Massachusetts law and policy. *See Bates v. Southgate,* 308 Mass. 170, 182 (1941); *Snyder v. Sperry & Hutchinson Co.,* 368 Mass. 433, 446 (1975); *McEvoy Travel Bureau, Inc. v. Norton Co.,* 408 Mass. 704, 712-714 (1990). VMark's reliance on the damage limitation and integration clauses of the agreement to bar EMC's recovery for misrepresentation is misplaced. The Massachusetts authority just cited, particularly *Bates,* establishes that a party may not escape liability for misrepresentation by resort to such provisions. *See Bates v. Southgate,* 308 Mass. at 179-180, 182, 183. *See also McEvoy Travel Bureau, Inc. v. Norton Co.,* 408 Mass. at 711 n.5; *Sheehy v. Lipton Indus., Inc.,* 24 Mass. App. Ct. 188, 193-194 (1987); *V.S.H. Realty, Inc. v. Texaco, Inc.,* 757 F.2d 411, 417-418 (1st Cir. 1985). In any event, it is the law of Massachusetts that even sophisticated businessmen must deal with each other honestly and may not induce contractual relations by material misrepresentations. *McEvoy Travel Bureau, Inc. v. Norton Co.,* 408 Mass. at 712-713.

system was wasted and had no value to EMC because of uni-Verse's ongoing inability to function as promised. Damages for misrepresentation should have included the costs of the defective computer system work. See, e.g., Convoy Co. v. Sperry Rand Corp., 672 F.2d 781, 785 (9th Cir. 1982); Clements Auto Co. v. Service Bureau Corp., 298 F. Supp. 115, 134 (D. Minn. 1969), affd. in relevant part, 444 F.2d 169 (8th Cir. 1971); Stahl Mgmt. Corp. v. Conceptions Unlimited, 554 F. Supp. 890, 895 (S.D.N.Y. 1983). EMC's evidence that it incurred costs of $65,208 for employees diverted to the unsuccessful conversion effort and that the time spent by such employees produced no benefit to EMC was undisputed and should have been accepted as the basis for the additional award.

2. Chapter 93A. As noted, the judge viewed VMark's representations to EMC about uniVerse as insufficiently rascally to be deemed unfair or deceptive as between parties experienced in the computer industry and sophisticated in business matters, under the "raised eyebrow" test of Levings v. Forbes & Wallace, Inc., 8 Mass. App. Ct. 498, 504 (1979). Possibly because of his truncation of EMC's misrepresentation count, the judge appears to have overlooked the additional teachings of Levings. To be held unfair or deceptive under c. 93A, practices involving even worldly-wise business people do not have to attain the antiheroic proportions of immoral, unethical, oppressive, or unscrupulous conduct, but need only be within any recognized or established common law or statutory concept of unfairness. Id. at 502, 504. More pertinently, Levings recognized that "[a] misrepresentation in the common law sense would . . . be the basis for a c. 93A claim." Id. at 504. Subsequent Massachusetts decisions have confirmed the validity of that observation. See Datacomm Interface, Inc. v. Computerworld, Inc., 396 Mass. 760, 779-780 (1986); McEvoy Travel Bureau, Inc. v. Norton Co., 408 Mass. 704, 714 (1990); Glickman v. Brown, 21 Mass. App. Ct. 229, 235 (1985); Sheehy v. Lipton Indus., Inc., 24 Mass. App. Ct. 188, 194-195 (1987).

The damages that EMC claims were the result of VMark's unfair and deceptive acts are the cost of the DEC equipment and lost employee time devoted to the conversion effort — precisely the same damages as those proximately flowing from the tortious misrepresentations. Since cumulative recovery is not available in such a situation, see McGrath v. Mishara, 386 Mass. 74, 84-85 (1982); Calimlim v. Foreign Car Center, Inc., 392 Mass. 228, 235-236 (1984),[13] there would be no independent legal significance to EMC's separate c. 93A count, but for EMC's demand that its damages be multiplied. EMC relies on the provision of G. L. c. 93A, § 11, par. 5, that authorizes doubling or trebling of actual damages for a "knowing" 93A violation, and on the scienter requirement for the tort of misrepresentation (see note 9, supra). The existence of that element, EMC asserts, automatically triggers § 11's mandatory doubling of damages for a "knowing" violation of the statute's prohibition against deceptive acts and practices.[14] We disagree. Although VMark's misstatements were made with sufficient awareness of the facts regarding uniVerse's less-than-perfect capabilities to be actionable under the traditional tort formula, they were not made so "knowingly" as to warrant the punitive sanctions of double damages under c. 93A.

