UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN DIVISION

| | | |
|---|---|---|
| NORTHAMPTON INTERNAL MEDICINE ASSOCIATES, P.C., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05-30090-MAP |
| GENERAL ELECTRIC COMPANY, | ) ) | |
| Defendant. | ) ) ) | |

**DECLARATION OF ROBERT H. STIER, JR**

Robert H. Stier, Jr. declares under penalty of perjury as follows:

1.      I am a partner at Pierce Atwood and have been retained as lead trial counsel in this action.  I am a member of the bar of the Commonwealth of Massachusetts and have been admitted to practice in the United States District Court for the District of Massachusetts.  I make this declaration of my own personal knowledge unless otherwise indicated.  I am competent to be a witness in this proceeding, and if called, would testify as follows.

2.      Attached as Exhibit C is a true and correct copy of the Agreement of Merger by which GE Medical Systems Information Technologies, Inc. acquired all shares of Millbrook Corporation.

3.      Section 1.1 of the Agreement indicates that Millbrook would survive the merger with Maverick Acquisition Corp. and "shall continue unaffected and unimpaired by the Merger to exist under and be governed by the laws of the State of Texas.

4.      Attached as Exhibit D is a true and correct copy of a Certificate of

Account status for Millbrook Corporation issued on June 15, 2005 by the Texas

Comptroller of Public Accounts.

I affirm under the penalties of perjury that the statements above are true and

correct.

/s/ Robert H. Stier, Jr.
Robert H. Stier, Jr. (BBO#646725)

Dated: June 16, 2005

**AGREEMENT OF MERGER**

**dated as of November 20, 2002**

**By and Among**

**GE MEDICAL SYSTEMS
INFORMATION TECHNOLOGIES, INC.,**

**MAVERICK ACQUISITION CORP.,**

**MILLBROOK CORPORATION**

**and**

**ROBERT O. ISHAM**

# TABLE OF CONTENTS

Page

ARTICLE I  THE MERGER ................................................................................2

    Section 1.1  Surviving Corporation ...............................................................2

    Section 1.2  Effect of the Merger...................................................................2

    Section 1.3  Articles of Incorporation, Bylaws, Directors and Officers ............2

ARTICLE II  CONVERSION OF SHARES; DETERMINATION OF PURCHASE
PRICE ...........................................................................................................2

    Section 2.1  Conversion Terms ......................................................................2

    Section 2.2  Determination of Estimated Purchase Price ..................................3

    Section 2.3  Determination of Purchase Price ................................................3

    Section 2.4  Holdback Amount ......................................................................5

ARTICLE III  EXCHANGE PROCEDURES ........................................................6

    Section 3.1  Exchange Agent .........................................................................6

    Section 3.2  Exchange Procedures .................................................................6

    Section 3.3  No Further Ownership Rights in Company Common Stock ............7

    Section 3.4  Termination of Exchange Fund ...................................................7

    Section 3.5  No Liability ................................................................................7

    Section 3.6  Investment of Exchange Fund .....................................................7

    Section 3.7  Withholding Rights .....................................................................7

    Section 3.8  Certain Adjustments...................................................................8

    Section 3.9  Dissenter's Rights ......................................................................8

ARTICLE IV  CLOSING ....................................................................................8

    Section 4.1  Closing Date...............................................................................8

    Section 4.2  Filing Articles of Merger and Effectiveness ................................8

    Section 4.3  Parent's Deliveries .....................................................................9

    Section 4.4  Acquisition's Deliveries..............................................................9

    Section 4.5  The Company's Deliveries .......................................................10

ARTICLE V  REPRESENTATIONS AND WARRANTIES OF THE COMPANY ...................11

    Section 5.1  Organization and Authority of the Company................................11

    Section 5.2  Capital Structure ......................................................................12

**TABLE OF CONTENTS**
(continued)

Page

Section 5.3  Subsidiaries and Investments .......................................................................13

Section 5.4  Financial Statements .................................................................................14

Section 5.5  No Undisclosed Liabilities ........................................................................14

Section 5.6  Operations Since Balance Sheet Date ........................................................14

Section 5.7  Taxes ........................................................................................................16

Section 5.8  Governmental Permits; Compliance ...........................................................17

Section 5.9  Real Property ............................................................................................18

Section 5.10  Personal Property Leases .........................................................................19

Section 5.11  Intellectual Property; Software .................................................................19

Section 5.12  Title to Property ......................................................................................21

Section 5.13  No Violation, Litigation or Regulatory Action ..........................................21

Section 5.14  Contracts ................................................................................................21

Section 5.15  Status of Contracts ..................................................................................22

Section 5.16  Insurance ................................................................................................23

Section 5.17  Employees and Related Agreements; ERISA .............................................23

Section 5.18  Environmental Matters .............................................................................25

Section 5.19  Employee Relations .................................................................................26

Section 5.20  VARs and Direct Customers .....................................................................26

Section 5.21  Availability of Assets ...............................................................................27

Section 5.22  Accounts Receivable; Inventories .............................................................27

Section 5.23  Product Liabilities ...................................................................................27

Section 5.24  Transactions with Affiliates ......................................................................28

Section 5.25  Budgets ..................................................................................................29

Section 5.26  Warranties ..............................................................................................29

Section 5.27  No Finder ...............................................................................................29

Section 5.28  Disclosure Materials ...............................................................................29

Section 5.29  Required Vote of Shareholders .................................................................29

Section 5.30  Disclosure ..............................................................................................29

ARTICLE VI  REPRESENTATIONS AND WARRANTIES OF PARENT AND
ACQUISITION ............................................................................................................30

Section 6.1  Organization; Capitalization of Acquisition ................................................30

Section 6.2  Authority; Conflicts ..................................................................................30

**TABLE OF CONTENTS**
(continued)

Page

Section 6.3 Information Supplied by Parent for Disclosure Materials ............................31

Section 6.4 No Finder ......................................................................................................31

ARTICLE VII ACTION PRIOR TO THE EFFECTIVE TIME .....................................................32

Section 7.1 Action by the Company; Preparation of the Disclosure Materials ...............32

Section 7.2 Action by Parent ..........................................................................................32

Section 7.3 Access to Information ...................................................................................32

Section 7.4 Preserve Accuracy of Representations and Warranties ................................33

Section 7.5 Consents of Third Parties; Governmental Approvals ...................................33

Section 7.6 Conduct of Business Prior to the Effective Time .........................................33

Section 7.7 Notification by the Company of Certain Matters .........................................36

Section 7.8 Company Stock Options and Company Warrants .........................................36

Section 7.9 State Takeover Laws .....................................................................................37

Section 7.10 Takeover Proposals .....................................................................................38

ARTICLE VIII CONDITIONS PRECEDENT TO OBLIGATIONS OF PARENT AND
ACQUISITION ....................................................................................................................38

Section 8.1 No Misrepresentation or Breach of Covenants and Warranties....................38

Section 8.2 No Changes or Destruction of Property ........................................................38

Section 8.3 No Restraint or Litigation .............................................................................39

Section 8.4 Necessary Governmental Approvals.............................................................39

Section 8.5 Necessary Consents ......................................................................................39

Section 8.6 Shareholder Approval and Conversion of Preferred Stock...........................39

Section 8.7 No Debt.........................................................................................................40

Section 8.8 Dissenters' Rights .........................................................................................40

Section 8.9 Effective Agreements....................................................................................40

Section 8.10 Employment Agreement .............................................................................40

Section 8.11 Other Convertible Securities.......................................................................40

ARTICLE IX CONDITIONS PRECEDENT TO OBLIGATIONS OF THE COMPANY .........40

Section 9.1 No Misrepresentation or Breach of Covenants and Warranties....................40

Section 9.2 No Restraint or Litigation .............................................................................40

Section 9.3 Necessary Governmental Approvals.............................................................41

Section 9.4 Necessary Consents ......................................................................................41

Section 9.5 Shareholder Approval ...................................................................................41

iii

**TABLE OF CONTENTS**
(continued)

<u>Page</u>

ARTICLE X  INDEMNIFICATION ...................................................................41

    Section 10.1  Indemnification ................................................................41

    Section 10.2  Notice of Claims ...............................................................43

    Section 10.3  Third Person Claims .........................................................43

    Section 10.4  Holdback Amount as Security; Set-Off ..........................44

    Section 10.5  Indemnification Payments on After-Tax Basis ...............44

    Section 10.6  Counsel for Disclosed Claims .........................................44

ARTICLE XI  TERMINATION .......................................................................45

    Section 11.1  Termination .......................................................................45

    Section 11.2  Notice of Termination ......................................................45

    Section 11.3  Effect of Termination .......................................................45

ARTICLE XII  GENERAL PROVISIONS .......................................................45

    Section 12.1  Survival of Obligations ....................................................45

    Section 12.2  Confidential Nature of Information ..................................46

    Section 12.3  No Public Announcement ................................................46

    Section 12.4  Notices ..............................................................................46

    Section 12.5  Successors and Assigns ...................................................48

    Section 12.6  Entire Agreement; Amendments .....................................48

    Section 12.7  Interpretation ....................................................................48

    Section 12.8  Waivers .............................................................................49

    Section 12.9  Expenses ...........................................................................49

    Section 12.10  Partial Invalidity .............................................................49

    Section 12.11  Execution in Counterparts .............................................49

    Section 12.12  Further Assurances .........................................................49

    Section 12.13  Governing Law ...............................................................50

    Section 12.14  Resolution of Disputes ..................................................50

ARTICLE XIII  DEFINITIONS .......................................................................50

    Section 13.1  Definitions ........................................................................50

## LIST OF SCHEDULES AND EXHIBITS

Schedules

| | | |
|---|---|---|
| Schedule 4.5(l) | - | Parties to Noncompetition and Nonsolicitation Agreements |
| Schedule 5.1 | - | Foreign Qualifications; Authority |
| Schedule 5.2 | - | Capital Structure |
| Schedule 5.4 | - | Financial Statements |
| Schedule 5.5 | - | Undisclosed Liabilities |
| Schedule 5.6 | - | Operations Since Balance Sheet Date |
| Schedule 5.7 | - | Taxes |
| Schedule 5.8 | - | Governmental Permits; Regulatory Compliance |
| Schedule 5.9 | - | Leased Real Property |
| Schedule 5.10 | - | Personal Property Leases |
| Schedule 5.11(a) | - | List of Certain Intellectual Property |
| Schedule 5.11(b) | - | List of Software |
| Schedule 5.11(c) | - | List of Intellectual Property Agreements |
| Schedule 5.11(d) | - | Right, Title and Interests in Intellectual Property |
| Schedule 5.11(e) | - | Validity and Enforceability of Intellectual Property |
| Schedule 5.11(f) | - | Challenge to Intellectual Property Rights |
| Schedule 5.11(g) | - | Owned Software |
| Schedule 5.11(h) | - | Exceptions to Work-for-Hire and Assignment Agreements |
| Schedule 5.11(i) | - | Ownership Rights Granted |
| Schedule 5.12 | - | Title to Property |
| Schedule 5.13 | - | Violation, Litigation or Regulatory Actions |
| Schedule 5.14 | - | Contracts |
| Schedule 5.15 | - | Status of Contracts |
| Schedule 5.16 | - | Insurance |
| Schedule 5.17(a) | - | Company Plans |
| Schedule 5.17(b) | - | Compliance of Company Plans |
| Schedule 5.17(d) | - | ERISA Benefit Plan Terminations and Benefits to Former Employees |
| Schedule 5.17(g) | - | Certain Employee Information |
| Schedule 5.17(h) | - | Conflicts of Interest; Certain Payments |
| Schedule 5.18 | - | Environmental Matters |
| Schedule 5.19 | - | Employee Relations |
| Schedule 5.20 | - | Customers and Suppliers |
| Schedule 5.21 | - | Availability of Assets |
| Schedule 5.23 | - | Product Liabilities |
| Schedule 5.24 | - | Affiliated Transactions |
| Schedule 5.25 | - | Budgets |
| Schedule 5.26 | - | Warranties |
| Schedule 7.6 | - | Closing Bonus Payments |
| Schedule 7.8 | - | Company Stock Options |
| Schedule 8.5 | - | Necessary Consents |
| Schedule 13.1 | | Purchase Price Example |

<u>Exhibits</u>

| Exhibit A | Form of Noncompetition and Nonsolicitation Agreement |
| Exhibit B | Form of Indemnification Agreement |
| Exhibit C | Form of Opinion of Counsel to the Company |

## AGREEMENT OF MERGER

AGREEMENT OF MERGER (this "Agreement"), dated as of November 20, 2002, by and among GE Medical Systems Information Technologies, Inc., a Wisconsin corporation ("Parent"), Maverick Acquisition Corp., a Texas corporation ("Acquisition"), Millbrook Corporation, a Texas corporation (the "Company") (Acquisition and the Company being hereinafter sometimes referred to as the "Constituent Corporations"), and Robert O. Isham, as representative of the Participating Equity Holders (as defined herein) (the "Representative").

WHEREAS, Acquisition is a Texas corporation having an authorized capital of 1,000 shares of common stock, par value $.01 per share, 100 of which are issued and outstanding and owned of record and beneficially by Parent;

WHEREAS, the Company is a Texas corporation having an authorized capital of (i) 7,500,000 shares of common stock, par value $.10 per share (the "Company Common Stock"), of which, as of the date hereof, 1,878,129 shares are issued and outstanding, (ii) 4,500,000 shares of preferred stock, par value $.10 per share (the "Preferred Stock"), of which (A) 1,000,000 shares have been designated Series A Convertible Preferred Stock (the "Series A Preferred Stock"), of which, as of the date hereof, 840,000 shares are issued and outstanding and are convertible into 160,000 shares of Company Common Stock, (B) 3,000,000 shares have been designated Series B Convertible Preferred Stock (the "Series B Preferred Stock"), of which, as of the date hereof, 2,808,482 shares are issued and outstanding and are convertible into 2,808,482 shares of Company Common Stock and (C) 500,000 shares have been designated Series C Convertible Preferred Stock (the "Series C Preferred Stock"), of which, as of the date hereof, no shares are issued and outstanding;

WHEREAS, the Company is engaged in the business of providing physician practice management software products and services;

WHEREAS, the respective Boards of Directors of the Constituent Corporations and of Parent have adopted the merger (the "Merger") of Acquisition into the Company pursuant to the terms and conditions of this Agreement, and the Board of Directors of the Company has directed that this Agreement be submitted to the Company's shareholders for approval;

WHEREAS, Parent and each of the Representative, Michael Caolo, Jr., Angela S. Duncum, Robert J. Holbrook, David R. Isham, Mark A. Isham, Steven E. Meyer and Michael K. Nissenbaum (collectively, the "Significant Shareholders") have entered into Voting Agreements (the "Voting Agreements") dated as of the date hereof pursuant to which, among other things, each such Significant Shareholder agrees to vote in favor of adoption of this Agreement and the Merger;

WHEREAS, Parent, the Company and the Representative have entered into a Representative Agreement (the "Representative Agreement") dated as of the date hereof pursuant to which, among other things, Robert O. Isham (acting individually or through his attorney-in-fact, Michael K. Casey) has agreed to be bound by the terms hereof as the Representative; and

**WHEREAS,** Parent, Acquisition, the Company and the Representative desire to make certain representations, warranties and agreements in connection with the Merger and also to prescribe various conditions to the Merger;

**NOW, THEREFORE,** in consideration of the mutual covenants and agreements hereinafter set forth, Parent, Acquisition, the Company and the Representative hereby agree as follows:

## ARTICLE I
## THE MERGER

**Section 1.1    Surviving Corporation.** Subject to the conditions contained herein and in accordance with the provisions of this Agreement and the TBCA at the Effective Time Acquisition shall be merged with and into the Company, which, as the corporation surviving in the Merger (the "Surviving Corporation"), shall continue unaffected and unimpaired by the Merger to exist under and be governed by the laws of the State of Texas. Upon the effectiveness of the Merger, the separate existence of Acquisition shall cease except to the extent provided by law in the case of a corporation after its merger into another corporation.

**Section 1.2    Effect of the Merger.** The Merger shall have the effects set forth in Section 5.06 of the TBCA.

**Section 1.3    Articles of Incorporation, Bylaws, Directors and Officers.** The Articles of Incorporation of Acquisition, as in effect immediately prior to the Effective Time, shall be amended so that Article 1 reads in its entirety as follows: "The name of the corporation is as set forth below: Millbrook Corporation." As so amended, the Articles of Incorporation of Acquisition shall be the Articles of Incorporation of the Surviving Corporation. The Bylaws of Acquisition, as in effect immediately prior to the Effective Time, shall be the Bylaws of the Surviving Corporation. The directors and officers of Acquisition immediately prior to the Effective Time shall be the initial directors and officers of the Surviving Corporation until their respective successors are duly elected and qualified.

## ARTICLE II
## CONVERSION OF SHARES; DETERMINATION OF PURCHASE PRICE

**Section 2.1    Conversion Terms.** As of the Effective Time, by virtue of the Merger and without any action on the part of any shareholder of the Company or Acquisition:

(a)    Each share of common stock of Acquisition issued and outstanding immediately prior to the Effective Time shall be converted into and become one fully paid and nonassessable share of common stock, par value $.01 per share, of the Surviving Corporation.

(b)    All shares of Company Common Stock that immediately prior to the Effective Time are held by Parent, if any, shall be cancelled and revert to the status of authorized but unissued shares and no capital stock of the Surviving Corporation, cash or other consideration shall be paid or delivered in exchange therefor.

2

(c)    Each share of Company Common Stock issued and outstanding immediately prior to the Effective Time (after taking into account the conversion of the Series A Preferred Stock and the Series B Preferred Stock and the cancellation of shares of Company Common Stock pursuant to this Section 2.1(b) and other than Dissenters' Shares) shall be converted into and become the right to receive the following (the "Merger Consideration"):

> (i)    the Per Share Closing Payment; plus

> (ii)   the Per Share Holdback Payment, if any; plus

> (iii)  the Per Share True-Up Payment, if any.

All such shares of Company Common Stock, when so converted, shall no longer be outstanding and shall automatically be cancelled and retired.

Section 2.2    **Determination of Estimated Purchase Price**. As of the close of business the day before the Closing Date, the Company shall deliver to Parent a certificate executed on behalf of the Company by the President of the Company, dated the date of its delivery, stating that there has been conducted under the supervision of such officer a review of all relevant information and data then available and setting forth the Company's best estimate of the Estimated Purchase Price, including an estimate of the various accounts which such officer anticipates based upon the most recent available financial statements and information will be reflected on the Valuation Date Balance Sheet prepared in accordance with the Agreed Accounting Principles. Such Estimated Purchase Price shall be subject to approval by Buyer.

Section 2.3    **Determination of Purchase Price**. (a) As promptly as practicable, but no later than sixty (60) days after the Effective Date, Parent shall cause the Company to:

> (i)    prepare, in accordance with the Agreed Accounting Principles, a balance sheet with respect to the Company as of the Valuation Date (the "Preliminary Valuation Date Balance Sheet");

> (ii)   determine the Purchase Price in accordance with the provisions of this Agreement (such Purchase Price as determined by the Company being referred to as the "Preliminary Purchase Price"); and

> (iii)  deliver to the Representative the Preliminary Valuation Date Balance Sheet and a calculation of the Preliminary Purchase Price (the "Preliminary Accounting Report").