[13] For the same reason, we need not separately, address EMC's arguments that VMark's conduct gives rise to independent c. 93A liability for material nondisclosure. We recognize, of course, that EMC is in any event entitled, under G. L. c. 93A, § 11, par. 6, to an award of reasonable attorneys' fees and costs incurred in the action, in addition to the amount of its actual damages.

[14] General Laws c. 93A, § 11, par. 5, inserted by St. 1972, c. 614, § 2, states: "If the court finds for the petitioner, recovery shall be in the amount of actual damages; or up to three, but not less than two, times such amount if the court finds that the use or employment of the method of competition or the act or practice was a willful or knowing violation of said section two." The fact that the trial judge does not make an express finding that a defendant's violation of G. L. c. 93A, § 2, was either willful or knowing is irrelevant if the evidence warrants such a finding. Service Publications, Inc. v. Goverman, 396 Mass. 567, 578 n.13 (1986); Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 475 (1991).

Central to our conclusions are the special circumstances involved in this case.[14] Most important are the judge's findings that VMark acted in good faith in its dealings with EMC, that it fully expected that uniVerse would function as represented, and that it was persistently ready and willing, though ultimately unable, to correct the software's shortcomings.[15] As a seasoned user of computer systems — so the judge found — EMC had to have realized that such complex, customized technology typically requires a period of adjustment and "debugging" after delivery to perfect. Cf. *Carl Beasley Ford, Inc.* v. *Burroughs Corp.*, 361 F. Supp. 325, 330 (E.D. Pa. 1973), affd., 493 F.2d 1400 (3d Cir. 1974); *Pezzillo* v. *General Tel. & Electronics Info. Sys., Inc.*, 414 F. Supp. 1257, 1259-1260 (M.D. Tenn. 1976), affd., 572 F.2d 1189 (6th Cir. 1978); *Logan Equip. Corp.* v. *Simon Aerials, Inc.*, 736 F. Supp. 1188, 1204 (D. Mass. 1990).

VMark's earnest efforts to make good on its contractual obligation by overcoming its product's recognized problems and making it perform to expectations do not, of course, create a defense to the tort claim. Establishing liability for misrepresentation does not require a showing that the defendant even knew that the statements made were false, see note 9, *supra*, let alone that the defendant actually intended to deceive the plaintiff. See *Zimmerman* v. *Kent*, 31 Mass. App. Ct. at 77, 81-82; Restatement (Second) of Torts § 526 comment (e); Prosser & Keeton, The Law of Torts § 107 (5th

[14]"Whether particular conduct merits c. 93A condemnation always depends on the unique facts of each case. See *Spence* v. *Boston Edison Co.*, 390 Mass. 604, 615 (1983).

[15]"Contrast the defendants' attitudes in two of the cases principally relied on by EMC, *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 472, 474-476 (1991), where the trial judge held that the defendant had deliberately violated its covenant of good faith and fair dealing, and *Dreier Co.* v. *Unitronix Corp.*, 218 N.J. Super. 260 (1986), where the seller of a software system, falsely represented as able to satisfy the buyer's needs, did nothing to attempt to fix the system after problems developed. We put great stock in the findings of the trial judge on issues such as intent and motivation, since he was in a superior position to assess the weight and credibility of the witnesses, and there is no showing that its innings were clearly erroneous. See *Zimmerman* v. *Kent*, 31 Mass. App. Ct. at 74 n.7.

ed. 1984).[16] "The inept blend of hopeful dissembling and dogged bumbling displayed by VMark does not, however, reflect the "culpable state of mind" required for imposition of § 11's extraordinary damage-penalty. Cf. *Shaw* v. *Rodman Ford Truck Center, Inc.*, 19 Mass. App. Ct. 709, 712 (1985), quoting from *Computer Sys. Engr., Inc.* v. *Qantel Corp.*, 571 F. Supp. 1365, 1375 (D. Mass. 1983), affd., 740 F.2d 59 (1st Cir. 1984).