(b)    Following receipt of the Preliminary Accounting Report, the Representative may review the same and, within thirty (30) days after the date of such receipt (the "Notice Period"), may deliver to Parent a certificate signed by it setting forth its objections to the Preliminary Valuation Date Balance Sheet and the Preliminary Purchase Price as set forth in the Preliminary Accounting Report, together with a summary of the reasons therefor and calculations which, in its view, are necessary to eliminate such objections. In the event the Representative does not so object within the Notice Period, the Preliminary Valuation Date

Balance Sheet and the Preliminary Purchase Price set forth in the Preliminary Accounting Report shall be final and binding as the "Valuation Date Balance Sheet" and the Purchase Price, respectively, for purposes of this Agreement but shall not limit the representations, warranties, covenants and agreements of the parties set forth elsewhere in this Agreement.

        (c)     In the event the Representative so objects within the Notice Period, Parent and the Representative shall use reasonable efforts to resolve by written agreement (the "Agreed Adjustments") any differences as to the Preliminary Valuation Date Balance Sheet and the Preliminary Purchase Price and, in the event Parent and the Representative so resolve any such differences, the Preliminary Valuation Date Balance Sheet and the Preliminary Purchase Price set forth in the Preliminary Accounting Report as adjusted by the Agreed Adjustments shall be final and binding as the Valuation Date Balance Sheet and the Purchase Price, respectively, for purposes of this Agreement but shall not limit the representations, warranties, covenants and agreements of the parties set forth elsewhere in this Agreement.

        (d)     In the event any objections raised by the Representative are not resolved by Agreed Adjustments within the thirty (30) day period next following the Notice Period, then Parent and the Representative shall submit the objections that are then unresolved to PricewaterhouseCoopers LLP and such firm (the "Accounting Firm") shall be directed by Parent and the Representative to resolve the unresolved objections (based solely on the presentations by Parent and by the Representative as to whether any disputed matter had been determined in a manner consistent with the Agreed Accounting Principles and this Agreement) as promptly as reasonably practicable and to deliver written notice to each of Parent and the Representative setting forth its resolution of the disputed matters. The Preliminary Valuation Date Balance Sheet and the Preliminary Purchase Price, after giving effect to any Agreed Adjustments and to the resolution of disputed matters by the Accounting Firm, shall be final and binding as the Valuation Date Balance Sheet and the Purchase Price, respectively, for purposes of this Agreement but shall not limit the representations, warranties, covenants and agreements of the parties set forth elsewhere in this Agreement.

        (e)     The parties hereto shall make available to Parent, Parent's accountants, the Representative, the Representative's accountants, and, if applicable, the Accounting Firm, such books, records and other information (including work papers) as any of the foregoing may reasonably request to prepare or review the Preliminary Accounting Report or any matters submitted to the Accounting Firm. The fees and expenses of Parent's accountants shall be paid by Parent. The fees and expenses of the Representative's accountants shall be paid by the Representative. The fees and expenses of the Accounting Firm hereunder shall be paid fifty percent (50%) by Parent and fifty percent (50%) by the Representative.

        (f)     Promptly (but not later than five days) after the determination of the Purchase Price pursuant to this Section 2.3 that is final and binding as set forth herein, if the Purchase Price exceeds the Estimated Purchase Price, Parent shall pay to the Exchange Agent for prompt distribution pursuant to the Exchange Agent Agreement to the Shareholders (other than any holder of Dissenters' Shares) and each Option Holder and Warrant Holder who has executed the appropriate documentation to effect the purchase contemplated by Section 7.8 (collectively, the "Participating Equity Holders"), by wire transfer of immediately available funds to such bank account of the Exchange Agent as the Exchange Agent shall designate in writing to Parent, an

amount equal to the excess of the Purchase Price over the Estimated Purchase Price. If the Estimated Purchase Price exceeds the Purchase Price, Parent shall setoff against the Holdback Amount, an amount equal to such excess of the Estimated Purchase Price over the Purchase Price.

      **Section 2.4**   **Holdback Amount.** (a) In addition to the use contemplated by Section 2.3(f), the Holdback Amount shall be used to satisfy the indemnification obligations under Article X. Parent shall deliver to the Exchange Agent on the eighteen-month anniversary of the Closing Date the Holdback Amount minus all amounts set off by Parent Group Members against the Holdback Amount pursuant to this Agreement minus the aggregate amount of claims set forth in one or more Claim Notices that have not been resolved by Parent and the Representative as of such date minus the reasonable out-of-pocket expenses incurred by the Representative in connection with performing his duties hereunder or under the Exchange Agent Agreement or the Representative Agreement and for which a written request and supporting documentation has been submitted to Parent, plus interest thereon from the date of payment of the expense by the Representative to the date of payment hereunder at 3% compounded semi-annually, the amount of which (but solely to the extent it does not reduce the Holdback Amount below zero) Parent shall pay promptly to the Representative.

      (b)    Upon resolution of any unresolved Claim Notice after the end of the Holdback Term, Parent shall deliver to the Exchange Agent the balance of the Holdback Amount not paid out pursuant to Section 2.4(a) minus all amounts for which Parent Group Members are entitled to receive pursuant to such resolved Claim Notices minus the aggregate amount of claims set forth in any remaining Claim Notices minus the reasonable out-of-pocket expenses incurred by the Representative in connection with performing his duties hereunder or under the Exchange Agent Agreement or the Representative Agreement and for which a written request and supporting documentation has been submitted to Parent (without duplication with expenses described in Section 2.4(a)), plus interest thereon from the date of payment of the expense by the Representative to the date of payment hereunder at 3% compounded semi-annually, the amount of which (but solely to the extent it does not reduce the Holdback Amount below zero) Parent shall pay promptly to the Representative.

      (c)    Upon resolution of the final unresolved Claim Notice after the end of the Holdback Term, Parent shall deliver to the Exchange Agent the balance of the Holdback Amount not paid out pursuant to Section 2.4(a) or 2.4(b) minus all amounts for which Parent Group Members are entitled to receive pursuant to such resolved Claim Notice minus the reasonable out-of-pocket expenses incurred by the Representative in connection with performing his duties hereunder or under the Exchange Agent Agreement or the Representative Agreement and for which a written request and supporting documentation has been submitted to Parent (without duplication with expenses described in Section 2.4(a) or (b)), plus interest thereon from the date of payment of the expense by the Representative to the date of payment hereunder at 3% compounded semi-annually, the amount of which (but solely to the extent it does not reduce the Holdback Amount below zero) Parent shall pay promptly to the Representative.

## ARTICLE III
## EXCHANGE PROCEDURES

**Section 3.1    Exchange Agent.** Upon approval of the Estimated Purchase Price by Buyer, Parent shall deposit with an exchange agent to be determined by Parent prior to the Closing (the "Exchange Agent") and pursuant to an agreement entered into among Parent, the Exchange Agent, the Company and the Representative (the "Exchange Agent Agreement"), for the benefit of the Participating Equity Holders and the holder of the Isham Debt, for exchange in accordance with this Article III, through the Exchange Agent, cash equal to the Closing Consideration plus the amount, if any, of the Isham Debt used in the calculation of the Estimated Purchase Price (such cash, together with any earnings with respect thereto, being hereinafter referred to as the "Exchange Fund").

**Section 3.2    Exchange Procedures.** (a) As soon as reasonably practicable after the date hereof, the Company shall mail to each holder of record of a certificate or certificates representing outstanding shares of Company Common Stock (the "Company Certificates"), (i) a letter of transmittal (which shall specify that delivery shall be effected, and risk of loss and title to the Company Certificates shall pass, only upon delivery of the Company Certificates to the Exchange Agent and shall be in such form and have such other provisions as Parent and the Company may reasonably specify) and (ii) instructions for use in effecting the surrender of the Company Certificates in exchange for the Per Share Closing Payment for each share of Company Common Stock represented by such Company Certificates.

(b)    Upon surrender of a Company Certificate for cancellation to the Exchange Agent, together with such letter of transmittal, duly executed, and such other documents as may reasonably be required by the Exchange Agent, following the Effective Time the holder of such Company Certificate shall be entitled to receive, in exchange for each share of Company Common Stock represented thereby, the Per Share Closing Payment, and the Company Certificate so surrendered shall forthwith be canceled. The Company and Parent will use their reasonable best efforts to cause the Exchange Agent to pay the Per Share Closing Payment by wire transfer of immediately available funds on or promptly after the Closing Date. In the event of a transfer of ownership of Company Common Stock that is not registered in the transfer records of the Company, payment may be made to a Person other than the Person in whose name the Company Certificate so surrendered is registered, if such Company Certificate shall be properly endorsed or otherwise be in proper form for transfer and the Person requesting such payment shall pay any transfer or other Taxes required by reason of such payment to a Person other than the registered holder of such Company Certificate or establish to the satisfaction of Parent that such Tax has been paid or is not applicable. Subject to the applicable provisions of the TBCA, until surrendered as contemplated by this Section 3.2, each Company Certificate shall be deemed at any time after the Effective Time to represent only the right to receive upon such surrender the Per Share Closing Payment for each share of Company Common Stock represented by such Company Certificate as contemplated by this Section 3.2. No interest shall be paid or accrue on any cash payable, whether in respect of the Per Share Closing Payments, dividends or otherwise, upon surrender of any Company Certificate.

(c)    Following the Effective Time, each Option Holder and Warrant Holder who has executed the appropriate documentation to effect the purchase contemplated by Section

6

7.8 shall be entitled to receive for each share of Company Common Stock subject to the vested portion of the Company Stock Option or Company Warrant, an amount in cash equal to the excess, if any, or the Per Share Closing Payment over the exercise price per share of Company Common Stock subject thereto. The Company and Parent shall use their reasonably best efforts to cause the Exchange Agent to pay such amount by wire transfer of immediately available funds on or promptly after the Closing Date. No interest shall be paid or accrue on any cash payable to any such Option Holder or Warrant Holder.

      (d)     At the Effective Time, the Company and Parent shall cause the Exchange Agent to pay to the holder of the Isham Debt the amount contemplated by the payoff letter referred to in Section 4.5(h).

      **Section 3.3**    **No Further Ownership Rights in Company Common Stock.** The Merger Consideration paid in accordance with the terms of this Article III upon conversion of any shares of Company Common Stock shall be deemed to have been paid in full satisfaction of all rights pertaining to such shares of Company Common Stock, subject, however, to the Surviving Corporation's obligations to pay or provide for the rights of dissenters. If, after the Effective Time, any certificates formerly representing shares of Company Common Stock are presented to the Surviving Corporation or the Exchange Agent for any reason, they shall be canceled and exchanged as provided in this Article III.

      **Section 3.4**    **Termination of Exchange Fund.** Any portion of the Exchange Fund that remains undistributed to the holders of Company Common Stock for twelve (12) months after the Closing Date shall be delivered to the Surviving Corporation, upon demand, and any holder of Company Common Stock who has not theretofore complied with this Article III shall thereafter look only to the Surviving Corporation for payment of its claim for Merger Consideration.

      **Section 3.5**    **No Liability.** None of Parent, the Surviving Corporation or the Exchange Agent shall be liable to any Person in respect of any cash from the Exchange Fund delivered to a public official pursuant to any applicable abandoned property, escheat or similar law. If any Company Certificate has not been surrendered prior to five (5) years after the Effective Time (or immediately prior to such earlier date on which the Per Share Closing Payments payable in respect of such Company Certificate would otherwise escheat to or become the property of any Governmental Body), any such shares, cash dividends or distribution in respect of such Company Certificate shall, to the extent permitted by applicable law, become the property of the Surviving Corporation, free and clear of all claims or interest of any Person previously entitled thereto.

      **Section 3.6**    **Investment of Exchange Fund.** The Exchange Agent shall invest any cash included in the Exchange Fund, as directed by the Surviving Corporation, on a daily basis. Any interest and other income resulting from such investments shall be paid to the Surviving Corporation.

      **Section 3.7**    **Withholding Rights.** The Surviving Corporation shall be entitled to deduct and withhold from the consideration otherwise payable to any holder of Company Common Stock pursuant to this Agreement such amounts as may be required to be deducted and

withheld with respect to the making of such payment under the Code, or under any provision of state, local or foreign Tax law. The Surviving Corporation will pay such withheld amounts to the appropriate taxing authority.

Section 3.8    **Certain Adjustments.** If after the date hereof and on or prior to the Closing Date, the outstanding shares of Company Common Stock shall be changed into a different number of shares by reason of any reclassification, recapitalization, split-up, combination or exchange of shares, or any dividend payable in stock or other securities is declared thereon with a record date within such period, or any similar event shall occur, the Per Share Closing Payment will be adjusted accordingly to provide to the holders of Company Common Stock the same economic effect as contemplated by this Agreement prior to such reclassification, recapitalization, split-up, combination, exchange or dividend or similar event. This provision is not intended to affect the need for any party to obtain the consent of the other parties hereto to take such an action under any other provision of this Agreement.

Section 3.9    **Dissenter's Rights.** Notwithstanding any provision of this Agreement to the contrary, any Dissenters' Shares shall not be converted into or represent a right to receive any of the Merger Consideration, but the holder shall only be entitled to such rights as are granted by the TBCA. If a holder of shares of Company Common Stock who demands appraisal of such shares under the TBCA shall effectively withdraw or otherwise lose (through failure to perfect or otherwise) the right to appraisal, then, as of the Effective Time or the occurrence of such event, whichever last occurs, each such share of Company Common Stock shall be converted into and represent only the right to receive the Per Share Closing Payment, without interest, upon the surrender of the certificate or certificates representing such share of Company Common Stock and the Per Share Holdback Payment, if any. The Company shall give Parent prompt notice of any written demands for appraisal of any shares of Company Common Stock, attempted withdrawals of such demands, and any other instruments served pursuant to the TBCA received by the Company relating to shareholders' rights of appraisal. The Company shall not, except with the prior written consent of Parent, voluntarily make any payment with respect to any demands for appraisals of capital stock of the Company, offer to settle any demands or approve any withdrawal of any such demands.

## ARTICLE IV
## CLOSING

Section 4.1    **Closing Date.** The Closing shall be consummated at 10:00 a.m., local time, on December 19, 2002, or such other date as shall be agreed upon by Parent and the Company, at the offices of Sidley Austin Brown & Wood, Bank One Plaza, 10 South Dearborn Street, Chicago, Illinois. The time and date on which the Closing is actually held are sometimes referred to herein as the "Closing Date."

Section 4.2    **Filing Articles of Merger and Effectiveness.** Subject to the fulfillment or waiver of the conditions to the respective obligations of each of the parties set forth in Article VIII or Article IX, as the case may be, at the Closing the parties shall cause the Merger to be consummated by filing Articles of Merger (which shall be in form and substance reasonably satisfactory to the parties hereto), executed and acknowledged in accordance with the laws of the State of Texas, in the office of the Secretary of State of the State of Texas. The

Merger shall become effective upon such filing as provided by the TBCA. The date and time on such date of effectiveness of the Merger are herein called, respectively, the "Effective Date" and the "Effective Time."

**Section 4.3    Parent's Deliveries.** Subject to the fulfillment or waiver of the conditions set forth in Article VIII, at the Effective Time Parent shall deliver to the Representative all the following:

(a)    a copy of the Articles of Incorporation of Parent certified as of a recent date by the Department of Financial Institutions of the State of Wisconsin;

(b)    a certificate of good standing of Parent, issued as of a recent date by the Department of Financial Institutions of the State of Wisconsin;

(c)    a certificate of the Secretary or an Assistant Secretary of Parent, dated the Closing Date, in form and substance reasonably satisfactory to the Representative, as to: (i) no amendments to the Articles of Incorporation of Parent since a specified date; (ii) the Bylaws of Parent; (iii) the resolutions of the Board of Directors of Parent authorizing the execution and performance of this Agreement and the transactions contemplated herein; and (iv) the incumbency and signatures of the officers of Parent executing this Agreement and any Parent Ancillary Agreement; and

(d)    the certificate contemplated by Section 9.1, duly executed by an authorized officer of Parent.

**Section 4.4    Acquisition's Deliveries.** Subject to fulfillment or waiver of the conditions set forth in Article VIII, at the Effective Time Acquisition shall deliver to the Representative all of the following:

(a)    a copy of the Articles of Incorporation of Acquisition certified as of a recent date by the Secretary of State of the State of Texas;

(b)    a certificate of good standing of Acquisition, issued as of a recent date by the Secretary of State of the State of Texas;

(c)    a certificate of the Secretary or an Assistant Secretary of Acquisition, dated the Closing Date, in form and substance reasonably satisfactory to the Representative, as to: (i) no amendments to the Articles of Incorporation of Acquisition since a specified date; (ii) the Bylaws of Acquisition; (iii) the resolutions of the Board of Directors of Acquisition authorizing the execution and performance of this Agreement and the transactions contemplated herein and the written consent of Parent approving this Agreement in accordance with Section 5.03 of the TBCA; and (iv) the incumbency and signatures of the officers of Acquisition executing this Agreement and any Acquisition Ancillary Agreement; and

(d)    the certificate contemplated by Section 9.1, duly executed by an authorized officer of Acquisition.

**Section 4.5    The Company's Deliveries.**  Subject to fulfillment or waiver of the conditions set forth in Article IX, at Closing the Company shall deliver to Parent all the following:

(a)    a copy of the Company's Articles of Incorporation certified as of a recent date by the Secretary of State of the State of Texas;

(b)    a certificate of good standing of the Company, issued as of a recent date by the Secretary of State of the State of Texas;

(c)    a certificate of the Secretary or Assistant Secretary of the Company, dated the Closing Date, in form and substance reasonably satisfactory to Parent, as to: (i) no amendments to the Articles of Incorporation of the Company since a specified date; (ii) the Bylaws of the Company; (iii) the resolutions of the Board of Directors of the Company and of the Shareholders authorizing the execution and performance of this Agreement and the transactions contemplated hereby; and (iv) incumbency and signatures of the officers of the Company executing this Agreement and any Company Ancillary Agreement;

(d)    the certificates contemplated by Sections 8.1(a) and 8.2, each duly executed by the President or any Vice President of the Company;

(e)    the certificate contemplated by Section 8.1(a), duly executed by the Representative;

(f)    the certificates contemplated by Section 8.1(b), duly executed by each Significant Shareholder;

(g)    the certificate contemplated by Section 8.7, duly executed by the President or any Vice President of the Company;

(h)    a payoff letter representing cancellation of the Isham Debt;

(i)    all consents, waivers or approvals obtained by the Company with respect to the consummation of the transactions contemplated by this Agreement;

(j)    duly executed resignations, effective as of the Effective Time, of each of the officers and directors of the Company;

(k)    letter agreements from Neil Simon, Lee Fowinkle, Carey Guernsey and Tim Reis, in form and substance reasonably satisfactory to Parent, relating to the deferral of proceeds of Company Stock Options held by such employees and related retention bonuses;

(l)    Noncompetition and Nonsolicitation Agreements, dated the Closing Date, substantially in the form contained in Exhibit A hereto, each duly executed by the Persons listed on Schedule 4.5(l);

10

(m)    the Indemnification Agreement, dated the Closing Date, substantially in the form contained in <u>Exhibit B</u> hereto, duly executed by each Significant Shareholder (other than Robert J. Holbrook and Steven E. Meyer); and

(n)    an opinion of counsel to the Company, dated the Closing Date, substantially in the form contained in <u>Exhibit C</u> hereto.

### ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

As an inducement to Parent and Acquisition to enter into this Agreement and to consummate the transactions contemplated hereby, the Company represents and warrants to Parent and Acquisition and agrees as follows:

**Section 5.1    <u>Organization and Authority of the Company</u>.** (a)  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Texas. The Company is duly qualified to transact business as a foreign corporation and is in good standing in each of the jurisdictions listed on <u>Schedule 5.1</u>, which jurisdictions are, except as set forth on <u>Schedule 5.1</u>, the only ones in which the ownership or leasing of its properties or the conduct of its business requires such qualification, and, except as set forth on <u>Schedule 5.1</u>, no other jurisdiction has demanded, requested or otherwise indicated that the Company is required to so qualify. The Company has full corporate power and authority to own or lease and operate its assets and to carry on its business as now conducted. The Company has delivered to Parent true and complete copies of the Company's minute books, and such minute books contain true and complete records of all meetings and other corporate action taken by the Board of Directors and shareholders of the Company. The execution, delivery and performance of this Agreement and the Company Ancillary Agreements by the Company have been duly authorized, approved and adopted by the Company's Board of Directors and, except for the approval of this Agreement by the Shareholders in accordance with Section 7.1(b) and the filing contemplated by Section 4.2, no other corporate proceedings on the part of the Company are necessary to authorize this Agreement and the transactions contemplated hereby. This Agreement has been duly authorized, executed and delivered by the Company and (assuming the valid authorization, execution and delivery of this Agreement by each of Parent and Acquisition) is a legal, valid and binding obligation of the Company enforceable in accordance with its terms, and each of the Company Ancillary Agreements has been duly authorized by the Company and upon execution and delivery by the Company will be (assuming the valid authorization, execution and delivery by each of the other parties thereto) a legal, valid and binding obligation of the Company enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

(b)    Except as set forth on <u>Schedule 5.1</u>, neither the execution and delivery of this Agreement or any of the Company Ancillary Agreements nor the consummation of the transactions contemplated hereby or thereby:

(i)  conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance upon any of the Company's assets, under (1) the Articles of Incorporation or Bylaws of the Company, (2) any Company Agreement, (3) any note, instrument, mortgage, agreement, lease, franchise or financial obligation to which the Company is a party or any of its assets or business is subject or by which the Company is bound, (4) any Court Order to which the Company is a party or by which any of its assets or business is subject or by which the Company is bound or (5) any Requirements of Law affecting the Company or its assets or business; or

(ii)  require the approval, consent, authorization or act of, or the making by the Company of any declaration, filing or registration with, any Governmental Body, except for the filing contemplated by Section 4.2.

**Section 5.2    Capital Structure.** (a) As of the date hereof, the authorized capital stock of the Company consists of 7,500,000 shares of Company Common Stock and 4,500,000 shares of Preferred Stock. Of the Preferred Stock, 1,000,000 shares have been designated Series A Preferred Stock, 3,000,000 shares have been designated Series B Preferred Stock and 500,000 shares have been designated Series C Preferred Stock.

(b)  At the close of business on the date of this Agreement:

(i)  1,878,129 shares of Company Common Stock were duly and validly issued and outstanding, fully paid and nonassessable;

(ii)  840,000 shares of Series A Preferred Stock were duly and validly issued and outstanding, fully paid and nonassessable;

(iii)  2,808,482 shares of Series B Preferred Stock were duly and validly issued and outstanding, fully paid and nonassessable;

(iv)  no shares of Series C Preferred Stock were issued and outstanding;

(v)  160,000 shares of Company Common Stock were reserved for issuance upon conversion of Series A Preferred Stock;

(vi)  2,808,482 shares of Company Common Stock were reserved for issuance upon conversion of Series B Preferred Stock;

(vii)  742,869 shares of Company Common Stock were reserved for issuance upon exercise of outstanding stock options issued under the Millbrook Corporation 1998 Stock Option Plan;

(viii)  256,668 shares of Company Common Stock were reserved for issuance upon exercise of outstanding stock options granted to Robert J. Holbrook pursuant to the Employment and Non-Competition Agreement dated May 30, 1997, as

vested pursuant to the Settlement and Release Agreement dated April 20, 1998, as further described in that certain letter dated August 7, 2000 (the "Holbrook Options");

(ix)    231,750 shares of Company Common Stock were reserved for issuance upon exercise of outstanding warrants; and

(x)    no Shares were reserved for issuance upon exercise of outstanding stock options issued under any other plans of the Company.

(c)    Schedule 5.2 contains a correct and complete list as of the date of this Agreement of each outstanding Company Stock Option, including the holder, date of grant, exercise price and number of Shares subject thereto, the plan under which such option was granted, if applicable, and whether the option is vested or exercisable.

(d)    Schedule 5.2 contains a correct and complete list as of the date of this Agreement of each outstanding Company Warrant, including the holder, date of grant, the agreement under which such Company Warrant was issued, the exercise price and the number of Shares subject thereto.

(e)    Except for the Holbrook Options, the Company Stock Options and the Company Warrants or as set forth in Schedule 5.2, there are no options, warrants, calls, rights or agreements to which the Company is a party or by which it is bound obligating the Company to issue, deliver or sell, or cause to be issued, delivered or sold, additional shares of capital stock of the Company or obligating the Company to grant, extend or enter into any such option, warrant, call, right or agreement, and there are no outstanding contractual rights to which the Company is a party, the value of which is based on the value of the Company Common Stock. Except as set forth on Schedule 5.2, there are no outstanding contractual obligations of the Company to repurchase, redeem or otherwise acquire any Shares.

(f)    Except as set forth on Schedule 5.2, the Company is not a party to and, to the Knowledge of the Company, there does not exist any shareholder agreement, voting trust agreement or any other similar contract, agreement, arrangement, commitment, plan or understanding restricting or otherwise relating to the voting, dividend, ownership or transfer rights of any shares of capital stock of the Company.

(g)    The Company does not have any outstanding bonds, debentures, notes or other obligations the holders of which have the right to vote (or convertible into or exercisable for securities having the right to vote) with the Shareholders on any matter.

(h)    None of the Shares has been issued in violation of, or is subject to, any preemptive or subscription rights, except as set forth on Schedule 5.2.

Section 5.3    **Subsidiaries and Investments.**  The Company does not, directly or indirectly, (a) own, of record or beneficially, any outstanding voting securities or other equity interests in any Person or (b) control any Person. The Company has never, directly or indirectly, (y) owned, of record or beneficially, any outstanding voting securities or other equity interests in any Person or (z) controlled any Person.

13

**Section 5.4** **Financial Statements.** Schedule 5.4 contains (i) the audited balance sheet of the Company as of June 30, 2002 and the related statement of income and shareholders' equity for the fiscal year then ended, together with the appropriate notes to such financial statements and (ii) the unaudited balance sheet of the Company as of [September 30, 2002] and the related statement of income and shareholders' equity for the three months then ended. Except as set forth on Schedule 5.4 or in the notes thereto, such financial statements have been prepared in conformity with generally accepted accounting principles applied in the United States and present fairly the financial position and results of operations of the Company as of their respective dates and for the respective periods covered thereby.

**Section 5.5** **No Undisclosed Liabilities.** Except as set forth on Schedule 5.5, the Company is not subject to any liability (including unasserted claims, whether known or unknown), whether absolute, contingent, accrued or otherwise, which is not shown or which is in excess of amounts shown or reserved for on the Balance Sheet, other than liabilities of the same nature as those set forth on the Balance Sheet and the notes thereto or reasonably incurred in the ordinary course of business consistent with past practice after the Balance Sheet Date.

**Section 5.6** **Operations Since Balance Sheet Date.** (a) Except as set forth on Schedule 5.6, since the Balance Sheet Date, there has been:

(i)     no material adverse change in the assets, business, operations, liabilities, profits, prospects or condition (financial or otherwise) of the Company and no fact or condition exists or is contemplated or threatened which might reasonably be expected to cause such a change in the future; and

(ii)     no damage, destruction, loss or claim, whether or not covered by insurance, or condemnation or other taking adversely affecting any of the assets, business, operations, condition or prospects of the Company.

(b)     Except as set forth on Schedule 5.6, since the Balance Sheet Date, the Company has conducted its business only in the ordinary course and in conformity with past practice. Without limiting the generality of the foregoing, since the Balance Sheet Date, except as set forth on Schedule 5.6, the Company has not:

(i)     issued, delivered or agreed (conditionally or unconditionally) to issue or deliver, or granted any option, warrant or other right to purchase, any of its capital stock or other equity interest or any security convertible into its capital stock or other equity interest;

(ii)     issued, delivered or agreed (conditionally or unconditionally) to issue or deliver any bonds, notes or other debt securities, or borrowed or agreed to borrow any funds, other than in the ordinary course of business consistent with past practice;

(iii)     paid any obligation or liability (absolute or contingent) other than current liabilities reflected on the Balance Sheet and current liabilities incurred since the Balance Sheet Date in the ordinary course of business consistent with past practice;

14

        (iv)     declared or made, or agreed to declare or make, any payment of dividends or distributions to its Shareholders or purchased or redeemed, or agreed to purchase or redeem, any of its capital stock or other equity interest, except in each case as provided herein;

        (v)     sold, leased (as lessor), transferred or otherwise disposed of (including any transfers from the Company to any of its Affiliates), or mortgaged or pledged, or imposed or suffered to be imposed any Encumbrance on, any of the assets reflected on the Balance Sheet or any assets acquired by the Company after the Balance Sheet Date, except for inventory and minor amounts of personal property sold or otherwise disposed of for fair value in the ordinary course of business consistent with past practice and except for Permitted Encumbrances;

        (vi)     canceled any debts owed to or claims held by the Company (including the settlement of any claims or litigation) or waived any other rights held by the Company other than in the ordinary course of business consistent with past practice;

        (vii)     paid any claims against the Company (including the settlement of any claims and litigation against the Company or the payment or settlement of any obligations or liabilities of the Company) other than in the ordinary course of business consistent with past practice;

        (viii)     created, incurred or assumed, or agreed to create, incur or assume, any indebtedness for borrowed money or entered into, as lessee, any capitalized lease obligations (as defined in Statement of Financial Accounting Standards No. 13);

        (ix)     accelerated or delayed collection of notes or accounts receivable in advance of or beyond their regular due dates or the dates when the same would have been collected in the ordinary course of business consistent with past practice;

        (x)     delayed or accelerated payment of any account payable or other liability of the Company beyond or in advance of its due date or the date when such liability would have been paid in the ordinary course of business consistent with past practice;

        (xi)     allowed the levels of raw materials, supplies, work-in-process or other materials to vary in any material respect from the levels customarily maintained in the inventory of the Company;

        (xii)     sold, assigned or transferred any Intellectual Property, except in the ordinary course of business consistent with past practice, or disclosed any proprietary or confidential information to any Person (other than Parent, its Affiliates and agents and other than in the ordinary course of business consistent with past practice, in each case subject to confidentiality agreements or other similar protections);

        (xiii)     acquired any real property or undertaken or committed to undertake capital expenditures (excluding purchases of personal computer equipment in

the ordinary course of business consistent with past practices) which, individually, were in excess of $25,000 or, in the aggregate, were in excess of $50,000;

(xiv)    declared, set aside or paid any dividend or made any other distribution (whether in cash, stock or other property) in respect of any of the Shares;

(xv)    instituted any increase in any compensation payable to any employee of the Company or in any profit-sharing, bonus, incentive, deferred compensation, insurance, pension, retirement, medical, hospital, disability, welfare or other benefits made available to employees of the Company;

(xvi)    made any change in the accounting principles and practices used by the Company from those applied in the preparation of the Balance Sheet and the related statements of income and shareholders' equity for the period then ended;

(xvii)    except in the ordinary course of business consistent with past practice, made or permitted any material amendment or termination of any Company Agreement;

(xviii)    entered into or become committed to enter into any other material transaction except in the ordinary course of business consistent with past practice; or

(xix)    prepared or filed any Tax Return inconsistent with past practice or, on any such Tax Return, taken any position, made any election, or adopted any method that is inconsistent with positions taken, elections made or methods used in preparing or filing similar Tax Returns in prior periods.

        **Section 5.7    Taxes.** (a) Except as set forth on <u>Schedule 5.7</u>: (i) the Company has filed all Tax Returns required to be filed; (ii) all such Tax Returns are complete and accurate and disclose all Taxes required to be paid by the Company for the periods covered thereby and all Taxes shown to be due on such Tax Returns have been timely paid; (iii) all Taxes (whether or not shown on any Tax Return) owed by the Company have been timely paid; (iv) the Company has not waived or been requested to waive any statute of limitations in respect of Taxes which waiver is currently in effect; (v) the Tax Returns referred to in clause (i) have been examined by the appropriate taxing authority or the period for assessment of the Taxes in respect of which such Tax Returns were required to be filed has expired; (vi) there is no action, suit, investigation, audit, claim or assessment pending or proposed or threatened with respect to Taxes of the Company and, to the Knowledge of the Company, no basis exists therefor; (vii) all deficiencies asserted or assessments made as a result of any examination of the Tax Returns referred to in clause (i) have been paid in full; (viii) all Tax Sharing Arrangements and Tax indemnity arrangements relating to the Company (other than this Agreement) will terminate prior to the Effective Time and the Company will not have any liability thereunder on or after the Effective Time; (ix) there are no liens for Taxes upon the assets of the Company except liens relating to current Taxes not yet due; (x) all Taxes which the Company is required by law to withhold or to collect for payment have been duly withheld and collected, and have been paid or accrued, reserved against and entered on the books of the Company; (xi) the Company has not been a member of any Company Group and the Company has not had at any time any direct or indirect

16

ownership in any corporation, partnership, limited liability company, trust, joint venture or other entity; and (xii) the Company is not currently the beneficiary of any extension of time within which to file any Tax Return.

(b)     No transaction contemplated by this Agreement is subject to withholding under Section 1445 of the Code (relating to "FIRPTA") and no stock transfer Taxes, sales Taxes, use Taxes, real estate transfer or gains Taxes, or other similar Taxes will be imposed on the transactions contemplated by this Agreement.

(c)     No payment or other benefit, and no acceleration of the vesting of any options, payments or other benefits, will be, as a direct or indirect result of the transactions contemplated by this Agreement, an "excess parachute payment" to a "disqualified individual" as those terms are defined in Section 280G of the Code and the Treasury Regulations thereunder. Except as set forth on Schedule 5.7, no payment or other benefit, and no acceleration of the vesting of any options, payments or other benefits, will, as a direct or indirect result of the transactions contemplated by this Agreement, be (or under Section 280G of the Code and the Treasury Regulations thereunder be presumed to be) a "parachute payment" to a "disqualified individual" as those terms are defined in Section 280G of the Code and the Treasury Regulations thereunder, without regard to whether such payment or acceleration is reasonable compensation for personal services performed or to be performed in the future.

Section 5.8    Governmental Permits; Compliance.    (a) The Company owns, holds or possesses all licenses, franchises, permits, privileges, variances, immunities, approvals and other authorizations from Governmental Bodies that are necessary to entitle it to own or lease, operate and use its assets and to carry on and conduct its business substantially as conducted (collectively, the "Governmental Permits"). Schedule 5.8 sets forth a list and brief description of each Governmental Permit, except for such incidental licenses, permits and other authorizations which would be readily obtainable by any qualified applicant without undue burden in the event of any lapse, termination, cancellation or forfeiture thereof. Complete and correct copies of all of the Governmental Permits have heretofore been delivered to Parent.

(b)     Except as set forth on Schedule 5.8: (i) the Company has fulfilled and performed its obligations under each of the Governmental Permits, and no event has occurred or condition or state of facts exists that constitutes or, after notice or lapse of time or both, would constitute a breach or default under any such Governmental Permit or that permits or, after notice or lapse of time or both, would permit revocation or termination of any such Governmental Permit, or that might adversely affect the rights of the Company under any such Governmental Permit; (ii) no notice of cancellation, of default or of any dispute concerning any Governmental Permit, or of any event, condition or state of facts described in the preceding clause, has been received by, or is known to, the Company; and (iii) each of the Governmental Permits is valid, subsisting and in full force and effect and will continue in full force and effect after the transactions contemplated by this Agreement, in each case without (x) the occurrence of any breach, default or forfeiture of rights thereunder or (y) the consent, approval, or act of, or the making of any filing with, any Governmental Body.

(c)     Without limiting the foregoing, the Company is in compliance with all applicable statutes, rules, regulations, standards, guidelines, policies or orders administered or

17

issued by the FDA or any other Medical Product Regulatory Authority. To the Knowledge of the Company, there are no facts that furnish any reasonable basis for any Form FDA-483 inspectional observations or warning letters from the FDA, Section 305 notices, or other similar communications from the FDA or any other Medical Product Regulatory Authority; and there have been no recalls, field notifications, alerts or seizures requested or threatened relating to the products of the Company, except as set forth on Schedule 5.8. The products of the Company, where required, are being marketed under valid 510(k) or Pre-Market Approval Applications exclusively owned by the Company, and there is no reason to believe that the FDA is or may consider limiting, suspending or revoking any such clearances/approvals or changing the marketing classification or labeling of any such products. There has been no false or misleading information or significant omission in any product application or product-related submission made by the Company to the FDA or any other Medical Product Regulatory Authority. Neither the Company nor any Affiliate of the Company, nor the officers, directors, managing employees or agents (as those terms are defined in 42 C.F.R. § 1001.1001) of the Company or any of its Affiliates: (i) have engaged in any activities that are prohibited under, or are cause for civil penalties or mandatory or permissive exclusion from, any Federal Health Care Program under Sections 1128, 1128A, 1128B, or 1877 of the SSA or related state or local statutes, including knowingly and willfully offering, paying, soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind in return for, or to induce, the purchase, lease or order, or the arranging for or recommending of the purchase, lease or order, of any item or service for which payment may be made in whole or in part under any such program; (ii) have had a civil monetary penalty assessed against them under Section 1128A of the SSA; (iii) have been excluded from participation under any Federal Health Care Program; or (iv) have been convicted (as defined in 42 C.F.R. § 1001.2) of any of the categories of offenses described in Sections 1128(a) or 1128(b)(1), (b)(2) or (b)(3) of the SSA.

**Section 5.9    Real Property.** (a) Schedule 5.9 sets forth a list and brief description of each lease or similar agreement (showing the parties thereto, annual rental, expiration date, renewal and purchase options, if any, the improvements thereon, the uses being made thereof, and the location of the real property covered by, and the space occupied under, such lease or other agreement) under which the Company is lessee of, or holds, uses or operates, any real property owned by any third Person (the "Leased Real Property"). Except as set forth on such Schedule, the Company has the right to quiet enjoyment of all the Leased Real Property described on such Schedule for the full term of each such lease or similar agreement (and any renewal option) relating thereto, and the leasehold or other interest of the Company in such Leased Real Property is not subject or subordinate to any Encumbrance except for Permitted Encumbrances. Except as set forth on Schedule 5.9, and except for Permitted Encumbrances, there are no agreements or other documents governing or affecting the occupancy or tenancy of any of the Leased Real Property by the Company. Complete and correct copies of any instruments evidencing Encumbrances, commitments for the issuance of title insurance, title opinions, surveys and appraisals in the Company's possession and any policies of title insurance currently in force and in the possession of the Company with respect to each such parcel of Leased Real Property have heretofore been delivered to Parent.

(b)    To the Knowledge of the Company, neither the whole nor any part of any real property leased, used or occupied by the Company is subject to any pending suit for

condemnation or other taking by any public authority, and no such condemnation or other taking is threatened or contemplated.

(c)     The Company does not own and does not have any right or obligation to acquire any real property.