We do not read the c. 93A cases as mandating that the multiple damages bonus be automatically imposed for any and all forms of misrepresentation. Rather, it is only when the acts of misrepresentation amount to "intentional fraud" that the severe sanction is appropriate. See *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 714. See also *Datacomm Interface, Inc.* v. *Computerworld, Inc.*, 396 Mass. at 779-780. The Supreme Judicial Court has recognized that only "callous and intentional violations" of c. 93A merit multiple damages, *Heller* v. *Silverbranch Constr. Corp.*, 376 Mass. 621, 627 (1978), and has emphasized the need to place a limit on punitive liability under c. 93A for "relatively innocent violations." *International Fid. Ins. Co.* v. *Wilson*, 387 Mass. 841, 854 (1983). As we have previously observed, a c. 93A offense may even be "grievous" without being knowing or wilful. *Shawmut Community Bank, N.A.* v. *Zagami*, 30 Mass. App. Ct. 371, 376 (1991), S.C., 411 Mass. 807 (1992).

Delivery of a defective product without revealing the defects, to the extent they are known and material, is surely market disruptive to the same extent whether the promisor is genuinely hopeful of eventually fulfilling his contract, cf. *Logan Equip. Corp.* v. *Simon Aerials, Inc.*, 736 F. Supp. at 1204, or is deliberately deceptive and entirely disdainful of his commitments. Cf. *McEvoy Travel Bureau, Inc.* v. *Norton Co.*, 408 Mass. at 708-709, 711; *Anthony's Pier Four, Inc.* v.

[16]"The fact that the defendant was disinterested, that he had the best of motives, and that he thought he was doing the plaintiff a kindness, will not absolve him from liability" for misrepresentation if all the requisite elements are present. Prosser & Keeton, The Law of Torts, *supra* at 741.

*HBC Assocs.,* 411 Mass. 451, 474-476 (1991). Nonetheless, the fault of the former — which smacks more (the trial judge's off-hand conclusion notwithstanding) of gross negligence[17] than of intentional fraud, see *Glickman v. Brown,* 21 Mass. App. Ct. at 234-235 — is markedly less damnable than that of the latter. It is insufficiently egregious to bring the offending party within the statutory objective of punishing truly inequitable marketplace behavior, *Manning v. Zuckerman,* 388 Mass. 8, 12 (1983), which unmistakably reeks of callousness, *Heller v. Silverbranch Constr. Corp.,* 376 Mass. at 627, of bad faith, *Patry v. Liberty Mobilhome Sales, Inc.,* 15 Mass. App. Ct. 701, 706 (1983), and of meretriciousness, *Bachman v. Parkin,* 19 Mass. App. Ct. 908, 910 (1984). Cf. *International Fid. Ins. Co. v. Wilson,* 387 Mass. at 855, 856-857 ("The Massachusetts Legislature consciously enacted a rule whereby the defendant's [c. 93A] liability is measured by the degree of his culpability"); *Computer Sys. Engr., Inc. v. Qantel Corp.,* 571 F. Supp. at 1375-1376.

Accordingly, we hold that EMC did not make out a case for multiple damages on these facts. VMark was misguidedly insincere but fundamentally well-intentioned in its inducement of EMC to purchase software of dubious reliability for the intended purpose, in misplaced reliance on its ability to perfect a product whose defects were either insolubly inherent or of such intractability as to confound VMark's inadequate curative efforts. Such undesirable, but not reprehensible, conduct can be sufficiently deterred by the mandatory imposition on VMark of the significant c. 93A penalty of paying EMC's reasonable attorneys' fees and costs, as well as its actual damages.