Section 5.10   **Personal Property Leases.**  Schedule 5.10 contains a brief description of each lease or other agreement or right, whether written or oral (including in each case the annual rental, the expiration date thereof and a brief description of the property covered), under which the Company is lessee of, or holds or operates, any machinery, equipment, vehicle or other tangible personal property owned by a third Person, except for any such lease, agreement or right that is terminable by the Company without penalty or payment on thirty (30) days' or less notice or which provide for annual lease payments of less than $5,000.

Section 5.11   **Intellectual Property; Software.**  (a)  Schedule 5.11(a) contains a list and description (showing in each case any product, device, process, service, business or publication covered thereby, the registered or other owner, expiration date and number, if any) of all Copyrights, Patent Rights and Trademarks owned by, licensed to or used by the Company.

(b)     Schedule 5.11(b) contains a list and description (showing in each case any owner, licensor or licensee) of all Software owned by, licensed to or used by the Company (except for Software licensed to the Company that is available in consumer retail stores and or is otherwise commercially available subject to "shrink-wrap" or "click-through" license agreements).

(c)     Schedule 5.11(c) contains a list and description (showing in each case the parties thereto and the material terms thereof) of all agreements, contracts, licenses, sublicenses, assignments and indemnities to which the Company is a party and which relate to (i) any Copyrights, Patent Rights or Trademarks listed on Schedule 5.11(a), (ii) any Trade Secrets owned by, licensed to or used by the Company or (iii) any Software listed on Schedule 5.11(b).

(d)     Except as disclosed on Schedule 5.11(d), the Company either: (i) owns the entire right, title and interest in and to the Intellectual Property included in its assets and properties, free and clear of Encumbrances except for Permitted Encumbrances; or (ii) has the perpetual, royalty-free right to use the same.

(e)     Except as disclosed on Schedule 5.11(e): (i) all registrations for Copyrights, Patent Rights and Trademarks identified on Schedule 5.11(a) as being owned by the Company are valid and in force, and all applications to register any unregistered Copyrights, Patent Rights and Trademarks so identified are pending and in good standing, all without challenge of any kind; (ii) the Intellectual Property owned by the Company is valid and enforceable; (iii) the Company has the sole and exclusive right to bring actions for infringement or unauthorized use of the Intellectual Property owned by the Company, and to the Knowledge of the Company, there is no basis for any such action; (iv) the Company has taken all actions reasonably necessary to protect, and where necessary register, the Copyrights, Trademarks, Software, Patent Rights or Trade Secrets owned by the Company; and (v) the Company is not in breach of any agreement affecting the Intellectual Property used by the Company, and has not

taken any action that would impair or otherwise adversely affect its rights in the Intellectual Property used by the Company.

(f)     Except as set forth on Schedule 5.11(f): (i) no infringement of any Intellectual Property right of any other Person has occurred or results in any way from the operations, activities, products, Software, equipment, machinery or processes used in the Company's business; (ii) no claim of any infringement of any Intellectual Property right of any other Person has been made or asserted in respect of the operations of the Company's business; (iii) no claim of invalidity of any Copyright, Trademark or Patent Right, Software or Trade Secret owned by the Company has been made; (iv) no proceedings are pending or, to the Knowledge of the Company, threatened, which challenge the validity, ownership or use of any Intellectual Property owned by the Company; and (v) the Company has not received notice of any claim that the operations, activities, products, software, equipment, machinery or processes of the Company infringe, misappropriate, violate or dilute any Intellectual Property right of any other Person and, to the Knowledge of the Company, there is no basis for any such claim.

(g)     Except as disclosed on Schedule 5.11(g): (i) the Software included in the Company's assets and properties is not subject to any transfer, assignment, site, equipment or other operational limitations; (ii) the Company has maintained and protected the software that it owns (the "Owned Software") (including source code and system specifications) with appropriate proprietary notices (including the notice of copyright in accordance with the requirements of 17 U.S.C. § 401), confidentiality and non-disclosure agreements and such other measures as are necessary to protect the proprietary, trade secret or confidential information contained therein; (iii) the Owned Software has been registered or is eligible for protection and registration under applicable copyright law and has not been forfeited to the public domain; (iv) the Company has copies of all releases or separate versions of the Owned Software so that the same may be subject to registration in the United States Copyright Office; (v) the Company has complete and exclusive right, title and interest in and to the Owned Software; (vi) the Company has developed the Owned Software through its own efforts and for its own account without the aid or use of any consultants, agents, independent contractors or Persons (other than Persons that are employees of the Company); (vii) the Owned Software does not infringe any Intellectual Property right of any other Person; (viii) any Owned Software includes the source code, system documentation, statements of principles of operation and schematics, as well as any pertinent commentary, explanation, program (including compilers), workbenches, tools, and higher level (or "proprietary") language used for the development, maintenance, implementation and use thereof, so that a trained computer programmer could develop, maintain, support, compile and use all releases or separate versions of the same that are currently subject to maintenance obligations by the Company; (ix) there are no agreements or arrangements in effect with respect to the marketing, distribution, licensing or promotion of the Owned Software by any other Person; and (x) the Company does not export or reexport the Owned Software.

(h)     Except as disclosed on Schedule 5.11(h), all employees, agents, consultants or contractors who have contributed to or participated in the creation or development of any Intellectual Property on behalf of the Company or any predecessor in interest thereto either: (i) is a party to a "work-for-hire" agreement under which the Company is deemed to be the original owner/author of all rights, title and interest therein; or (ii) has executed an

assignment or an agreement to assign in favor of the Company (or such predecessor in interest, as applicable) of all right, title and interest in such Intellectual Property.

(i)      Except as disclosed on <u>Schedule 5.11(i)</u>, the Company has not granted to any third Person any ownership rights, exclusive rights or any rights to sublicense any of the products it develops, manufactures or sells or any Intellectual Property relating to such products to any third Persons.

**Section 5.12   Title to Property.**  Except as set forth on <u>Schedule 5.12</u> and except for assets disposed of in the ordinary course of its business, the Company has good and marketable title to each item of equipment and other property reflected on the Balance Sheet or thereafter acquired, free and clear of Encumbrances except for Permitted Encumbrances.

**Section 5.13   No Violation, Litigation or Regulatory Action.**  Except as set forth on <u>Schedule 5.13</u>:

(i)      the Company is not subject to any Court Order;

(ii)     the assets of the Company and their uses comply with all applicable Requirements of Law and Court Orders;

(iii)    the Company has complied with all Requirements of Law and Court Orders that are applicable to its assets or business;

(iv)    there are no lawsuits, claims, suits, proceedings or investigations pending or, to the Knowledge of the Company, threatened, against or affecting the Company nor, to the Knowledge of the Company, is there any basis for any of the same, and there are no lawsuits, suits or proceedings pending in which the Company is the plaintiff or claimant; and

(v)     there is no action, suit or proceeding pending or, to the Knowledge of the Company, threatened that questions the legality or propriety of the transactions contemplated by this Agreement.

**Section 5.14   Contracts.**  Except as set forth on <u>Schedule 5.14</u> or any other Schedule hereto, the Company is not a party to or bound by:

(a)     any contract for the purchase, sale or lease of real property;

(b)     any contract for the purchase of supplies or raw materials which involved the payment of more than $15,000 in the fiscal year ended June 30, 2002, which the Company reasonably anticipates will involve the payment of more than $15,000 in the fiscal year ending June 30, 2003 or which extends beyond May 1, 2003;

(c)     any contract for the sale of goods or services which involved the payment of more than $25,000 in the fiscal year ended June 30, 2002, which the Company reasonably anticipates will involve the payment of more than $25,000 in the fiscal year ending June 30, 2003 or which extends beyond May 1, 2003;

(d)     any contract for the purchase, licensing or development of Software;

(e)     any consignment, distributor, dealer, manufacturers representative, sales agency, advertising representative or advertising or public relations contract;

(f)     any partnership, joint venture, franchise or other similar agreement or arrangement;

(g)     any agreement or instrument that provides for, or relates to, the incurrence by the Company of debt for borrowed money (including any interest rate or foreign currency swap, cap, collar, hedge or insurance agreements, or options or forwards on such agreements, or other similar agreements for the purpose of managing the interest rate and/or foreign exchange risk associated with its financing);

(h)     any guarantee of the obligations of customers, suppliers, officers, directors, employees, Affiliates or others;

(i)     any agreement that limits or restricts where the Company may conduct business or any agreement containing any covenant or provision prohibiting the Company from engaging in any line or type of business;

(j)     any contract that provides for, or relates to, any non-competition or confidentiality arrangement with any Person, including any current or former officer or employee of the Company, except for the Confidentiality and Exclusivity Agreements;

(k)     any contract with a Governmental Body;

(l)     any contract not made in the ordinary course of business; or

(m)     any other contract, agreement, commitment, understanding or instrument that is material to the Company.

        **Section 5.15    Status of Contracts.**  Except as set forth on Schedule 5.15 or on any other Schedule hereto, each of the leases, contracts, licenses and other agreements listed on Schedules 5.9, 5.10, 5.11(c), 5.14 or 5.17(a) (collectively, the "Company Agreements") constitutes a valid and binding obligation of the parties thereto and is in full force and effect and (except for those Company Agreements which by their terms will expire prior to the Effective Time or are otherwise terminated prior to the Effective Time in accordance with the provisions hereof) will continue in full force and effect after the Effective Time, in each case without breaching the terms thereof or resulting in the forfeiture or impairment of any rights thereunder and without the consent, approval or act of, or the making of any filing with, any other Person. The Company has fulfilled and performed its obligations required to be performed under each of the Company Agreements as of the date hereof or the Closing Date, and the Company is not in, or alleged to be in, breach or default under, nor is there or is there alleged to be any basis for termination of, any of the Company Agreements and no other party to any of the Company Agreements has breached or defaulted thereunder, and no event has occurred and no condition or state of facts exists which, with the passage of time or the giving of notice or both, would constitute such a default or breach by the Company or by any other such party.  The Company is

not currently paying liquidated damages in lieu of performance under any of the Company Agreements or, other than in the ordinary course of business, currently renegotiating any of the Company Agreements. None of the Company Agreements contains terms unduly burdensome to the Company or is harmful to its business. Complete and correct copies of each of the Company Agreements have heretofore been delivered to Parent.

    **Section 5.16 Insurance.** The Company maintains policies of fire and casualty, liability (general, products and other liability), workers' compensation and other forms of insurance and bonds in such amounts and against such risks and losses as are insured against by companies engaged in the same or a similar business. Schedule 5.16 sets forth a list and brief description (including nature of coverage, limits, deductibles, premiums and the loss experience for the most recent three (3) years with respect to each type of coverage) of all policies of insurance maintained, owned or held by the Company on the date hereof. The Company has complied with each of such insurance policies and has not failed to give any notice or present any claim thereunder in a due and timely manner. The Company shall keep its current insurance or comparable insurance in full force and effect through the Effective Time.

    **Section 5.17 Employees and Related Agreements; ERISA.** (a) Except as described on Schedule 5.17(a), the Company is not a party to or bound by any oral or written:

     (i) employee collective bargaining agreement, employment agreement (other than employment agreements terminable by the Company without premium or penalty on notice of thirty (30) days or less under which the only monetary obligation of the Company is to make current wage or salary payments and provide current fringe benefits), consulting, advisory or service agreement, deferred compensation agreement, or covenant not to compete;

     (ii) contract or agreement with any officer, director or employee (other than employment agreements disclosed in response to clause (i) or excluded from the scope of clause (i)), agent, or attorney-in-fact of the Company; or

     (iii) stock option, stock purchase, bonus or other incentive plan or agreement.

    (b) Except as described on Schedule 5.17(b), the Company does not maintain, and is not required to contribute to, any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA) or "welfare benefit plan" (as such term is defined in Section 3(1) of ERISA), on behalf of any of its employees. Each of the plans described on such Schedule (the "Company's ERISA Benefit Plans") that is intended to qualify under Section 401(a) of the Code, has received a favorable determination letter from the IRS, and no event has occurred which would cause any such plan to cease being so qualified. Except as set forth on Schedule 5.17(b), each of the Company's ERISA Benefit Plans complies in form in all material respects in accordance with the requirements of ERISA and, where applicable, the Code. The Company has complied with the health care continuation requirements of Section 601, et seq. of ERISA with respect to its employees and their spouses, former spouses and dependents. The Company is not a party to any "multiemployer plan" (as such term is defined in Section 3(37) of ERISA).

(c)     The Company has delivered or caused to be delivered to Parent, with respect to each of the Company's ERISA Benefit Plans correct and complete copies of (i) all plan documents and amendments, trust agreements and insurance contracts, (ii) the most recent IRS determination letter, (iii) the most recent Annual Report (Form 5500 Series) and accompanying schedules, as filed, (iv) the current and, to the extent available, the prior summary plan description, (v) the most recent financial statements and (vi) the most recent actuarial report.

(d)     Except as set forth on Schedule 5.17(d), none of the Company's ERISA Benefit Plans subject to Title IV of ERISA has terminated since September 2, 1974; no proceeding has been initiated to terminate any such plan; and there has been no "reportable event" (within the meaning of Section 4043(b) of ERISA) since September 2, 1974. None of the Company's ERISA Benefit Plans which is a defined benefit plan has incurred any "accumulated funding deficiency" (within the meaning of Section 412 of the Code), whether or not waived. Assuming that each of the Company's ERISA Benefit Plans which is subject to Title IV of ERISA were terminated as of the Closing Date, the Company would have no liability under Title IV of ERISA as a result of such termination. Except as set forth on Schedule 5.17(d), the Company has no obligations under any of the Company's ERISA Benefit Plans or otherwise to provide health benefits to former employees of the Company, except as specifically required by law.

(e)     Neither the Company nor, to the Knowledge of the Company, any other "disqualified person" (within the meaning of Section 4975 of the Code) or "party in interest" (within the meaning of Section 3(14) of ERISA) has engaged in any "prohibited transaction" (within the meaning of Section 4975 of the Code or Section 406 of ERISA) with respect to any of the Company's ERISA Benefit Plans which could subject any such Plan (or its related trust) or the Company or any officer, director or employee of the Company to the penalty or Tax under Section 402(i) or Section 402(l) of ERISA or Section 4975 of the Code.

(f)     There is no pending or, to the Knowledge of the Company, threatened, claim which alleges any violation of ERISA or any other law (i) by or on behalf of any of the Company's ERISA Benefit Plans or (ii) by any employee of the Company or any plan participant or beneficiary against any such plan.

(g)     Schedule 5.17(g) contains: (i) a list of all employees or commission salespersons of the Company as of August 31, 2002 whose then Current Annual Compensation was in excess of $60,000; (ii) the then Current Annual Compensation of, and a description of the fringe benefits (other than those generally available to employees of the Company) provided by the Company to any such employees or salespersons; (iii) a list of all present or former employees or commission salespersons of the Company paid in excess of $60,000 in the fiscal year ended June 30, 2002 who have terminated or given notice of their intention to terminate their relationship with the Company since March 1, 2002; (iv) a list of any increase, effective after April 30, 2002, in the rate of compensation of any employees or commission salespersons if such increase exceeds five percent (5%) of the previous annual salary of such employee or commission salesperson; and (v) a list of all substantial changes in job assignments of, or arrangements with, or promotions or appointments of, any employees or commission salespersons of the Company whose compensation as of August 31, 2002 was in excess of $60,000 per annum.

24

(h)     Except as set forth on Schedule 5.17(h), (i) the Company is not involved in any transaction or other situation with any employee, officer, director or Affiliate of the Company which may be generally characterized as a "conflict of interest," including direct or indirect interests in the business of competitors, suppliers or customers of the Company and (ii) there are no situations that involved or involves (A) the use of any funds of the Company for unlawful contributions, gifts, entertainment or other unlawful expenses related to political activity, (B) the making of any direct or indirect unlawful payments to government officials or others from funds of the Company or the establishment or maintenance of any unlawful or unrecorded funds, (C) the violation of any of the provisions of The Foreign Corrupt Practices Act of 1977, or any rules or regulations promulgated thereunder, (D) the receipt of any illegal discounts or rebates or any other violation of the antitrust laws or (E) any investigation by the Securities and Exchange Commission or any other federal, foreign, state or local government agency or authority.

**Section 5.18    Environmental Matters.**  Except as set forth on Schedule 5.18:

(a)     The operations of the Company comply with all applicable Environmental Laws;

(b)     The Company has obtained all environmental, health and safety Governmental Permits necessary for the operation of its business, and all such Governmental Permits are in full force and effect and the Company is in compliance with all terms and conditions of such permits;

(c)     None of the Company, nor any of the present Leased Real Property or operations, or the past Leased Real Property or operations or real property owned by the Company, is subject to any on-going investigation by, order from or agreement with any Person (including any prior owner or operator of Leased Real Property) respecting (i) any Environmental Law, (ii) any Remedial Action or (iii) any claim of Losses and Expenses arising from the Release or threatened Release of a Contaminant into the environment;

(d)     The Company is not subject to any judicial or administrative proceeding, order, judgment, decree or settlement alleging or addressing a violation of or liability under any Environmental Law;

(e)     The Company has not:

(i)     reported a Release of a hazardous substance pursuant to Section 103(a) of CERCLA, or any state equivalent;

(ii)     filed a notice pursuant to Section 103(c) of CERCLA;

(iii)     filed notice pursuant to Section 3010 of RCRA, indicating the generation of any hazardous waste, as that term is defined under 40 C.F.R. Part 261 or any state equivalent; or

(iv)     filed any notice under any applicable Environmental Law reporting a substantial violation of any applicable Environmental Law.

(f)     There is not now, nor to the Knowledge of the Company has there ever been, on or in any Leased Real Property or real property owned by the Company:

(i)     any treatment, recycling, storage or disposal of any hazardous waste, as that term is defined under 40 C.F.R. Part 261 or any state equivalent, that requires or required a Governmental Permit pursuant to Section 3005 of RCRA; or

(ii)    any underground storage tank or surface impoundment or landfill or waste pile.

(g)     There is not now on or in any Leased Real Property any polychlorinated biphenyls (PCB) used in pigments, hydraulic oils, electrical transformers or other equipment;

(h)     The Company has not received any notice or claim to the effect that it is or may be liable to any Person as a result of the Release or threatened Release of a Contaminant;

(i)     No Environmental Encumbrance has attached to any or Leased Real Property or real property owned by the Company;

(j)     Any asbestos-containing material which is on or part of any Leased Real Property is in good repair according to the current standards and practices governing such material, and its presence or condition does not violate any currently applicable Environmental Law; and

(k)     None of the products the Company manufactures, distributes or sells in connection with its business, now or in the past, contains asbestos or asbestos-containing material.

Section 5.19    **Employee Relations.**  Except as set forth on Schedule 5.19, the Company has complied with all applicable Requirements of Law that relate to prices, wages, hours, discrimination in employment and collective bargaining and is not liable for any arrears of wages or any Taxes or penalties for failure to comply with any of the foregoing. The Company believes that its relations with its employees are satisfactory. The Company is not a party to, or affected by or threatened with, any dispute or controversy with a union or with respect to unionization or collective bargaining involving its employees. The Company is not materially affected by any dispute or controversy with a union or with respect to unionization or collective bargaining involving any supplier or customer of the Company. There has not been any union organizing or election activities involving any non-union employees of the Company since January 1, 2001 and, to the Knowledge of the Company, none are threatened as of the date hereof.