[17] EMC made a separate claim and argument that VMark's inaccurate and incomplete representations regarding uniVerse were at the very least negligent. Although the tort of negligent misrepresentation is recognized in Massachusetts, *Glickman v. Brown,* 21 Mass. App. Ct. at 234-235, EMC has failed to develop this theory in any coherent manner, and the record does not provide a basis for determining the scope of the requisite duty of care in ascertaining and communicating the truth in circumstances such as those here presented.

As previously noted, it is unnecessary to address the merits of VMark's appellate challenges to the judge's award of reliance damages to EMC on the ground of either breach of contract or promissory estoppel. Even if the judge was wrong, EMC would remain entitled to recover the same damages under its successful misrepresentation count — its actual losses causally arising from VMark's conduct. See note 2, *supra.* Were the judge correct, EMC could not recover duplicative or cumulative damages under multiple legal theories based on the same core of fact. See *McGrath v. Mishara,* 386 Mass. at 83-84. *Calimlim v. Foreign Car Center, Inc.,* 392 Mass. at 235-236.

Accordingly, the judgment dated September 28, 1992, is to be modified by striking the second and third paragraphs and inserting the following:

"That judgment enter for the defendant EMC Corporation on counts IV and VI of its counterclaim against VMark Software, Inc., in the total amount of $382,109 plus interest.

"That judgment enter for the plaintiff VMark Software, Inc., on counts I, II, III & V of EMC's counterclaim."

As modified, the judgment is affirmed. The case is remanded to the Superior Court for the determination of EMC's reasonable attorneys' fees and costs under G. L. c. 93A, § 11.

*So ordered.*

%JS 44   (Rev. 3/99)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Northampton Internal Medicine Associates, P.C.

**(b)** County of Residence of First Listed Plaintiff  Hampshire County
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Keith A. Minoff, Esq.
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, MA 01115
(413)732-2301

## DEFENDANTS

General Electric Company d/b/a GE Healthcare Technologies GE Medical Systems Information Technologies, and Clinical Information Systems

County of Residence of First Listed
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

Attorneys (If Known)

## II. BASIS OF JURISDICTION   (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☒ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                and One Box for Defendant)

|  | DEF |  |  | DEF |
|---|---|---|---|---|
| Citizen of This State  ☒ 1 | ☐ 1 | Incorporated or Principal Place   ☒ 4 | | ☐ 4 |
|  | | of Business in This State | | |
| Citizen of Another State  ☐ 2 | ☒ 2 | Incorporated and Principal Place   ☐ 5 | | ☒ 5 |
|  | | of Business in Another State | | |
| Citizen or Subject of a  ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |
| Foreign Country | | | | |

## IV. NATURE OF SUIT   (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | ☐ 423 Withdrawal | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury | of Property 21 USC | 28 USC 157 | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 820 Copyrights | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 830 Patent | ☐ 810 Selective Service |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | Exchange |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 875 Customer Challenge |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☒ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt.Reporting | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | & Disclosure Act | **FEDERAL TAX SUITS** | Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 740 Railway Labor Act | | ☐ 900 Appeal of Fee |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | | ☐ 870 Taxes (U.S. Plaintiff | Determination Under Equal Access to |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | or Defendant) | Justice |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. | 26 USC 7609 | State Statutes |
| | | ☐ 550 Civil Rights | Security Act | | ☐ 890 Other Statutory Actions |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to
District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION   (Cite the U.S. Civil Statute under which you are filing and write brief statement of cause.
Do not cite jurisdictional statutes unless diversity.)

This is a diversity action under 28 U.S.C. §1332. Action for breach of conduct, breach of warranty, misrepresentation and violation of M.G.L. c. 93A, §9 arising from a purchase of computer software from the defendant.

## VII. REQUESTED IN
COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S)
IF ANY

(See
instructions):

JUDGE

DOCKET NUMBER

DATE  4/20/2005

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

305919

JS 44 Reverse (Rev. 12/96)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44

### Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.**    **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b.) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States, are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.**    **Residence (citizenship) of Principal Parties.** This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.**    **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.**    **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a) Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.**    **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause.

**VII.**    **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.** This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.