Section 5.20    **VARs and Direct Customers.**  Set forth on Schedule 5.20 hereto is a list of names and addresses of all value-added resellers ("VARs") with $100,000 or more in purchases from the Company during the fiscal year ended June 30, 2002 and the ten (10) largest direct customers (measured by dollar volume of purchases) of the Company and the percentage of the business of the Company which each such VAR or direct customer represented during the fiscal year ended June 30, 2002. Except as set forth on Schedule 5.20, there exists no actual or threatened termination, cancellation or limitation of, or any modification or change in, the

business relationship of the Company with any of the ten (10) largest VARs for the fiscal year ended June 30, 2002 (measured by dollar volume of purchases) or direct customers listed on Schedule 5.20, or whose purchases individually or in the aggregate are material to the operations of the Company's business, and there exists no present condition or state of facts or circumstances involving such VARs, direct customers or sales representatives that would materially adversely affect the Company's business or prevent the conduct of the Company's business after the consummation of the transactions contemplated by this Agreement in essentially the same manner in which it has heretofore been conducted.

Section 5.21    **Availability of Assets.**  Except as set forth on Schedule 5.21, the assets owned, leased or licensed by the Company constitute all the assets and properties used in, or necessary for, the operation of the business of the Company (including all books, records, computers and computer programs and data processing systems), and all such physical assets are in good condition (subject to normal wear and tear) and serviceable condition and are suitable for the uses for which intended.

Section 5.22    **Accounts Receivable; Inventories.**  (a)  All accounts receivable of the Company have arisen from bona fide transactions in the ordinary course of business.  All accounts receivable reflected on the Balance Sheet are good and collectible in the ordinary course of business at the aggregate recorded amounts thereof, net of any applicable allowance for doubtful accounts reflected on the Balance Sheet; and all accounts receivable to be reflected on the Valuation Date Balance Sheet will be good and collectible in the ordinary course of business at the aggregate recorded amounts thereof, net of any applicable allowance for doubtful accounts, which allowance will be determined on a basis consistent with the basis used in determining the allowance for doubtful accounts reflected on the Balance Sheet.

(b)    The inventories of the Company (including raw materials, supplies, work-in-process, finished goods and other materials) (i) are in good, merchantable and useable condition, (ii) are reflected on the Balance Sheet and will be reflected on the Valuation Date Balance Sheet at the lower of cost or market in accordance with the Agreed Accounting Principles and (iii) are, in the case of finished goods, of a quality and quantity saleable in the ordinary course of business and, in the case of all other inventories are of a quality and quantity useable in the ordinary course of business.  The inventory obsolescence policies of the Company are appropriate for the nature of the products sold and the marketing methods used by the Company, the reserve for inventory obsolescence contained on the Balance Sheet fairly reflects the amount of obsolete inventory as of the Balance Sheet Date, and the reserve for inventory obsolescence to be contained on the Valuation Date Balance Sheet will fairly reflect the amount of obsolete inventory as of the Valuation Date.

Section 5.23    **Product Liabilities.**  (a)  Except as set forth on Schedule 5.23, the Company has not received a claim for or based upon breach of product warranty (other than warranty service and repair claims in the ordinary course of business not material in amount or significance), strict liability in tort, negligent manufacture of product, negligent provision of services or any other allegation of liability, including or resulting in product recalls, arising from the materials, design, testing, manufacture, packaging, labeling (including instructions for use), or sale of its products or from the provision of services; and, to the Knowledge of the Company, there is no basis for any such claim.  The products sold or delivered or services rendered by the

Company comply with all contractual requirements, warranties or covenants applicable thereto and are not subject to any term, condition, guaranty, warranty or other indemnity beyond the applicable standard terms and conditions of sale for such products and services, copies of which have previously been delivered to Parent.

(b)     Schedule 5.23 contains a list of products of the Company in development and planned introductions.  The product and service, engineering, development, manufacturing and quality control processes that have been and are being followed by the Company are designed to produce products and services that (i) are consistent with the claims made about them in the sales brochures of the Company and other statements made about them by or on behalf of the Company, (ii) otherwise meet the reasonable expectations of customers of the Company or any Affiliates, (iii) comply with applicable regulatory requirements and (iv) avoid claims of the type described in Section 5.23(a).

(c)     Except as set forth on Schedule 5.23, the Company has not made any sales to customers that are contingent upon (x) providing future enhancements of existing products, (y) adding features not currently available on existing products or (z) otherwise enhancing the performance of existing products (other than beta or similar arrangements pursuant to which customers of the Company from time to time test or evaluate products).

**Section 5.24   Transactions with Affiliates.** (a)  For purposes of this Section 5.24, the term "Affiliated Person" means (i) any holder of capital stock of the Company, (ii) any director, officer or senior executive of the Company, (iii) any Person that directly or indirectly controls, is controlled by, or is under common control with the Company or (iv) any member of the immediate family of any of such Persons and any Person that directly or indirectly controls, is controlled by, or is under common control with any such immediate family member.

(b)     Except as set forth on Schedule 5.24, since January 1, 2001, the Company has not, in the ordinary course of business or otherwise, (i) purchased, leased or otherwise acquired any property or assets or obtained any services from, (ii) sold, leased or otherwise disposed of any property or assets or provided any services to (except with respect to remuneration for services rendered in the ordinary course of business as director, officer or employee of the Company), (iii) entered into or modified in any manner any contract with or (iv) borrowed any money from, or made or forgiven any loan or other advance (other than expenses or similar advances made in the ordinary course of business) to, any Affiliated Person.

(c)     Except as set forth on Schedule 5.24, (i) the contracts of the Company do not include any obligation or commitment between the Company and any Affiliated Person, (ii) the assets of the Company do not include any receivable or other obligation or commitment from an Affiliated Person to the Company except for those obligations or commitments incurred in the ordinary course of business and (iii) the liabilities of the Company do not include any payable or other obligation or commitment from the Company to any Affiliated Person except for such obligations or commitments incurred in the ordinary course of business.

(d)     To the Knowledge of the Company and except as set forth on Schedule 5.24, no Affiliated Person of the Company is a party to any contract with any customer or supplier of the Company that affects in any manner the business of the Company.

**Section 5.25   Budgets.**  Schedule 5.25 sets forth (a) as of the date hereof the budgets of capital, payroll and other expenditures of the Company prepared in the ordinary course of business for the fiscal year ending June 30, 2003 and (b) the total capital expenditures through September 30, 2002, if any, for each capital expenditure project for which funds are proposed to be expended during the fiscal year ending June 30, 2003. The parties acknowledge and agree that the failure of the Company to comply with the budget for the year ending June 30, 2003 in any manner shall not be considered a breach of the representation contained herein.

**Section 5.26   Warranties.**  Schedule 5.26 sets forth (i) a specimen copy of the form of written warranties covering products sold by the Company which have not yet expired and (ii) a summary of the warranty expense incurred by the Company during each of its last three (3) fiscal years. The reserve for liabilities with respect to warranty claims contained in the Balance Sheet fairly reflects in all material respects the amount required in accordance with generally accepted accounting principles to be shown thereon as of the Balance Sheet Date and the reserve for such liabilities to be contained in the books and records of the Company on the Effective Date will fairly reflect in all material respects the amount required in accordance with generally accepted accounting principles to be shown thereon as of the Effective Date.

**Section 5.27   No Finder.**  None of the Company nor any Person acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement other than to HLH&Z.

**Section 5.28   Disclosure Materials.**  The disclosure materials (collectively, the "Disclosure Materials") to be prepared by the Company in accordance with Section 7.1 and used in connection with obtaining approval by the Shareholders of the Merger, this Agreement and the transactions contemplated hereby (the "Shareholder Approval") will, when prepared by the Company and distributed to the Shareholders, comply in all material respects with the provisions of the TBCA and will not, at the time of the mailing of the Disclosure Materials, at the time the Company obtains Shareholder Approval or at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading; provided, that the Company makes no representation with respect to information concerning Parent or Acquisition supplied by Parent to the Company for inclusion in the Disclosure Materials.

**Section 5.29   Required Vote of Shareholders.**  The affirmative vote of the holders of two-thirds (2/3) of the outstanding shares of Company Common Stock and Preferred Stock, voting together as a single class, is required to approve this Agreement. No other vote of the Shareholders is required by law, the Company's Articles of Incorporation or Bylaws or otherwise in order for the Company to consummate the Merger and the transactions contemplated by this Agreement.

**Section 5.30   Disclosure.**  None of the representations or warranties of the Company contained herein, none of the information contained in the Schedules referred to in this Article V, and none of the other information or documents furnished to Parent or any of its representatives by the Company or its representatives pursuant to the terms of this Agreement, is

false or misleading in any material respect or omits to state a fact herein or therein necessary to make the statements herein or therein not misleading in any material respect. There is no present fact that adversely affects the Company or its business in any material respect which has not been set forth or referred to in this Agreement or the Schedules hereto.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PARENT AND ACQUISITION

As an inducement to the Company to enter into this Agreement and to consummate the transactions contemplated hereby, Parent and Acquisition hereby jointly and severally represent and warrant to the Company and agree as follows:

**Section 6.1    Organization; Capitalization of Acquisition.** Parent is a corporation duly organized, validly existing and in good standing under the laws of the State of Wisconsin. Parent has the full corporate power and authority to own or lease and operate its properties and assets and to carry on its business as now conducted. Acquisition is a corporation duly organized and validly existing under the laws of the State of Texas. Acquisition was organized solely for the purpose of engaging in the transactions contemplated by this Agreement and has not engaged in any business since it was incorporated which is not in connection with this Agreement. The authorized capital of Acquisition consists of 1,000 shares of common stock, par value $.01 per share, of which 100 shares have been issued and are outstanding and none are held as treasury shares. All of the outstanding shares of capital stock of Acquisition are validly issued, fully paid and nonassessable and owned of record and beneficially by Parent, free from all Encumbrances.

**Section 6.2    Authority; Conflicts.** (a) Parent has all requisite power and authority to execute, deliver and perform this Agreement and each of the Parent Ancillary Agreements to which it is a party. The execution, delivery and performance of this Agreement and the Parent Ancillary Agreements by Parent have been duly authorized and approved by its Board of Directors and do not require any further authorization or consent of Parent or its shareholders. This Agreement has been duly authorized, executed and delivered by Parent and (assuming the valid authorization, execution and delivery of this Agreement by the Company) is a legal, valid and binding agreement of Parent enforceable in accordance with its terms, and each of the Parent Ancillary Agreements has been duly authorized by Parent and upon execution and delivery by Parent will be (assuming the valid authorization, execution and delivery by each of the other parties thereto) a legal, valid and binding obligation of Parent enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

(b)    Acquisition has all requisite power and authority to execute, deliver and perform this Agreement and each Acquisition Ancillary Agreement. The execution, delivery and performance of this Agreement and each Acquisition Ancillary Agreement by Acquisition have been duly authorized and approved by its Board of Directors and, except for the approval of this Agreement by Parent in accordance with Section 7.2 and the filing contemplated by Section 4.2, no other corporate proceedings on the part of Acquisition are necessary to authorize this

Agreement and the transactions contemplated hereby. This Agreement has been duly authorized, executed and delivered by Acquisition and (assuming the valid authorization, execution and delivery of this Agreement by the Company) is a legal, valid and binding agreement of Acquisition enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by the effect of general principles of equity (regardless of whether enforcement is considered in a proceeding in equity or at law).

(c)     Neither the execution and delivery of this Agreement or any of the Parent Ancillary Agreements or the consummation of any of the transactions contemplated hereby or thereby nor compliance with or fulfillment of the terms, conditions and provisions hereof or thereof will:

(i)     conflict with, result in a breach of the terms, conditions or provisions of, or constitute a default, an event of default or an event creating rights of acceleration, termination or cancellation or a loss of rights under, or result in the creation or imposition of any Encumbrance upon any of Parent's or Acquisition's assets, under (1) the Articles of Incorporation or Bylaws of Parent or Acquisition, (2) any material note, instrument, mortgage, agreement, lease, franchise or financial obligation to which either Parent or Acquisition is a party or any of their respective assets or business is subject or by which either Parent or Acquisition is bound, (3) any Court Order to which either Parent or Acquisition is a party or by which any of their respective assets or business is subject or by which either Parent or Acquisition is bound or (4) any Requirements of Law affecting either Parent or Acquisition or their respective assets or business, other than any such conflicts, breaches, defaults or rights that, individually or in the aggregate, would not materially impair the ability of either Parent or Acquisition to perform its obligations hereunder or prevent the consummation of any of the transactions contemplated hereby; or

(ii)     require the approval, consent, authorization or act of, or the making by either Parent or Acquisition of any declaration, filing or registration with, any Person, except for the filing contemplated by Section 4.2.

**Section 6.3     Information Supplied by Parent for Disclosure Materials.** None of the information supplied by Parent in writing for inclusion in the Disclosure Materials will, at the time of the mailing of the Disclosure Materials or at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in the light of the circumstances under which they are made, not misleading.

**Section 6.4     No Finder.** Neither Parent nor Acquisition any Person acting on behalf of Parent or Acquisition has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

**ARTICLE VII**
**ACTION PRIOR TO THE EFFECTIVE TIME**

The respective parties hereto covenant and agree to take the following actions between the date hereof and the Effective Time:

**Section 7.1    Action by the Company; Preparation of the Disclosure Materials.** (a) The Company shall prepare the Disclosure Materials as promptly as possible after the date hereof and shall submit the proposed Disclosure Materials to Parent and its counsel not less than five (5) days prior to submitting the Disclosure Materials to the Shareholders. Parent shall furnish the Company with such information concerning Parent as shall be required to be included in the Disclosure Materials. The Company shall use commercially reasonable efforts to mail the Disclosure Materials to Shareholders on or before November 25, 2002. If prior to the Effective Time either (i) the Company determines that the Disclosure Materials need to be amended or supplemented in order for the representation and warranty of the Company in Section 5.28 to be correct or (ii) Parent determines that the Disclosure Materials need to be amended or supplemented in order for the representation and warranty of Parent in Section 6.3 to be correct, the Company or Parent, as the case may be, shall notify the other of such determination and shall deliver to the other such amendment or supplement as such party believes is necessary to make such representation and warranty correct. The Company shall consider all such amendments proposed by Parent, and shall cause all such amendments or supplements that the parties reasonably believe are necessary to be mailed to the Shareholders as soon as practicable after such delivery.

(b)    The Company shall properly obtain from the Shareholders approval of the Merger and this Agreement. The Company will, through its Board of Directors, recommend to the Shareholders the approval of this Agreement as required by (i) the Articles of Incorporation and Bylaws of the Company and (ii) the TBCA. The Company shall use commercially reasonable efforts to obtain such approvals on or before December 17, 2002.

**Section 7.2    Action by Parent.** Parent, as the sole shareholder of Acquisition, shall take such actions as may be necessary to approve the Merger and this Agreement as required by the TBCA.

**Section 7.3    Access to Information.** The Company shall afford to the officers, employees and authorized representatives of Parent (including independent public accountants, financial advisors, environmental consultants and attorneys) complete access during normal business hours to the offices, properties, employees and business and financial records (including computer files, retrieval programs and similar documentation and such access and information that may be necessary in connection with an environmental audit) of the Company to the extent Parent shall deem necessary or desirable and shall furnish to Parent or its authorized representatives such additional information concerning the Company as shall be reasonably requested, including all such information as shall be necessary to enable Parent or its representatives to verify the accuracy of the representations and warranties contained in this Agreement, to verify that the covenants of the Company contained in this Agreement have been complied with and to determine whether the conditions set forth in Article VIII have been satisfied. Parent agrees that such investigation shall be conducted in such a manner as not to

interfere unreasonably with the operations of the Company and shall be conducted at a time mutually acceptable to Parent and the Company. No investigation made by Parent or its representatives hereunder shall affect the representations and warranties of the Company hereunder.

**Section 7.4  Preserve Accuracy of Representations and Warranties.** Each of the parties hereto shall refrain from taking any action that would render any representation or warranty contained in Article V or VI of this Agreement inaccurate as of the Effective Time. Each party shall promptly notify the other parties of any action, suit or proceeding that shall be instituted or threatened against such party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement. The Company shall promptly notify Parent of (i) any lawsuit, claim, proceeding or investigation that may be threatened, brought, asserted or commenced against the Company that would have been listed on <u>Schedule 5.13</u> if such lawsuit, claim, proceeding or investigation had arisen prior to the date hereof and (ii) any other event or matter that becomes known to the Company and would cause any other representation or warranty contained in Article V to be untrue in any material respect.

**Section 7.5  Consents of Third Parties; Governmental Approvals.** (a) The Company will act diligently and reasonably to secure, before the Effective Time, the consent, approval or waiver, in form and substance reasonably satisfactory to Parent, from any party to any Company Agreement set forth on <u>Schedule 5.1</u> required to be obtained to permit the consummation of the transactions contemplated by this Agreement; provided that (i) neither the Company nor Parent shall have any obligation to offer or pay any consideration in order to obtain any such consents or approvals and (ii) the Company shall not make any agreement or understanding affecting its assets or business as a condition for obtaining any such consents or waivers except with the prior written consent of Parent. During the period prior to the Closing Date, Parent shall act diligently and reasonably to cooperate with the Company to obtain the consents, approvals and waivers contemplated by this Section 7.5(a).

(b)  During the period prior to the Effective Time, the parties hereto shall act diligently and reasonably, and shall cooperate with each other, to secure any consents and approvals of any Governmental Body required to be obtained by them in order to permit the consummation of the transactions contemplated by this Agreement or to otherwise satisfy the conditions set forth in Section 8.4; provided that the Company shall not make any agreement or understanding affecting its assets or business as a condition for obtaining any such consents or approvals except with the prior written consent of Parent; and, provided further, that neither Parent nor any of its Affiliates shall be required to divest or hold separate or otherwise take or commit to take any action that limits its freedom of action with respect to, or its ability to retain, the Shares or any of the businesses, product lines or assets of Parent or any of its Affiliates, or take any action that would have a material adverse effect on Parent or any of its Affiliates.

**Section 7.6  Conduct of Business Prior to the Effective Time.** (a) Except as expressly contemplated by this Agreement, the Company shall operate and carry on its business only in the ordinary course and substantially as currently operated. Consistent with the foregoing, the Company shall keep and maintain its assets and properties in good operating condition and repair and shall use reasonable efforts consistent with past business practice to maintain its business organization intact and to preserve the goodwill of the suppliers,

contractors, licensors, employees, customers, distributors and others having business relations with the Company (except, in each case, with the express prior written approval of Parent). In connection therewith, the Company shall not attempt to persuade any employee or agent of the Company to terminate such person's relationship with the Company.

(b)     Except as expressly contemplated by this Agreement, set forth on Schedule 7.6 or with the express prior written approval of Parent, the Company shall not:

(i)     (A) declare, set aside or pay any dividends on, or make any other actual, constructive or deemed distributions in respect of, any of its capital stock, or otherwise make any payments to its Shareholders in their capacity as such, (B) split, combine or reclassify any of its capital stock or issue, sell or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock (other than any issuances of its securities upon the exercise of any outstanding options to purchase such securities or upon the conversion of any outstanding convertible securities that are convertible into such securities) or (C) purchase, redeem or otherwise acquire any shares of capital stock of the Company or any other securities thereof;

(ii)     except as set forth in clause (i) above and except for the issuance of Company Common Stock pursuant to outstanding Company Stock Options and Company Warrants, issue, deliver, sell, pledge, dispose of or otherwise encumber any shares of its capital stock or other securities (including any rights, warrants or options to acquire any shares of its capital stock or other securities);

(iii)     make any change in its business or operations or make any expenditure which shall exceed the amount, as set forth on Schedule 5.25, budgeted therefor;

(iv)     make any capital expenditure or enter into any contract or commitment therefor, other than capital expenditures or commitments for capital expenditures referred to in the applicable budget contained on Schedule 5.25;

(v)     amend its Articles of Incorporation or Bylaws;

(vi)     acquire or agree to acquire by merging or consolidating with, or by purchasing a substantial portion of the assets of or equity in, or by any other manner, any business or any corporation, partnership, limited liability company, association or other business organization or division thereof;

(vii)     alter through merger, liquidation, reorganization, restructuring or in any other fashion its corporate structure;

(viii)     make or incur any new capital expenditure or expenditures which, individually, is in excess of $10,000 or, in the aggregate, are in excess of $20,000;

(ix)     except as contemplated by Schedule 5.25, enter into any contract, agreement, undertaking, obligation or commitment that would have been required to be set forth on Schedule 5.14 if in effect on the date hereof or enter into any contract that

34

requires the consent or approval of any third Person to consummate the transactions contemplated by this Agreement; or make any modification to any existing Company Agreement or to any Governmental Permits;

(x)     enter into any contract for the purchase, lease (as lessee) or other occupancy of real property or exercise any option to purchase real property or any option to extend a lease listed on Schedule 5.9;

(xi)     sell, lease (as lessor), transfer or otherwise dispose of, or mortgage or pledge, or impose or suffer to be imposed any Encumbrance on, any of the assets or properties of the Company, other than inventory and minor amounts of personal property sold or otherwise disposed of for fair value in the ordinary course of business consistent with past practice and other than Permitted Encumbrances;

(xii)     cancel any debts owed to or claims held by the Company (including the settlement of any claims or litigation) other than in the ordinary course of business consistent with past practice;

(xiii)     create, incur or assume, or agree to create, incur or assume, any indebtedness for borrowed money or enter into, as lessee, any capitalized lease obligations (as defined in Statement of Financial Accounting Standards No. 13), other than any refinancing of the Isham Debt on terms no more onerous to the Company than those contained in the Isham Date on the date hereof;

(xiv)     accelerate or delay collection of any notes or accounts receivable in advance of or beyond their regular due dates or the dates when the same would have been collected in the ordinary course of business consistent with past practice;

(xv)     delay or accelerate payment of any account payable or other liability beyond or in advance of its due date or the date when such liability would have been paid in the ordinary course of business consistent with past practice;

(xvi)     allow the levels of raw materials, supplies, work-in-process or other materials included in the inventory of the Company to vary in any material respect from the levels customarily maintained by the Company;

(xvii)     enter into any transaction with any Affiliate, other than on an arms'-length basis;

(xviii)     enter into or adopt, or amend, any bonus, profit-sharing, incentive, deferred compensation, insurance, pension, retirement, medical, hospital, disability, welfare, severance or other employee benefit plan with respect to employees of the Company, other than any such amendment to an employee benefit plan that is made to maintain the qualified status of such plan or its continued compliance with applicable law;

35

(xix)    alter the compensation of the employees of the Company, other than changes made in accordance with normal compensation practices and consistent with past compensation practices;

(xx)    make any change in the accounting practices or policies applied in the preparation of the financial statements referred to on <u>Schedule 5.4</u> except as required by generally accepted accounting principles;

(xxi)    prepare or file any Tax Return inconsistent with past practice or, on any such Tax Return, take any position, make any election, or adopt any method that is inconsistent with positions taken, elections made or methods used in preparing or filing similar Tax Returns in prior periods (including positions, elections or methods which would have the effect of deferring income to periods after the Closing Date or accelerating deductions to periods prior to the Closing Date); or

(xxii)    enter into any agreement or commitment to take any action prohibited by this Section 7.6(b).

**Section 7.7    Notification by the Company of Certain Matters.** During the period prior to the Effective Time, the Company will promptly advise Parent in writing of (i) any material adverse change in the condition of the assets or business of the Company, (ii) any notice or other communication from any third Person alleging that the consent of such third Person is or may be required in connection with the transactions contemplated by this Agreement and (iii) any material default under any Company Agreement or event which, with notice or lapse of time or both, would become such a default on or prior to the Effective Time and of which the Company has Knowledge.

**Section 7.8    Company Stock Options and Company Warrants.** (a) Prior to the Effective Time, the Company shall terminate the Millbrook Corporation 1998 Stock Option Plan and any other stock-based incentive plan or arrangement providing for compensation or consideration wholly or partially in the form of shares of Company Common Stock or any other capital stock of the Company (collectively, the "<u>Stock Option Plans</u>"), and shall grant no additional Company Stock Options under such Stock Option Plans or otherwise on or after the date of this Agreement, except such options, awards or rights that the Company has, prior to the date of this Agreement, agreed to grant or proposed to grant (subject to approval by the Company's Board of Directors) in connection with the commencement of an individual's employment with the Company or in connection with an employee's promotion to a new position, all of which are set forth on <u>Schedule 7.8</u>. <u>Schedule 7.8</u> identifies each Company Stock Option as of the date of this Agreement, the Stock Option Plan pursuant to which such Company Stock Option was granted, if applicable, the holder of such Company Stock Option, the number of shares subject to such Company Stock Option, the current exercise price of such Company Stock Option and whether such Company Stock Option is an incentive stock option under Section 422 of the Code.

(b)    The Company shall take all actions necessary or appropriate to cause all outstanding Company Stock Options that are, or as a result of the transactions contemplated by this Agreement become, vested and exercisable immediately prior to the Effective Time to be

purchased by the Company, effective immediately prior to the Effective Time and contingent on the Closing of the Merger. The holder of any Company Stock Option (each an "Option Holder") that is partially or fully vested and is not exercised as of the Effective Time will be entitled to receive, in consideration thereof, through the Exchange Agent for each share of Company Common Stock subject to the vested portion of the Company Stock Option, an amount in cash equal to the excess, if any, of the Per Share Closing Payment over the exercise price per share of Company Common Stock subject thereto plus the right to receive the Per Share Holdback Payment, if any, and the Per Share True-Up Payment, if any. The amounts payable pursuant to Section 3.2(c) and this Section 7.8(b) shall be subject to and made net of all applicable withholding Taxes. Upon receipt of such payment in respect of the vested portion of any Company Stock Option, such vested portion of the Company Stock Option shall be cancelled. The receipt by the Option Holder of the consideration contemplated by this Section 7.8(b) shall be deemed a release of any and all rights the Option Holder thereof had or may have had in respect of the applicable Company Stock Option with respect to the vested portion of such Company Stock Option.

(c)    The Company shall take all actions necessary or appropriate to cause all outstanding Company Warrants that are, or as a result of the transactions contemplated by this Agreement become, vested and exercisable immediately prior to the Effective Time to be purchased by the Company, effective immediately prior to the Effective Time and contingent on the Closing of the Merger. The holder of any Company Warrant (each a "Warrant Holder") that is partially or fully vested and is not exercised as of the Effective Time will be entitled to receive, in consideration thereof, through the Exchange Agent for each share of Company Common Stock subject to the vested portion of the Company Warrant, an amount in cash equal to the excess, if any, of the Per Share Closing Payment over the exercise price per share of Company Common Stock subject thereto plus the right to receive the Per Share Holdback Payment, if any, and the Per Share True-Up Payment, if any. The amounts payable pursuant to Section 3.2(c) and this Section 7.8(b) shall be subject to and made net of all applicable withholding Taxes. Upon receipt of such payment in respect of the vested portion of any Company Warrant, such vested portion of the Company Warrant shall be cancelled. The receipt by the Warrant Holder of the consideration contemplated by this Section 7.8(c) shall be deemed a release of any and all rights the Warrant Holder thereof had or may have had in respect of the applicable Company Warrant with respect to the vested portion of such Company Warrant.

(d)    The Company (i) shall take all action necessary to implement the provisions of this Section 7.8, including amending the agreements representing the outstanding stock option awards under the Millbrook Corporation 1998 Stock Option Plan or otherwise pursuant to resolution by the Company's Board of Directors in form and substance satisfactory to Parent and obtaining the written consent of each Option Holder of a Company Stock Option to such amendments in form and substance satisfactory to Parent, and (ii) shall provide Parent with duly executed copies of such amendments and consents prior to the Effective Time. Prior to the Effective Time, the Company shall use reasonable efforts to obtain any other necessary consents or releases from each Option Holder and Warrant Holder and to take any such other lawful action as may be necessary or appropriate to give effect to this Section 7.8.

**Section 7.9    State Takeover Laws.** If any "fair price," "business combination" or "control share acquisition" statute or other similar statute or regulation shall become

applicable to the transactions contemplated hereby, Parent, Acquisition and the Company and the respective Boards of Directors of Acquisition and the Company shall use reasonable efforts to grant such approvals and take such actions as are necessary so that the transactions contemplated hereby may be consummated as promptly as practicable on the terms contemplated hereby and otherwise act to minimize the effects of any such statute or regulation on the transactions contemplated hereby.

    **Section 7.10 Takeover Proposals.**  The Company shall not, nor shall the Company authorize any investment banker, attorney or other advisor or representative of the Company to, (a) directly or indirectly solicit, initiate or encourage the submission of, any Takeover Proposal or (b) directly or indirectly participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to the Company in connection with, or take any other action to facilitate any inquiries or the making of any proposal that constitutes or may reasonably be expected to lead to, any Takeover Proposal.

**ARTICLE VIII**
**CONDITIONS PRECEDENT TO OBLIGATIONS OF PARENT AND ACQUISITION**

    The obligations of Parent and Acquisition under this Agreement shall, at the option of Parent and Acquisition, be subject to the satisfaction, on or prior to the Effective Time, of the following conditions:

    **Section 8.1 No Misrepresentation or Breach of Covenants and Warranties.**

    (a) There shall have been no material breach by the Company or the Representative in the performance of any of their respective covenants and agreements herein; each of the representations and warranties of the Company and the Representative contained or referred to herein or in the Representative Agreement shall be true and correct at the Effective Time as though made at the Effective Time, except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by Parent and Acquisition or any transaction permitted by Section 7.6; and there shall have been delivered to Parent and Acquisition a certificate or certificates to such effect, dated the Effective Date, signed on behalf of the Company by the President or any Vice President of the Company and by the Representative.

    (b) There shall have been no material breach by any Significant Shareholder in the performance of any of its covenants and agreements contained in the applicable Voting Agreement; none of the representations or warranties of such Significant Shareholder contained or referred to in the applicable Voting Agreement shall be untrue or incorrect in any respect at the Effective Time and such representations and warranties shall be true and correct as though made at the Effective Time; and there shall have been delivered to Parent and Acquisition a certificate or certificates to such effect, dated the Effective Date and signed by such Significant Shareholder.

    **Section 8.2 No Changes or Destruction of Property.**  Between the date hereof and the Effective Time, there shall have been: (a) no material adverse change in the assets, business, operations, liabilities, profits, prospects or condition (financial or otherwise) of

38

the Company; (b) no material adverse federal or state legislative or regulatory change affecting the business of the Company; and (c) no material damage to the assets or properties of the Company by fire, flood, casualty, act of God or the public enemy or other cause, regardless of insurance coverage for such damage; and there shall have been delivered to Parent and Acquisition a certificate to such effect, dated the Effective Date, signed on behalf of the Company by the President or any Vice President of the Company.

**Section 8.3    No Restraint or Litigation.**  No injunction or restraining order shall have been issued by any court of competent jurisdiction and be in effect which restrains or prohibits any transaction contemplated hereby. No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) that remains in effect, and that has the effect of making the transactions contemplated hereby illegal or otherwise restraining, enjoining or prohibiting consummation of the transactions contemplated by this Agreement, and neither the Company nor Parent shall have received written notice from any Governmental Body that it has determined to institute any suit or proceeding to restrain or enjoin the consummation of the transactions contemplated hereby or to nullify or render ineffective this Agreement if consummated, or to take any other action that would result in the prohibition or a material change in the terms of the transactions contemplated hereby.

**Section 8.4    Necessary Governmental Approvals.**  The parties shall have received all approvals and actions of or by all Governmental Bodies that are necessary to consummate the transactions contemplated hereby, which are either specified on Schedule 5.1 or otherwise required to be obtained prior to Closing by applicable Requirements of Law or which are necessary to prevent a material adverse change in the Company or in the business, operations, liabilities, profits, prospects or condition (financial or otherwise) of the Company.

**Section 8.5    Necessary Consents.**  The Company or the Representative shall have received consents, in form and substance reasonably satisfactory to Parent and Acquisition, to the transactions contemplated hereby from the other parties to all contracts, leases, agreements and permits to which the Company is a party or by which the Company or any of its assets or properties is affected and which are specified on Schedule 8.5 or are otherwise necessary to prevent a material adverse change in the assets, business, operations, liabilities, profits, prospects or condition (financial or otherwise) of the Company.

**Section 8.6    Shareholder Approval and Conversion of Preferred Stock.**  (a) This Agreement shall have been duly approved by the requisite votes of the Shareholders in accordance with the TBCA and the Articles of Incorporation and Bylaws of the Company.

(b)    The holders of Series A Preferred Stock and Series B Preferred Stock shall have taken such action as is necessary under the Articles of Incorporation of the Company and the TBCA to effect the automatic conversion, immediately prior to, and contingent upon, the consummation of the Merger, of all shares of Series A Preferred Stock and Series B Preferred Stock into shares of Company Common Stock in accordance with the terms and subject to the conditions of the Articles of Incorporation of the Company.

**Section 8.7    No Debt.** The Company shall have no outstanding indebtedness for borrowed money as of the Closing Date except for that contemplated by the line of credit dated July 1, 2001 in the original aggregate principal amount of $2,400,000 (the "Isham Debt"); and there shall have been delivered to Parent and Acquisition a certificate to such effect, dated the Effective Date, signed on behalf of the Company by the President or any Vice President of the Company.

**Section 8.8    Dissenters' Rights.** Holders of not more than three percent (3%) of the outstanding shares of Company capital stock shall have properly exercised and not revoked their rights to dissent to the Merger under Article 5.11 – 5.13 of the TBCA.

**Section 8.9    Effective Agreements.** The Indemnification Agreement, each of the Noncompetition and Nonsolicitation Agreements, the Representative Agreement and each of the Voting Agreements shall be in full force and effect.

**Section 8.10    Employment Agreement.** Michael K. Nissenbaum shall have executed and delivered to Parent an employment agreement with the Company in a form satisfactory to Parent.

**Section 8.11    Other Convertible Securities.** Except as contemplated by Sections 7.8 and 8.6(b), all outstanding securities, options, warrants or other rights to purchase that are convertible into or exercisable for Company Common Stock or any other capital stock of the Company shall have been fully converted or exercised for Company Common Stock or cancelled, all contingent upon the consummation of the Merger, and thereafter no holder of any such instrument shall have any rights to acquire any equity security of the Company or the Surviving Corporation.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF THE COMPANY

The obligations of the Company under this Agreement shall, at the option of the Company, be subject to the satisfaction, on or prior to the Effective Time, of the following conditions:

**Section 9.1    No Misrepresentation or Breach of Covenants and Warranties.** There shall have been no material breach by Parent or Acquisition in the performance of any of their respective covenants and agreements herein; each of the representations and warranties of Parent and Acquisition contained in this Agreement shall be true and correct at the Effective Time as though made at the Effective Time, except for changes therein specifically permitted by this Agreement or resulting from any transaction expressly consented to in writing by the Company or any transaction contemplated by this Agreement; and there shall have been delivered to the Company a certificate or certificates to such effect, dated the Effective Date, signed on behalf of Parent by a duly authorized officer of Parent and on behalf of Acquisition by a duly authorized officer of Acquisition.

**Section 9.2    No Restraint or Litigation.** No injunction or restraining order shall have been issued by any court of competent jurisdiction and be in effect which restrains or

prohibits any transaction contemplated hereby. No Governmental Body shall have enacted, issued, promulgated, enforced or entered any statute, rule, regulation, injunction or other order (whether temporary, preliminary or permanent) that remains in effect, and that has the effect of making the transactions contemplated hereby illegal or otherwise restraining, enjoining or prohibiting consummation of the transactions contemplated by this Agreement, and neither the Company nor Parent shall have received written notice from any Governmental Authority that it has determined to institute any suit or proceeding to restrain or enjoin the consummation of the transactions contemplated hereby or to nullify or render ineffective this Agreement if consummated, or to take any other action that would result in the prohibition or a material change in the terms of the transactions contemplated hereby.

**Section 9.3    Necessary Governmental Approvals.** The parties shall have received all approvals and actions of or by all Governmental Bodies necessary to consummate the transactions contemplated hereby, which are required to be obtained prior to the Closing by applicable Requirements of Law.

**Section 9.4    Necessary Consents.** The Company or the Representative shall have received consents, in form and substance reasonably satisfactory to them, to the transactions contemplated hereby from the other parties to all contracts, leases, agreements and permits to which the Company is a party or by which the Company or any of its assets or properties is affected and which are specified on Schedule 8.5 or are otherwise necessary to prevent a material adverse change in the assets, business, operations, liabilities, profits, prospects or condition (financial or otherwise) of the Company.

**Section 9.5    Shareholder Approval.** This Agreement shall have been duly approved by the requisite vote of the Shareholders in accordance with the TBCA and the Articles of Incorporation and Bylaws of the Company; provided, however, that this condition shall not be effective if its failure is primarily the result of the Company's failure to perform its obligations under Section 7.1.

## ARTICLE X
## INDEMNIFICATION

**Section 10.1    Indemnification.** (a) Each Parent Group Member shall be indemnified and held harmless from and against any and all Losses and Expense incurred by any such Parent Group Member in connection with or arising from:

(i)    any breach by the Company of any of its covenants in this Agreement or in any Company Ancillary Agreement;

(ii)    any failure of the Company to perform any of its obligations in this Agreement or in any Company Ancillary Agreement;

(iii)    any breach of any warranty or the inaccuracy of any representation of the Company contained or referred to in this Agreement or any certificate delivered by or on behalf of the Company pursuant hereto;

41

(iv)    any breach of any warranty or the inaccuracy of any representation of the Representative contained or referred to in this Agreement, the Representative Agreement or any certificate delivered by or on behalf of the Representative pursuant hereto;

(v)    any failure by the Company or the Representative to obtain, prior to the Closing, any consent set forth on Schedule 5.1;

(vi)    the payment by the Company of Acquisition Expenses and Representative's Expenses in excess of amounts taken into account in connection with the determination of the Purchase Price pursuant to Section 2.3;

(vii)    the proceedings disclosed on Schedule 5.13 and any counterclaims or related claims or proceedings whether filed or made before or after the Closing Date;

(viii)    any Pre-Closing Taxes or Transfer Taxes;

(ix)    any Losses and Expenses incurred by any Parent Group Member in connection with or arising from the exercise of appraisal rights pursuant to the TBCA by any holders of capital stock of the Company (including all Losses and Expenses associated with any appraisal proceedings and all amounts determined to be payable to any such holders pursuant to Article 5.12 of the TBCA) to the extent that such Losses and Expenses exceed the product of (x) the number of Dissenters' Shares and (y) an amount equal to the Merger Consideration; or

(x)    the amount, if any, by which the Estimated Purchase Price exceeds the Purchase Price that cannot be setoff against the Holdback Amount pursuant to Section 2.3(f);

provided, however, that Parent Group Members shall be indemnified and held harmless under clause (iii) of this sentence with respect to Loss and Expense incurred by Parent Group Members (other than Loss and Expense incurred as a result of inaccuracies of the representations and warranties contained in Sections 5.1, 5.2, 5.7 and 5.27, as to which this proviso shall have no effect) only to the extent that the aggregate amount of such Loss and Expense exceeds $840,000, and the aggregate amount that all Parent Group Members shall be indemnified and held harmless pursuant to this Agreement shall not exceed the sum of the amounts set forth opposite the names of Robert O. Isham, Michael Caolo, Jr. and Michael K. Nissenbaum on Exhibit A of the Indemnification Agreement (it being agreed and understood that the Aggregate Indemnification Liability set forth opposite Robert O. Isham is the sum of his Aggregate Indemnification Liability and those set forth opposite the names of Angela S. Duncum, David R. Isham and Mark A. Isham on such Exhibit).

(b)    The indemnification provided for in this Section 10.1 shall terminate eighteen (18) months after the Closing Date (and no claims shall be made by any Parent Group Member under this Section 10.1 thereafter), except that the indemnification of Parent Group Members shall continue as to:

(i)    the representations and warranties set forth in Sections 5.1, 5.2, 5.3, 5.18 and 5.27 and the covenants of the Company set forth in Sections 12.2 and 12.12, as to all of which no time limit shall apply;

(ii)    the representations and warranties set forth in Sections 5.7, 5.11 and 5.17 and the indemnification provided in Section 10.1(a)(viii), as to which the indemnification provided for in this Section 10.1 shall survive for the applicable statute of limitations; and

(iii)    any Loss or Expense of which any Parent Group Member has notified the Representative in accordance with the requirements of Section 10.2 on or prior to the date such indemnification would otherwise terminate in accordance with this Section 10.1, as to which the right of the Parent Group Member to be indemnified shall continue until the liability shall have been determined pursuant to this Article X, and all Parent Group Members shall have been reimbursed for the full amount of such Loss and Expense in accordance with this Article X.

**Section 10.2    Notice of Claims.**  (a) Any Parent Group Member seeking indemnification hereunder shall give to the Representative a written notice (a "Claim Notice") describing in reasonable detail the facts giving rise to the claim for indemnification hereunder and shall include in such Claim Notice (if then known) the amount or the method of computation of the amount of such claim, and a reference to the provision of this Agreement or any other agreement, document or instrument executed hereunder or in connection herewith upon which such claim is based. A Claim Notice in respect of any action at law or suit in equity by or against a third Person as to which indemnification will be sought shall be given promptly after the action or suit is commenced. The failure of any Parent Group Member to give the Claim Notice promptly as required by this Section 10.2 shall not affect such Parent Group Member's rights under this Article X except to the extent such failure is actually prejudicial to the rights and obligations of the Representative or extends beyond the appropriate time limit for indemnification set forth in Section 10.1(b).

(b)    After the giving of any Claim Notice pursuant hereto, the amount of indemnification to which a Parent Group Member shall be entitled under this Article X shall be determined: (i) by the written agreement between the Parent Group Member and the Representative; (ii) by a final award of arbitration; (iii) by an Award; or (iv) by any other means to which the applicable Parent Group Member and the Representative shall agree. The judgment or decree of a court shall be deemed final when the time for appeal, if any, shall have expired and no appeal shall have been taken or when all appeals taken shall have been finally determined.

**Section 10.3    Third Person Claims.**  The Parent Group Member to be indemnified hereunder shall have the right to conduct and control, through counsel of its choosing, the defense, compromise or settlement of any third Person claim, action or suit against such Parent Group Member as to which indemnification will be sought by such Parent Group Member hereunder, and in any such case the Representative shall cooperate in connection therewith and shall furnish such records, information and testimony and attend such conferences, discovery proceedings, hearings, trials and appeals as may be reasonably requested by the Parent

43

Group Member in connection therewith; provided, that the Representative may participate, through counsel chosen by it and at its own expense, in the defense of any such claim, action or suit as to which the Parent Group Member has so elected to conduct and control the defense thereof; and provided further that the Parent Group Member shall not, without the written consent of the Representative (which written consent shall not be unreasonably withheld), pay, compromise or settle any such claim, action or suit, except that no such consent shall be required if, following a written request from the Parent Group Member, the Representative shall fail, within fourteen (14) days after the making of such request, to acknowledge and agree in writing that, if such claim, action or suit shall be adversely determined, such Parent Group Member shall be entitled to indemnification hereunder. Notwithstanding the foregoing, the Parent Group Member shall have the right to pay, settle or compromise any such claim, action or suit without such consent, provided that in such event the Parent Group Member shall waive any right to indemnity therefor hereunder unless such consent is unreasonably withheld.

**Section 10.4    Holdback Amount as Security; Set-Off.** Any amount of indemnification that a Parent Group Member is determined to be entitled to be paid pursuant to this Article X shall, first, be set off against the Holdback Amount. To the extent that the amount of Loss and Expense to be indemnified pursuant to this Article X exceeds the amount of the Holdback Amount, the amount of such excess Losses and Expenses shall be paid directly to the appropriate Parent Group Member in accordance with the terms of the Indemnification Agreement.

**Section 10.5    Indemnification Payments on After-Tax Basis**. The indemnity payment hereunder with respect to any Damages shall be calculated on an "After-Tax Basis", which shall mean an amount which is sufficient to compensate the indemnified party for the event giving rise to such Damages, determined after taking into account (1) all increases in federal, state, local or other Taxes (including estimated Taxes) payable by the indemnified party as a result of the receipt of the indemnity payment (as a result of the indemnity payment being included in income, resulting in a reduction of tax basis, or otherwise), (2) to the extent not previously taken into account in computing the amount of the such Damages, all increases in federal, state, local and other Taxes (including estimated Taxes) payable by the indemnified party for all affected taxable years and periods (including any increased Tax that results from the indemnified event causing a reduction in Tax basis) as a result of the indemnified event, and (3) to the extent not previously taken into account in computing the amount of the such Damages, all reductions in federal, state, local and foreign Taxes (including estimated Taxes) realized by the indemnified party for all affected taxable years and periods as a result of such Damages.

**Section 10.6    Counsel for Disclosed Claims**. Following the Closing, Parent agrees that it will continue to use the primary counsel used by the Company prior to Closing for those proceedings disclosed on Schedule 5.13. Notwithstanding the foregoing, Parent may change primary counsel for those claims disclosed on Schedule 5.13 (a) with the prior written consent of the Representative, (b) in the event of a material increase in the fees of such counsel or (c) in the event such counsel fails to meet the standards of Parent generally applicable to other counsel retained by Parent for similar matters.

44

## ARTICLE XI
## TERMINATION

**Section 11.1    Termination.** Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Effective Time:

(a)    by the mutual consent of all of the parties hereto;

(b)    by Parent in the event of any material breach by the Company or the Representative of any of their respective agreements, representations or warranties contained herein or in the Representative Agreement and the failure of the Company or the Representative, as applicable, to cure such breach within seven (7) days after receipt of notice from Parent requesting such breach to be cured;

(c)    by the Company in the event of any material breach by Parent or Acquisition of any of their respective agreements, representations or warranties contained herein and the failure of Parent to cure such breach, or cause Acquisition to cure such breach, within seven (7) days after receipt of notice from the Company requesting such breach to be cured;

(d)    by any party hereto if any court of competent jurisdiction in the United States or other Governmental Body shall have issued a final and non-appealable order, decree or ruling permanently restraining, enjoining or otherwise prohibiting the consummation of the Merger; or

(e)    by any party if the Effective Time shall not have occurred on or before January 10, 2003 (or such later date as may be mutually agreed to by all of the parties hereto); provided that the right to terminate this Agreement pursuant to this Section 11.1(e) shall not be available to a party whose failure to fulfill any of its obligations under this Agreement has been the cause of the Effective Time not occurring on or before such date.

**Section 11.2    Notice of Termination.** Any party desiring to terminate this Agreement pursuant to Section 11.1 shall give written notice of such termination to the other parties to this Agreement.

**Section 11.3    Effect of Termination.** In the event that this Agreement shall be terminated pursuant to this Article XI, all further obligations of the parties under this Agreement (other than Sections 12.2 and 12.9) shall be terminated without further liability of any party to the others; provided that nothing herein shall relieve any party from liability for its willful breach of this Agreement.

## ARTICLE XII
## GENERAL PROVISIONS

**Section 12.1    Survival of Obligations.** All representations, warranties, covenants and obligations contained in this Agreement shall survive the consummation of the transactions contemplated by this Agreement; provided, however, that, except as otherwise

provided in Article X, the representations and warranties contained in Articles V and VI shall terminate on the eighteen (18) month anniversary of the Closing Date. Except as otherwise provided herein, no claim shall be made for the breach of any representation or warranty contained in Article V or VI or under any certificate delivered with respect thereto under this Agreement after the date on which such representations and warranties terminate as set forth in this Section.

**Section 12.2    Confidential Nature of Information.** Each party agrees that it will treat in confidence all documents, materials and other information which it shall have obtained regarding the other parties hereto during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents, and, in the event the transactions contemplated hereby shall not be consummated, each party will return to the other parties all copies of nonpublic documents and materials which have been furnished in connection therewith. Such documents, materials and information shall not be communicated to any third Person (other than, in the case of Parent or Acquisition, to their counsel, accountants, financial advisors or lenders, and in the case of the Company and the Representative, to their counsel, accountants or financial advisors). No other party shall use any confidential information in any manner whatsoever except solely for the purpose of evaluating the proposed Merger; provided, however, that after the Effective Time Parent and the Surviving Corporation may use or disclose any confidential information reasonably related to the Company or its assets or business, except for the terms and conditions of, and parties to, this Agreement. The obligation of each party to treat such documents, materials and other information in confidence shall not apply to any information which (i) is or becomes available to such party from a source other than such party, (ii) is or becomes available to the public other than as a result of disclosure by such party or its agents, (iii) is required to be disclosed under applicable law or judicial process, but only to the extent it must be disclosed or (iv) such party reasonably deems necessary to disclose to obtain any of the consents or approvals contemplated hereby.

**Section 12.3    No Public Announcement.** No party hereto shall, without the approval of all of the other parties, make any press release or other public announcement concerning the transactions contemplated by this Agreement, except as and to the extent that any such party shall be so obligated by law or the rules of any stock exchange, in which case the other parties shall be advised and the parties shall use commercially reasonable efforts to cause a mutually agreeable release or announcement to be issued; provided that the foregoing shall not preclude communications or disclosures necessary to implement the provisions of this Agreement or to comply with accounting and Securities and Exchange Commission disclosure obligations.

**Section 12.4    Notices.** All notices or other communications required or permitted hereunder shall be in writing and shall be deemed given or delivered when delivered personally or three (3) business days after being sent by registered or certified mail or by private overnight courier addressed as follows:

If to the Company (after the Effective Time), Parent or Acquisition to:

GE Medical Systems Information Technologies, Inc.
400 Woodland Prime
N74 W12501 Leatherwood Court
Menomonee Falls, Wisconsin 53051
Attention: Chief Executive Officer

with copies to:

GE Medical Systems Information Technologies, Inc.
400 Woodland Prime
N74 W12501 Leatherwood Court
Menomonee Falls, Wisconsin 53051
Attention: General Counsel

and

Sidley Austin Brown & Wood
Bank One Plaza
10 South Dearborn Street
Chicago, Illinois  60603
Attention:  David J. Zampa

If to the Company (prior to the Effective Time) to:

Millbrook Corporation
3330 Keller Springs Road, Suite 201
Carrollton, Texas  75006
Attention:

with a copy to:

Kane, Russell, Coleman & Logan
1601 Elm Street, Suite 3700
Dallas, Texas  75201
Attention:  Ken Biermacher

with a copy to:

Robert O. Isham
c/o Michael K. Casey
2201 S FM 51, Suite 600
Decatur, Texas 76234

If to the Representative:

Robert O. Isham
c/o Michael K. Casey

> 2201 S FM 51, Suite 600
> Decatur, Texas 76234

with a copy to:

> Haynes and Boone
> 201 Main Street, Suite 2200
> Fort Worth, Texas 76102
> Attention: William D. Ratliff, III

or to such other address as such party may indicate by a notice delivered to the other parties hereto.

**Section 12.5  Successors and Assigns.** (a) The rights of each party under this Agreement shall not be assignable by such party hereto prior to the Effective Time without the written consent of the other parties, except that the rights of Parent hereunder may be assigned prior to the Effective Time, without the consent of any other party hereto, to any corporation all of the outstanding capital stock of which is owned or controlled by Parent or to any general or limited partnership in which Parent or any such corporation is a general partner, provided that (i) the assignee shall assume in writing all of Parent's obligations hereunder and (ii) Parent shall not be released from any of its obligations hereunder by reason of such assignment. Following the Effective Time, any party may assign any of its rights hereunder, but no such assignment shall relieve it of its obligations hereunder.

(b)    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors and permitted assigns. The successors and permitted assigns hereunder shall include, in the case of Parent, any permitted assignee as well as the successors in interest to such permitted assignee (whether by merger, liquidation (including successive mergers or liquidations) or otherwise). Nothing in this Agreement, expressed or implied, is intended or shall be construed to confer upon any Person other than the parties and successors and assigns permitted by this Section 12.5 any right, remedy or claim under or by reason of this Agreement.

**Section 12.6  Entire Agreement; Amendments.** This Agreement and the Exhibits and Schedules referred to herein, the Voting Agreements, the Representative Agreement and the documents delivered pursuant hereto or thereto contain the entire understanding of the parties hereto or thereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties hereto, other than the Confidentiality and Exclusivity Agreements, which shall terminate upon Closing. This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto.

**Section 12.7  Interpretation.** For purposes of this Agreement: (i) the words "include," "includes" and "including" shall be deemed to be followed by the words "without limitation," (ii) the word "or" is not exclusive and (iii) the words "herein," "hereof," "hereby," "hereto" and "hereunder" refer to this Agreement as a whole. Unless the context otherwise requires, references herein: (i) to Articles, Sections, Exhibits and Schedules mean the Articles

and Sections of and the Exhibits and Schedules attached to this Agreement; (ii) to an agreement, instrument or other document means such agreement, instrument or other document as amended, supplemented and modified from time to time to the extent permitted by the provisions thereof and by this Agreement; and (iii) to a statute means such statute as amended from time to time and includes any successor legislation thereto and regulations promulgated thereunder as of or prior to the Effective Time. The Schedules and Exhibits referred to herein shall be construed with and as an integral part of this Agreement to the same extent as if they were set forth verbatim herein. Titles to Articles and headings of Sections are inserted for convenience of reference only and shall not be deemed a part of or to affect meaning or interpretation of this Agreement.

**Section 12.8   Waivers.**  Any term or provision of this Agreement may be waived, or the time for its performance may be extended, by the party or parties entitled to the benefit thereof. Any such waiver shall be validly and sufficiently authorized for the purposes of this Agreement if, as to any party, it is authorized in writing by an authorized representative of such party. The failure of any party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way to affect the validity of this Agreement or any part hereof or the right of any party thereafter to enforce each and every such provision. No waiver of any breach of this Agreement shall be held to constitute a waiver of any other or subsequent breach.

**Section 12.9   Expenses.**  Except as otherwise provided in this Section 12.9, each of the parties hereto shall bear its own costs and expenses (including fees and disbursements of its counsel, accountants and other financial, legal, accounting or other advisors), incurred by it or its Affiliates in connection with the preparation, negotiation, execution, delivery and performance of this Agreement and each of the other documents and instruments executed in connection with or contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby (collectively, the "Acquisition Expenses"); provided, however, that, the Acquisition Expenses of the Company shall be borne by the Shareholders.

**Section 12.10   Partial Invalidity.**  Wherever possible, each provision hereof shall be interpreted in such manner as to be effective and valid under applicable law, but in case any one or more of the provisions contained herein shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such provision shall be ineffective to the extent, but only to the extent, of such invalidity, illegality or unenforceability without invalidating the remainder of such invalid, illegal or unenforceable provision or provisions or any other provisions hereof, unless such a construction would be unreasonable.

**Section 12.11   Execution in Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the parties hereto and delivered to each of the other parties hereto.

**Section 12.12   Further Assurances.**  From time to time after the Effective Time, the officers and directors of the Surviving Corporation shall be authorized to execute and deliver, in the name and on behalf of Acquisition, the Company or otherwise, such deeds and other

instruments and to take or cause to be taken such further or other action as shall be necessary or desirable in order to vest or perfect in or to confirm, of record or otherwise, in the Surviving Corporation title to, and possession of, all of the property, rights, privileges, powers, immunities and franchises of Acquisition and the Company and otherwise carry out the purposes of this Agreement.

        **Section 12.13  Governing Law.**  Except to the extent that Texas law is mandatorily applicable to the Merger and the rights and obligations of the shareholders of the Company and Acquisition, this Agreement shall be governed by and construed in accordance with the internal laws (as opposed to the conflicts of law provisions) of the State of New York.

        **Section 12.14  Resolution of Disputes.**  Any dispute, controversy or claim arising out of or relating to this Agreement, or the negotiation or breach, termination or validity thereof (a "Dispute"), shall be settled by arbitration in accordance with the commercial arbitration rules of the American Arbitration Association ("AAA"), and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  The arbitration shall be held in Denver, Colorado and shall be conducted before a single arbitrator mutually agreeable to the parties hereto, or if no agreement can be reached, then selected by the AAA.  The law applicable to the arbitration, including the administration and enforcement thereof, shall be the Federal Arbitration Act, 9 U.S.C. §§ 1-16, and the law governing this Agreement.  The cost of the arbitration, including the fees and expenses of the arbitrator, shall be shared equally by Parent and the Representative.  Each party shall bear the cost of preparing and presenting its case.  The arbitration award (the "Award") shall be presented to the parties in writing, and upon request of either Parent or the Representative, shall specify the factual and legal bases for the Award.  The Award may be confirmed and enforced in any court of competent jurisdiction.  Any post-Award proceedings will be governed by the Federal Arbitration Act.  Notwithstanding any of the foregoing, each of Parent, the Surviving Corporation or the Representative may, without inconsistency with this arbitration provision, apply to any court having jurisdiction hereof and seek interim provisional, injunctive or other equitable relief until the Award is rendered or the controversy is otherwise resolved.  Except as necessary in court proceedings to enforce this arbitration provision or any Award, or to obtain interim relief, neither Parent, the Surviving Corporation, the Representative nor an arbitrator may disclose the existence, content or results of any arbitration hereunder without the prior written consent of Parent, the Surviving Corporation and the Representative.

### ARTICLE XIII
### DEFINITIONS

        **Section 13.1  Definitions.**  In this Agreement, the following terms have the meanings specified or referred to in this Section 13.1 and shall be equally applicable to both the singular and plural forms.

        **"510(k)"** means a premarket notification cleared by the FDA under Section 510(k) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360(k), and 21 C.F.R. Part 807.

        **"AAA"** has the meaning specified in Section 12.14.

"**Accounting Firm**" has the meaning specified in Section 2.3(d).

"**Acquisition**" has the meaning specified in the first paragraph of this Agreement.

"**Acquisition Ancillary Agreements**" means all agreements, instruments and documents being or to be executed and delivered by Acquisition under this Agreement or in connection herewith.

"**Acquisition Expenses**" has the meaning specified in Section 12.9.

"**Affiliate**" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person.

"**Agreed Accounting Principles**" means generally accepted accounting principles applied in the United States, applied on a basis consistent with the Balance Sheet.

"**Agreed Adjustments**" has the meaning specified in Section 2.3(c).

"**Agreement**" has the meaning specified in the first paragraph of this Agreement.

"**Award**" has the meaning specified in Section 12.14.

"**Balance Sheet**" means the audited balance sheet of the Company as of June 30, 2002 included on Schedule 5.4.

"**Balance Sheet Date**" means June 30, 2002.

"**Base Net Worth**" means a negative $2,075,509.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601 et seq., and the regulations promulgated thereunder.

"**Claim Notice**" has the meaning specified in Section 10.2(a).

"**Closing**" means the closing of the Merger of Acquisition with and into the Company in accordance with Article IV.

"**Closing Consideration**" means a dollar amount equal to the Estimated Purchase Price less the Holdback Amount.

"**Closing Date**" has the meaning specified in Section 4.1.

"**Code**" means the Internal Revenue Code of 1986 and except where the context otherwise requires, the regulations promulgated thereunder.

"**Company**" has the meaning specified in the first paragraph of this Agreement.

"**Company Ancillary Agreements**" means all agreements, instruments and documents being or to be executed and delivered by the Company under this Agreement or in connection herewith.

"**Company Agreements**" has the meaning specified in Section 5.15.

"**Company Certificates**" has the meaning specified in Section 3.2(a).

"**Company Common Stock**" has the meaning specified in the recitals to this Agreement.

"**Company Group**" means any "affiliated group" (as defined in Section 1504(a) of the Code without regard to the limitations contained in Section 1504(b) of the Code) that, at any time on or before the Closing Date, includes or has included the Company or any predecessor of or successor to the Company (or another such predecessor or successor), or any other group of corporations that, at any time on or before the Closing Date, files or has filed Tax Returns on a combined, consolidated or unitary basis with the Company or any predecessor of or successor to the Company (or another such predecessor or successor).

"**Company's ERISA Benefit Plans**" has the meaning specified in Section 5.17(b).

"**Company Stock Option**" means an option to purchase Shares issued under the Millbrook Corporation 1998 Stock Option Plan or otherwise.

"**Company Warrant**" means any warrant to purchase Shares.

"**Confidentiality and Exclusivity Agreements**" means the Confidentiality and Exclusivity Agreements each dated August 13, 2002 and the Exclusivity Agreement dated October 28, 2002, in each case between the Company and General Electric Company, a New York corporation and the owner of all of the capital stock of Parent, acting through its GE Medical Systems Division.

"**Constituent Corporations**" has the meaning specified in the first paragraph of this Agreement.

"**Contaminant**" means any waste, pollutant, hazardous or toxic substance or waste, petroleum, petroleum-based substance or waste, special waste, or any constituent of any such substance or waste.

"**Copyrights**" means United States and foreign copyrights, copyrightable works and mask work, whether registered or unregistered, and pending applications to register the same.

"**Court Order**" means any judgment, order, award or decree of any foreign, federal, state, local or other court or tribunal and any award in any arbitration proceeding.

"**Current Annual Compensation**" means, with respect to a Person, such Person's annual compensation including per diem compensation and other special compensation.

"**Disclosure Materials**" has the meaning specified in Section 5.28.

"**Dispute**" has the meaning specified in Section 12.14.

"**Dissenters' Shares**" means shares of Company Common Stock with respect to which appraisal rights shall have been properly perfected in accordance with the TBCA.

"**Effective Date**" has the meaning specified in Section 4.2.

"**Effective Time**" has the meaning specified in Section 4.2.

"**Encumbrance**" means any lien, claim, charge, security interest, mortgage, pledge, easement, conditional sale or other title retention agreement, defect in title or other restrictions of any kind.

"**Environmental Encumbrance**" means an Encumbrance in favor of any Governmental Body for (i) any liability under any Environmental Law or (ii) damages arising from, or costs incurred by such Governmental Body in response to, a Release or threatened Release of a Contaminant into the environment.

"**Environmental Laws**" means any and all past, present and future applicable laws (including statutes, regulations and common law) of the United States, any state, or political subdivision of either of them, or any other national or political subdivision, for the protection of the environment or human health and safety, including judgments, awards, decrees, regulations, rules, standards, requirements, orders and permits issued by any court, administrative agency or commission or other governmental authority under such laws, and shall include CERCLA, the Clean Air Act (42 U.S.C. §§ 7401 et seq.), RCRA, the Clean Water Act (33 U.S.C. §§ 1251 et seq.), the Occupational Safety and Health Act (29 U.S.C. §§ 651 et seq.), the Toxic Substance Control Act (15 U.S.C. §§ 2601 et seq.) and the Safe Drinking Water Act (42 U.S.C. §§ 300f et seq.), as well as any and all state or local laws that relate to pollution, contamination of the environment, human health or safety and all future amendments to such laws, and all past, present and future regulations, rules, standards, requirements, orders and permits issued thereunder.

"**ERISA**" means the Employee Retirement Income Security Act of 1974 and the regulations promulgated thereunder.

"**Estimated Purchase Price**" means the Purchase Price, as defined herein, but determined on an estimated basis by the Company in good faith and as reflected in the certificate referred to in Section 2.2.

"**Exchange Agent**" has the meaning specified in Section 3.1.

"**Exchange Agent Agreement**" has the meaning specified in Section 3.1.

"**Exchange Fund**" has the meaning specified in Section 3.1.

"**Expenses**" means any and all expenses incurred in connection with investigating, defending or asserting any claim, action, suit or proceeding incident to any matter indemnified against hereunder (including court filing fees, court costs, arbitration fees or costs, witness fees and reasonable fees and disbursements of legal counsel, investigators, expert witnesses, accountants and other professionals), but shall not include internal legal costs and expenses allocated by a party to such matter.

"**FDA**" means the United States Food and Drug Administration, or any successor organization.

"**Federal Health Care Program**" means any health care program administered or funded, in whole or in part, by the government of the United States of America, including the Medicare, Medicaid and TRICARE programs (described in Title XVIII of the SSA, Title XIX of the SSA, and Title 10, Chapter 55 of the U.S.C., respectively).

"**Fully Diluted Share Number**" means the number of shares of Company Common Stock outstanding at the Effective Time plus the number of shares of Company Common Stock subject to any Company Stock Option or Company Warrant outstanding at the Effective Time.

"**Governmental Body**" means any foreign, federal, state, local or other governmental authority or regulatory body.

"**Governmental Permits**" has the meaning specified in Section 5.8(a).

"**HLH&Z**" means Houlihan Lokey Howard & Zukin Capital.

"**Holbrook Options**" has the meaning specified in Section 5.2(b)(viii).

"**Holdback Amount**" means $4,200,000.

"**Holdback Payment**" means any amount payable to the Participating Equity Holders pursuant to Section 2.4 plus interest from the Closing Date to the date of any payment thereof at 3% compounded semi-annually.

"**Holdback Term**" means the eighteen-month period beginning on the Closing Date.

"**Indemnification Agreement**" means the Indemnification Agreement in the form of Exhibit B.

"**Intellectual Property**" means Copyrights, Patent Rights, Trademarks and Trade Secrets.

"**Isham Debt**" has the meaning specified in Section 8.7.

54

"**Knowledge of the Company**" means, as to a particular matter, the actual knowledge after due inquiry of the executive officers of the Company.

"**Leased Real Property**" has the meaning specified in Section 5.9(a).

"**Losses**" means any and all losses, costs, obligations, liabilities, settlement payments, awards, judgments, fines, penalties, damages, expenses, deficiencies or other charges.

"**Medical Product Regulatory Authority**" means any Governmental Body that is concerned with the safety, efficacy, reliability, manufacture, sale or marketing of medical products, including the FDA.

"**Merger**" has the meaning specified in the recitals to this Agreement.

"**Merger Consideration**" has the meaning specified in Section 2.1(c).

"**Noncompetition and Nonsolicitation Agreement**" means the Noncompetition and Nonsolicitation Agreement in the form of Exhibit A.

"**Notice Period**" has the meaning specified in Section 2.3(b).

"**Option Holder**" has the meaning specified in Section 7.8(b).

"**Owned Software**" has the meaning specified in Section 5.11(g).

"**Parent**" has the meaning specified in the first paragraph of this Agreement.

"**Parent Ancillary Agreements**" means all agreements, instruments and documents being or to be executed and delivered by Parent under this Agreement or in connection herewith.

"**Parent Group Member**" means (i) Parent and its Affiliates, (ii) their respective directors, officers, employees, agents, attorneys and consultants and (iii) successors and assigns of the foregoing.

"**Participating Equity Holders**" has the meaning specified in Section 2.3(f).

"**Patent Rights**" means United States and foreign patents, patent applications, continuations, continuations-in-part, divisions, reissues, patent disclosures, inventions (whether or not patentable or reduced to practice) and improvements thereto.

"**Per Share Closing Payment**" means the Closing Consideration divided by the Fully Diluted Share Number (rounded to the nearest ten thousandth).

"**Per Share Holdback Payment**" means, in respect of any Holdback Payment, the amount of such payment divided by the Fully Diluted Share Number (rounded to the nearest ten thousandth).

**"Per Share True-Up Payment"** means the True-Up Amount, if any, <u>divided by</u> the Fully Diluted Share Number (rounded to the nearest ten thousandth).

**"Permitted Encumbrances"** means (a) liens for Taxes and other governmental charges and assessments arising in the ordinary course of business which are not yet due and payable, (b) liens of landlords and liens of carriers, warehousemen, mechanics and materialmen and other like liens arising in the ordinary course of business for sums not yet due and payable and (c) other liens or imperfections on property which are not material in amount, do not interfere with, and are not violated by the consummation of the transactions contemplated by, this Agreement, and do not materially detract from the value or marketability of, or materially impair the existing use of, the property affected by such lien or imperfection.

**"Person"** means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Body.

**"Pre-Closing Taxes"** means any Taxes imposed on the Company or for which the Company may otherwise be liable for any taxable year or period (or portion thereof) that ends on or before the Closing Date; <u>provided</u>, <u>however</u>, that Pre-Closing Taxes shall include state sales and use Taxes only to the extent they exceed the reserve therefor set forth in the Valuation Date Balance Sheet. For purposes of this definition, any Taxes attributable to a taxable year or period that begins on or before and ends after the Closing Date shall be allocated to the pre-closing period on a "closing of the books" basis by assuming that the books of the Company were closed at the close of the Closing Date, provided, however, that exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for depreciation, shall be apportioned on a daily basis.

**"Preferred Stock"** has the meaning specified in the recitals to this Agreement.

**"Preliminary Accounting Report"** has the meaning specified in Section 2.3(a)(iii).

**"Preliminary Purchase Price"** has the meaning specified in Section 2.3(a)(ii).

**"Preliminary Valuation Date Balance Sheet"** has the meaning specified in Section 2.3(a)(i).

**"Pre-Market Approval Application"** means a premarket approval application approved by the FDA in accordance with 21 U.S.C. § 360e and 21 C.F.R. Part 814.

**"Purchase Price"** means $29,200,000 <u>less</u> (i) the aggregate amount of all indebtedness for borrowed money of the Company reflected on the Valuation Date Balance Sheet, including principal, interests, fees, penalties or other amounts related thereto, (ii) the dollar amount of all customer deposit liabilities of the Company reflected on the Valuation Date Balance Sheet opposite the line item titled the same, (iii) the dollar amount of all fees of professionals reflected on the Valuation Date Balance Sheet as owed by the Company at the Effective Time in connection with the transactions contemplated by this Agreement, including amounts owed to HLH&Z pursuant to the letter agreement between the Company and HLH&Z

dated December 16, 2000, and (iv) if the Base Net Worth exceeds the Valuation Date Net Worth by $1,285,000 or more, the entire amount by which the Base Net Worth exceeds the Valuation Date Net Worth as determined in accordance with Section 2.3 plus the Sum of the Exercise Prices. Schedule 13.1 contains an example of the Purchase Price calculated as of the date set forth therein.

"**RCRA**" means the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 et seq., and the regulations promulgated thereunder.

"**Release**" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration of a Contaminant into the indoor or outdoor environment or into or out of any Leased Real Property, including the movement of Contaminants through or in the air, soil, surface water, groundwater or Leased Real Property.

"**Remedial Action**" means actions required to (i) clean up, remove, treat or in any other way address Contaminants in the indoor or outdoor environment, (ii) prevent the Release or threatened Release or minimize the further Release of Contaminants or (iii) investigate and determine if a remedial response is needed and to design such a response and post-remedial investigation, monitoring, operation and maintenance and care.

"**Representative**" has the meaning specified in the first paragraph of this Agreement.

"**Representative Agreement**" has the meaning specified in the recitals to this Agreement.

"**Requirements of Law**" means any foreign, federal, state and local laws, statutes, regulations, rules, codes or ordinances enacted, adopted, issued or promulgated by any Governmental Body (including those pertaining to electrical, building, zoning, subdivision, land use and Environmental Laws) or common law.

"**Series A Preferred Stock**" has the meaning specified in the recitals to this Agreement.

"**Series B Preferred Stock**" has the meaning specified in the recitals to this Agreement.

"**Series C Preferred Stock**" has the meaning specified in the recitals to this Agreement.

"**Shareholder Approval**" has the meaning specified in Section 5.28.

"**Shareholders**" means the holders of shares of capital stock (whether Company Common Stock or Preferred Stock) of the Company.

"**Shares**" means the issued and outstanding shares of capital stock (whether Company Common Stock or Preferred Stock) of the Company.

"**Significant Shareholders**" has the meaning specified in the recitals to this Agreement.

"**Software**" means computer software programs and software systems, including all databases, compilations, tool sets, compilers, higher level or "proprietary" languages, related documentation and materials, whether in source code, object code or human readable form.

"**SSA**" means the United States Social Security Act, codified at Title 42, Chapter 7, of the United States Code.

"**Stock Option Plans**" has the meaning specified in Section 7.8(a).

"**Sum of the Exercise Prices**" means an amount equal to the sum of the exercise price of each unexpired Company Stock Option or Company Warrant outstanding immediately prior to the Effective Time.

"**Surviving Corporation**" has the meaning specified in Section 1.1.

"**Takeover Proposal**" means (a) any proposal for a merger or other business combination involving the Company, (b) any proposal or offer to acquire in any manner, directly or indirectly, an equity interest in or any voting securities of the Company representing fifteen percent (15%) or more of the total voting securities of the Company outstanding or (c) an offer to acquire in any manner, directly or indirectly, a substantial portion of the assets of the Company, other than, in each case, the transactions contemplated by this Agreement.

"**Tax**" (and, with correlative meaning, "**Taxes**" and "**Taxable**") means:

(i)      any federal, state, local or foreign net income, gross income, gross receipts, premium, windfall profit, severance, property, production, sales, use, license, excise, franchise, employment, payroll, withholding, alternative or add-on minimum, ad valorem, value-added, transfer, stamp, or environmental (including taxes under Code Section 59A) tax, or any other tax, custom, duty, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest or penalty, addition to tax or additional amount imposed by any governmental authority; and

(ii)      any liability for the payment of amounts with respect to payments of a type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group, or as a result of any obligation of the Company under any Tax Sharing Arrangement or Tax indemnity arrangement.

"**Tax Return**" means any return, report or similar statement required to be filed with respect to any Tax (including any attached schedules), including any information return, claim for refund, amended return or declaration of estimated Tax.

"**Tax Sharing Arrangement**" means any written or unwritten agreement or arrangement for the allocation or payment of Tax liabilities or payment for Tax benefits with respect to a consolidated, combined or unitary Tax Return which Tax Return includes or has included the Company.

"**TBCA**" means the Texas Business Corporation Act.

"**Trademarks**" means United States, state and foreign trademarks, service marks, logos, trade dress and trade names (including all assumed and fictitious names under which the Company is conducting business or has within the previous five (5) years conducted business), whether registered or unregistered, and pending applications to register the foregoing.

"**Trade Secrets**" means confidential ideas, trade secrets, know-how, concepts, methods, processes, formulae, reports, data, customer lists, mailing lists, business plans or other proprietary information.

"**Transfer Taxes**" means any real property transfer or gains Tax, sales Tax, use Tax, stamp Tax, stock transfer Tax or other similar Tax imposed on the transactions contemplated by this Agreement.

"**True-Up Amount**" means the amount, if any, payable by Parent pursuant to Section 2.3(f).

"**Valuation Date**" means the close of business on the last business day prior to the Closing Date.

"**Valuation Date Balance Sheet**" has the meaning specified in Section 2.3(b).

"**Valuation Date Net Worth**" means the excess of the total assets of the Company (other than cash) over the total current liabilities (other than customer deposits and the current portion of the Isham Debt or the current portion of any other long-term debt (excluding capital lease obligations)) of the Company plus, without duplication, any long-term debt, if any (other any long-term Isham Debt), reflected in the Valuation Date Balance Sheet.

"**VARs**" has the meaning specified in Section 5.20.

"**Voting Agreements**" has the meaning specified in the recitals to this Agreement.

"**Warrant Holders**" has the meaning specified in Section 7.8(c).

\* \* \* \* \* \*

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed the day and year first above written.

**GE MEDICAL SYSTEMS
INFORMATION TECHNOLOGIES, INC.**

By: _____
Name:   Pamela S. Krop
Title:   Vice President and General Counsel

**MAVERICK ACQUISITION CORP.**

By: _____
Name:   Pamela S. Krop
Title:   Vice President and General Counsel

**MILLBROOK CORPORATION**

By: _____
Name:
Title:

_____
Robert O. Isham, as Representative

Signature Page to Merger Agreement
dated as of November 20, 2002, by and among
the parties referred to above

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed the day and year first above written.

**GE MEDICAL SYSTEMS
INFORMATION TECHNOLOGIES, INC.**

By: _____

Name:

Title:

**MAVERICK ACQUISITION CORP.**

By: _____

Name:

Title:

**MILLBROOK CORPORATION**

By: *[signature]*

Name: Michael K. Nissenbaum

Title: President & CEO

**ROBERT O. ISHAM,
AS REPRESENTATIVE**

By: *[signature]*

Michael K. Casey,

Attorney-in-Fact

Signature Page to Merger Agreement
dated as of November 20, 2002, by and among
the parties referred to above



# TEXAS COMPTROLLER OF PUBLIC ACCOUNTS

## CAROLE KEETON STRAYHORN · COMPTROLLER · AUSTIN, TEXAS 78774

June 15, 2005

# CERTIFICATE OF ACCOUNT STATUS

THE STATE OF TEXAS
COUNTY OF TRAVIS

I, Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, DO HEREBY CERTIFY that according to the records of this office

### MILLBROOK CORPORATION

is, as of this date, in good standing with this office having no franchise tax reports or payments due at this time. This certificate is valid through the date that the next franchise tax report will be due November 15, 2005.

This certificate does not make a representation as to the status of the corporation's Certificate of Authority, if any, with the Texas Secretary of State.

This certificate is valid for the purpose of conversion when the converted entity is subject to franchise tax as required by law. This certificate is not valid for the purpose of dissolution, merger, or withdrawal.

GIVEN UNDER MY HAND AND
SEAL OF OFFICE in the City of
Austin, this 15th day of
June, 2005 A.D.

*Carole Keeton Strayhorn*

Carole Keeton Strayhorn
Texas Comptroller

Taxpayer number: 17525081968
File number: 0128992200

Form 05-304 (Rev. 02-03/14)