UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN SECTION

CIVIL ACTION NO. 05-30090 MAP

| | |
|---|---|
| NORTHAMPTON INTERNAL MEDICINE ASSOCIATES, P.C., | ) ) ) |
| Plaintiff | ) ) |
| vs. | ) ) |
| GENERAL ELECTRIC COMPANY d/b/a GE Healthcare Technologies, GE Medical Systems Information Technologies, and Clinical Information Systems, | ) ) ) ) ) ) ) |
| Defendant | ) |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS MOTION TO DISMISS UNDER RULE 12(B)(6)

The plaintiff, Northampton Internal Medicine Associates, P.C. ("NIMA"), submits this memorandum in opposition to the Motion to Dismiss Under Rule 12(b)(6) filed by defendant General Electric Company ("GE").

## I.  INTRODUCTION

GE makes two arguments in support of its motion to dismiss.  First, GE argues that this lawsuit must be brought in Texas and decided under Texas law based on a forum selection clause contained in two documents which GE contends apply to the claims brought by NIMA.  Second, GE argues that GE is not a proper party in this case and that Millbrook Associates, a wholly-owned subsidiary of GE, is the proper defendant. Each of these arguments is addressed separately below.

## II.  ARGUMENT

### A.  Standard Of Review

A motion to dismiss for failure to state a claim may be granted only if it appears, beyond doubt, that the plaintiff can provide no facts in support of its claim that entitles it to relief.  See *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).  The Court must accept all factual averments in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See, Garita Hotel Ltd. Partnership v. Ponce Federal Bank, F.S.B.,* 958 F.2d 15, 17 (1st Cir. 1992).  The Court is also required to look only to the allegations of the complaint and if under any theory they are sufficient to state a cause of action, a motion to dismiss the count must be denied.  See *Knight v. Mills,* 836 F.2d 659, 664 (1st Cir. 1987).

### B.  Massachusetts is the Proper Forum for NIMA's Claims

In arguing that this suit may only be brought in Texas and that Texas law should apply, GE cites language included in two documents.  The first is an Electronic Data Interchange Agreement (the "EDI Agreement") entered into between NIMA and Millbrook Associates on February 24, 2003.  The second document is a Millbrook End User License Agreement which was allegedly packaged with the Millbrook Practice Manager software which NIMA first installed at its office in April 2003.

GE omits to mention that Millbrook and GE also signed other agreements upon which this suit is based which do not contain any forum selection clause.  These include the original Millbrook purchase order which NIMA accepted on December 30, 2002, a copy of which is attached hereto as Exhibit A.  By executing this document, NIMA agreed to purchase and Millbrook agreed to sell to NIMA the MPM software along with product support, on-site

training, project management, an integration software kit and database conversion services. NIMA agreed to pay Millbrook the sum of $51,154.00 for these goods and services along with an additional sum of $6,354.00 for future maintenance. In addition, on March 7, 2003 NIMA and Millbrook executed a Technical Support Agreement, a copy of which is attached hereto as Exhibit B. Neither the Purchase Order nor the Technical Support Agreement contains a forum selection clause or a choice of law clause. Significantly, neither document refers to or incorporates either the EDI Agreement or the End User License Agreement cited by GE in its motion.

NIMA's breach of contract claims against GE are based on the original Purchase Order and the Technical Support Agreement and not the EDI Agreement or the software license. In fact, as made clear in the Complaint, the problems which NIMA experienced stemmed from Millbrook's, and later GE's, failure to properly install and set up the MPM software at NIMA's offices and to provide timely technical support and corrective solutions to NIMA to prevent insurance claims from being repeatedly rejected by third-party payers and assist NIMA in resubmitting rejected claims in a timely fashion. As a result of these breaches on the part of GE/Millbrook, between April and November 2003, NIMA had nearly $123,000.00 in insurance claims rejected for payment. (See Affidavit of Lawrence Schiffman, attached as Exhibit C).

In addition, NIMA has brought tort-based claims against GE for breach of express warranty, misrepresentation and violations of M.G.L. c. 93A which are also not based on any of the contracts which GE cites in its motion. On the contrary, these claims are based largely on oral and written statements falsely touting the capabilities of the MPM software which were made to NIMA by Millbrook in late 2002, *before* the original purchase order was executed. These included a written statement by Millbrook that medical offices using the MPM software

were seeing "accelerated cash flows, increased revenues, reduced expenses and better morale within their office staff." (See letter dated December 13, 2002 from Patrick O'Mahoney to Roxanne Haber of NIMA, attached to the Complaint as Exhibit A). NIMA's claims for breach of express warranty and violations of Chapter 93A are similarly based on these extra-contractual misrepresentations. Clearly, this is not a case where the tort claims and contract claims involve the same operative facts and should therefore be heard in the forum selected by the contracting parties. Cf. *Lambert v. Kysar, 983* F. 2nd 1110, 1121-1122 (1st Cir. 1993).

Even if the forum selection clauses were deemed to somehow be applicable to NIMA's claims, they should not be enforced. Under Massachusetts law, a forum selection clause will not be enforced if one of the parties would suffer such serious inconvenience in litigating in the selected forum that it is effectively deprived of its day in court. *Firemen's Fund Amer. Ins. Cos. v. Puerto Rico Forwarding Co., Inc.,* 492 F. 2d 1294, 1297 (1st Cir. 1974); *Doe v. Seacamp Ass'n., Inc.* 276 F. Supp. 222,226 (D. Mass 2003). Among the factors used to determine if a forum selection clause is reasonable, just, and was freely entered into are the following: the place where the contract was executed, the place where the transactions have been performed, the location of the parties, convenience of the witnesses and accessibility of evidence, and the relative bargaining power of the parties and the circumstances of their negotiations. *Doe,* supra, citing *D'Antuono v. CCH Computax Systems, Inc.,* 570 F. Supp. 708, 712 (D.R.I. 1983).

Here, all the contracts in question were executed by NIMA in Massachusetts. All of the negotiations occurred in Massachusetts. The software was installed at NIMA's office in Florence, Massachusetts. In addition, the MPM software was demonstrated, marketed and sold to NIMA in Massachusetts. Millbrook installed the program in Massachusetts, performed the data transition services in Massachusetts and trained NIMA's employees on the system, all in

Massachusetts. Perhaps most importantly, requiring NIMA to litigate these claims in Texas would impose unreasonable and undue hardship on NIMA, effectively depriving it of its day in court. NIMA maintains one office in Florence, Massachusetts. It employs five physicians and a small office staff. If NIMA were required to litigate this case in Texas, NIMA's physicians and office staff would be required to travel thousands of miles to testify at trial, effectively requiring NIMA to close its offices and deprive its patients of necessary medical care. *See* Affidavit of Lawrence S. Schiffman, M.D., attached hereto as Exhibit C. On the other hand, given GE's size and the fact that it is actively engaged in business in Massachusetts, it would certainly not be unfair, unreasonable or inconvenient for GE to litigate this case in this forum.[1]

**B.    GE is the Proper Party Defendant**

GE argues that Millbrook and not GE is the proper party defendant and that therefore all claims against GE should be dismissed. In support of this argument, GE states that after it acquired Millbrook Associates in late 2002, Millbrook continued to exist as a wholly-owned subsidiary of GE and never passed out of existence.

Regardless of whether Millbrook Associates may have continued to exist in some form after GE acquired it, GE led NIMA to understand that GE had assumed all responsibility for the Millbrook system installed at NIMA, as evidenced by the numerous letters and other communications between GE and NIMA and its attorneys from November 2003 forward. As Dr. Schiffman of states in his affidavit (Exhibit C), starting in November 2003, GE assigned Lisa K. Brown of GE Healthcare as NIMA's contact person for all technical issues involving the

---

[1] It should be noted that GE furnished NIMA with a GE Customer License Agreement after it acquired Millbrook. This Agreement requires that any claims or controversies arising out of it be submitted to arbitration at the AAA office located closest to the largest metropolitan area in the state where the customer's principal offices are located. A copy of the GE Customer License Agreement is attached hereto at Exhibit D.

Millbrook system. From November 2003 forward, Ms. Brown of GE corresponded regularly with NIMA's office manager, Roxanne Haber, concerning various technical issues. In April 2004, Ms. Brown of GE Medical Systems conducted a site evaluation of NIMA's system and produced a six-page System Evaluation Report (Exhibit 3 to Dr. Schiffman's affidavit). In addition, on January 9, 2004, GE wrote to NIMA (Exhibit 2 to Dr. Schiffman's affidavit) informing it that GE had acquired Millbrook Associates and was working to unify Millbrook Practice Manager into GE's new Centricity Physician's Office Suite. The letter also stated that GE was offering "the best possible support network" and that, since NIMA "was a direct customer of GE, [it] did not need to do or change anything." In addition, GE wrote a series of letters to NIMA and its prior counsel in 2004, before this litigation was commenced, responding to NIMA's claims against GE (Exhibit 1 to Dr. Schiffman's affidavit). In none of these letters, including GE's May 5, 2004, response to NIMA's notice of demand pursuant to M.G.L. Chapter 93A §9, does GE ever suggest that Millbrook and not GE was the proper party for addressing these issues. Under these circumstances, GE should be estopped from taking this position now.

In addition, where, as here, there is control over two or more corporations involved in a single enterprise and a failure to make clear which corporation is taking action in a particular situation or to observe with care the formal barriers between the corporations, the court may disregard the separate entities. *My Bread Baking Company v. Cumberland Farms, Inc.*, 353 Mass 614, 620, 233 N.E.2nd 748, 752 (1968). On these facts, GE can also be held liable for Millbrook's acts on an agency theory. An agency or similar relationship may exist between two corporate entities with common ownership when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the inter-corporate

relationship, *or* when there is a confused intermingling of activity of two or more corporations engaged in the common enterprise with substantial disregard of the separate nature of the corporate entities or a serious ambiguity about the manner and capacity in which the various corporations and the respective representatives are acting.  In such circumstances, in imposing liability upon one or more of a group of "closely identified" corporations, a court "need not consider with nicety which of them ought to be held liable for the act of one corporation for which the plaintiff deserves payment.  *Id.,* 353 Mass at 619. *W.W. Britton, Inc. v. S. M. Hill Company,* 327 Mass 335, 338-339, 98 N.E.2nd 637, 639 (1951).

In the event that this Court should rule at this very early stage that GE is not a proper party, the plaintiff would request leave to amend the complaint pursuant to F.R.C.P. 15(a) to add Millbrook Associates as an additional party defendant.

### III.  UNDERLINE CONCLUSION

Based on the foregoing, the plaintiff, Northampton Internal Medicine Associates, respectfully urges that defendant General Electric's Motion to Dismiss be denied in all respects.

THE PLAINTIFF
NORTHAMPTON INTERNAL
MEDICINE ASSOCIATES, P.C.

By
Keith A. Minoff, Esq., of
Robinson Donovan, P.C.
1500 Main Street, Suite 1600
Springfield, Massachusetts 01115
Phone (413) 732-2301  Fax (413) 785-4658
BBO No.:  551536

www.millbrook.com





**EXHIBIT**
A

MILLBROOK
practice management solutions

Millbrook Salesperson  Patrick O'Mahoney
Phone 508-251-6217
Fax 508-452-9009
Email patrickob@millbrook.com
Date Prepared December 28, 2002
Quote Valid For 30 Days

Millbrook Practice Manager · Order Form 4.4D

| Customer Information (If leasing, please provide info at bottom of page) | | Millbrook Corporation |
|---|---|---|
| Company Name | Northhampton Internal Medicine | Accounts Receivable |
| Contact | Roxanne Haber | PO Box 678077 |
| Address | 190 Nonotuck Road | Dallas, TX 75267 |
| | | Phone 972-663-2000 |
| City, State, Zip | Florence, MA 01062 | Fax 972-663-2484 |
| County | Hampshire | |
| Phone | 413-584-9511 | Practice Specialty  Internal Medicine |
| Fax | 413-584-4218 | Software Replacing  MED-I |
| Email | | Estimated Go Live Date  March 26, 2003 |
| Millbrook ID | 22181 | If signed on the date this quote was prepared |
| | | MIK Partner  N/A |

| Item # | MBC Part # | Product Description | QTY | SRP Unit Cost | Ext SRP Cost |
|---|---|---|---|---|---|
| 1 | PLS | Millbrook Practice Manager (PM) Physician License Software | 7 | $ 5,000 00 | $ 35,000 00 |
| 2 | PLSOP | Millbrook Practice Manager Other Provider License Software | 1 | $ 2,500 00 | $ 2,500 00 |
| 3 | EDIS1 | One Time EDI Access Fee (per Provider to be enrolled)* | 8 | $ 250 00 | $ 2,000 00 |
| 4 | CODES | Annual CPT, ICD9 codes and insurance carriers  (per license)** | 8 | $ 50 00 | $ 400 00 |
| 5 | ASM | Annual Millbrook PM Software Updates (per License) | 7 | $ 900 00 | $ 6,300 00 |
| 6 | ASMOP | Annual Millbrook PM Other Provider Software Updates | 1 | $ 450 00 | $ 450 00 |
| 7 | SUP10-PAK | End-User Direct Support 10pak (Ten incidents to customer support during normal business hours) | 1 | $ 1,600 00 | $ 1,600 00 |
| 7 | TRAIN | Onsite Millbrook PM training  (per day, travel expenses not included)*** | 9 | $ 1,000 00 | $ 9,000 00 |
| 8 | PM | Millbrook PM Project Management  See attached. | 1 | $ 2,500 00 | $ 2,500 00 |
| 9 | MIK | Millbrook PM Integration Software Kit (MIK) | 0 | $ 3,500 00 | $    - |
| 10 | MIKASC | Annual (MIK) Software Updates | 0 | $ 630 00 | $    - |
| 11 | MPDPC1 | Database conversion, Demographics Only | 1 | $ 4,000 00 | $ 4,000 00 |
| | | (Conv. price can vary depending on source and size of data base) | | | |
| 12 | MAMCDHCFI | MA Medicaid HCFA form (one-time fee)    - | 1 | $ 300 00 | $ 300 00 |
| 13 | MAMCDHCFI | MA Medicaid HCFA form annual maintenance | 1 | $ 54 00 | $ 54 00 |
| Special Notes | | Adjustment Based on Full Time Equivalency of 7 Docs | 1 | -$2,950 00 | -$2,950 00 |
| | | Incentive Based on Decision on or before 12/30/2002 | 1 | -$10,000 00 | -$10,000 00 |

Order Total (plus applicable sales tax)  $ 51,154 00

**Payment Terms: 50% on order acceptance - 50% prior to final licensing.**
Make all payments to: Millbrook Corporation, Accounts Receivable, P.O. Box 678077, Dallas, TX 75267
All sales are subject to sales tax unless Millbrook receives a valid sales tax exemption certificate.

Second and Subsequent Years  Maintenance: $ 6,354 00

*See Attached for Claim Submission Options
Note  Optional plans available that require analysis of claim volume and payors to determine pricing
**This is an annual fee, released in January of each year
***Travel expenses will be billed separately

| Customer Acceptance | |
|---|---|
| Name (print) Roxanne J. Haber | Estimated go live date is based on 90 days |
| Title Office Manager | from order acceptance and 50% deposit |
| Signature _____  Date 12-30-02 | has been received by Millbrook. |

Leasing Company Information

| | |
|---|---|
| Company | _____ |
| Address | _____ |
| City, State, Zip | _____ |
| Contact | _____ |
| Phone | _____ |

**Note:** Hardware must meet minimum requirements as set forth in documentation.



**EXHIBIT**

B

## Technical Support Agreement

**Requirements**

✓ Remote access/direct connection to the SQL Server is required. This can be through Virtual Private Networking (VPN), Remote Access Service (RAS) or Internet IP. PCAnywhere or other third party dial up connection utilities are not acceptable and cannot be substituted for the above.
  ○ If the direct connection of choice is by way of modem, it must be installed on the server where the Millbrook database resides.
  ○ We strongly recommend the phone line be a dedicated modem/fax line and not accessible through the phone system. This prevents someone from interrupting a connection by attempting to make an outbound call.

✓ Support is provided for the Millbrook Practice Manager™ software. Limited support is provided for Microsoft SQL Server™, hardware and networking only where directly related to the Millbrook Practice Manager software.

✓ Supportability document will be forwarded to you by Millbrook Technical Support and must be completed to access Millbrook support.

✓ Each customer must designate a primary and a secondary contact. All support questions must be filtered through these contacts.

**Support Policy**

✓ Millbrook Technical Support reserves the right to refer customers to specific sections of:
  1. the software manual or help system
  2. knowledge base articles
  3. Millbrook website
  4. any other pertinent reference materials
  when Millbrook Technical Support believes the case resolution resides therein.

✓ Use applies to regular Support hours 7:30am-5:30pm Central Standard Time.

✓ After hours support is billable at our normal after hours rate, must be paid in advance and is not considered part of the customer's Unlimited Support agreement.

✓ Database upgrades are not included in the unlimited support agreement and will be billed separately. This only applies to customers who either request our assistance walking a user through the upgrade process or we perform the upgrade remotely. However, any problems or question pertaining to an upgrade are covered.

✓ Customer acknowledges that Millbrook Technical Support is not a substitute for, or replacement of, end user training.

Millbrook maintains monthly statistics of support cases logged by all Millbrook End Users. These support cases are trended based on a number of criteria, including number of cases logged per license for each customer. Should Millbrook determine that a customer's support cases logged for a particular quarter fall outside a reasonable average for all Millbrook customers (deemed "Excessive Use"), Millbrook shall notify the customer in writing of its Excessive Use. Should the customer receive two such notices in any twelve-month period, Millbrook reserves the right to adjust the annual or quarterly support fee. *If Project Management (PM) was purchased, cases will not be counted until PM expires.*

Millbrook Technical Support also reserves the right to refer any customer deemed to have Excessive Use for additional end user training. If such end user training is necessary, training fees will apply.

**Acknowledgement**

I have read and agree to the above terms and conditions:

_Northampton Internal Medicine Assoc._ _Magger_ _3/7/03_
P.C.
Organization Name  Organization's Officer or Owner  Date

_Roxanne Hahm or Elizabeth Russell_
Organization's Support Contact  Date

  Millbrook Corporation  Date

Please return this form via fax to (972) 663-2097 or mail to Millbrook Corporation 3330 Keller Springs, Ste 201 Carrollton, TX 75006 Attn: Support.



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
WESTERN SECTION

CIVIL ACTION NO. 05-30090 MAP

NORTHAMPTON INTERNAL MEDICINE                 )
ASSOCIATES, P.C.,                             )
                                              )
         Plaintiff                            )
                                              )
vs.                                           )
                                              )
GENERAL ELECTRIC COMPANY d/b/a                )
GE Healthcare Technologies,                   )
GE Medical Systems Information                )
Technologies, and Clinical                    )
Information Systems,                          )
                                              )
         Defendant                            )

## AFFIDAVIT OF LAWRENCE S. SCHIFFMAN, M.D.

I, Lawrence S. Schiffman hereby depose and say:

1.       I am a physician licensed to practice medicine in the Commonwealth of

Massachusetts.  I am a principal with Northampton Internal Medicine Associates with offices are

located at 190 Nonotuck Street, Florence, MA.

2.       In 2003, NIMA contracted with Millbrook Associates to purchase and install

Millbrook Practice Manager software at our office in Florence, MA.  This was following sales

presentations, demonstrations and contract negotiations, all of which took place at our offices in

Massachusetts.  Millbrook also performed data transition and trained NIMA's employees on the

system at NIMA's offices.  The MPM software went live in April 2003.  NIMA immediately

began experiencing substantial problems with the new system which caused numerous third-

party payer claims to be rejected.  Between April and November 2003, NIMA had nearly

405161

$123,000.00 in third-party claims rejected for payment as a result of problems with the new

system.

     3.     We subsequently learned that Millbrook Associates had recently been acquired by

General Electric.  In or about November 2003, our office manager, Roxanne Haber began

communicating directly with GE on all issues concerning the MPM software.  Our principal

contact for all technical issues involving the Millbrook Software was Lisa K. Brown of GE

Healthcare.  GE led NIMA to understand that from that date forward, GE had assumed all

responsibility for the MPM system installed at NIMA.

     4.     Both NIMA and its prior counsel in this matter have received numerous pieces of

correspondence from GE Medical Systems and GE Healthcare Technologies responding to

NIMA's claims in this matter. Attached hereto as Exhibit 1 are true and correct copies of GE

correspondence dated January 6, 2004, May 5, 2004, September 13, 2004 and December 8, 2004.

In none of these letters, including GE's May 5, 2004 response to the Chapter 93A notice of

demand, does GE suggest that Millbrook and not GE is the proper party for addressing these

claims.

     5.     On January 9, 2004, NIMA received a letter from  GE Medical Systems

informing us that GE Medical Systems Information Technologies had acquired Millbrook and

was working to unify Millbrook Practice Manager into GE's new Centricity Physician Office

Suite.  GE reassured us in the letter that it was offering the best possible support network and

that since our practice was "a direct customer of GE, we did not need to do or change anything."

A true and correct copy of this letter is attached hereto as Exhibit 2

6.      On April 23, 2004, we were provided with a six-page System Evaluation Report prepared by Lisa K. Brown of GE Healthcare.  A true and correct copy of this document is attached hereto as Exhibit 3.

7.      Based on all of our communications with GE regarding the MPM software which we originally purchased from Millbrook Associates, we were always led to believe that GE had assumed all responsibility for the Millbrook System installed at NIMA.  At no time prior to the filing of this lawsuit has anyone at GE ever stated or even suggested that Millbrook and not GE was the proper party.

8.      NIMA maintains a very busy medical practice. We currently employ five physicians, including two primary care physicians, an oncologist and two rheumatologists, including myself.  If NIMA were required to litigate this case in Texas, it would impose an unreasonable and undue hardship on our practice.  Our physicians and office staff would be required to travel thousands of miles to testify at trial, effectively requiring us to close our offices and deprive our patients of necessary medical care.

I solemnly affirm under the pains and penalties of perjury that the foregoing Affidavit is true and correct and based upon my personal knowledge.

Signed under the pains and penalties of perjury this _22_ day of _July_____, 2005

LAWRENCE S. SCHIFFMAN, M.D.

Rec'd 1/12/04
MLC

GE Medical Systems
Information Technologies

General Electric Company
20540 NW Evergreen Parkway, Hillsboro, OR 97124-7111
503 531-7000

EXHIBIT
1

January 6, 2004

Michael K. Callan
Doherty, Wallace, Pillsbury and
Murphy, P.C.
Attorneys at Law
One Monarch Place
Suite 1900
Springfield, Massachusetts 01144

   Re: Northampton Internal Medicine Associates, P.C.

Dear Mr. Callan,

Mr. Patrick J. O'Mahoney has forwarded your letter on to Catherine Pompei here in the
Hillsboro, Oregon location.

Catherine has asked me to forward the requested documentation to you.  Therefore,
enclosed please find copies of documents and Agreements, that are between NIMA and
Millbrook that she was able to locate and are known to her at this time.

Catherine Pompei can be reached at telephone: 503-531-7053, fax: 503-531-7001, email:
Catherine.pompei@med.ge.com or here at the Hillsboro location using the above address,
if you should have any further questions.

Sincerely,


Nancy McLaughlin
Administrative Assistant


Enclosures

# GE Healthcare

# Technologies

*Via Facsimile:* 413-734-3910

May 5, 2004

W. Garth Janes, Esquire
Doherty, Wallace, Pillsbury and Murphy, P.C.
One Monarch Place, Suite 1900
Springfield, MA 01144-1900

Re: Northampton Internal Medicine Associates, P.C.

Dear Mr. Janes:

We are in receipt of your letter of April 5, 2004. As we have discussed with both you and your client, we have and will continue to work with Northampton Internal Medicine Associates to assist in the resolution of the issues that Northampton has experienced in submitting and processing electronic claims; however, we need a corresponding commitment from your client.

As you and your client are undoubtedly aware, successful electronic claims processing is a complex process that requires the participation and cooperation of several parties, including the healthcare provider users, the software application vendor(s), the claims processing clearinghouse(s) and the relevant payers. As laws and regulations and payer requirements evolve over time, requirements and processes must correspondingly change. While we can understand your client's frustration with this process, please understand that the process *is* complex and mastering it requires active, knowledgeable and fully engaged users. Requesting GE to resolve these issues without involvement from Northampton's staff indicates to me that there is a misunderstanding of GE's role in this process.

A review of the support log indicates that out of the six electronic claims processing issues logged in the second half of 2003, one required that Northampton upgrade to a new release, one was an enrollment process to be performed by Northampton, two required a cooperative effort to reconfigure the software to address Northampton's specific needs and two were Northampton user errors. In addition, it appears that the resolution of many of the issues was delayed due to a lack of engagement and responsiveness from Northampton. I understand that all of these issues have been resolved and that now GE has and is devoting substantial resources to assist Northampton in collecting accounts receivable from payers that may have delayed payment due to glitches in the processing. GE is providing this assistance above and beyond any contractual requirements.

*we cannot contact → GE has contract w/ McKesson exclusively - McKesson does not even respond to GE timely*

May 5, 2004
W. Garth Janes, Esquire
Page 2

Mr. Janes, GE has thousands of successful installations of its practice management software that have been implemented nationwide. We understand and empathize with your client in its frustration in the time and effort involved in moving to an electronic claims processing system. But there is no substitute for active, knowledgeable and engaged participation by users in learning the new system and in proactively assisting in the identification and resolution of the inevitable glitches involved in the implementation and ongoing management of an ever-evolving process that includes numerous participants.

Although not required by our agreements, but out of a sincere desire to assist Northampton we would suggest the following as a way of moving forward: (1) we will continue to assist Northampton in the collection of accounts receivables from Tufts and Massachusetts Blue Cross Blue Shield for claims rejected for untimely filings for which Northampton received a notice by November 30, 2003 until a final determination by these payers on such claims, and (2) we will to send to Northampton a GE representative for an additional two day on-site visit at no charge to reinforce the electronic claims submission process. Please note that we will need a corresponding commitment from Northampton to devote a resource to work with us to help ensure the success of this process.

Very truly yours,

Jacqueline L. Studer
Associate General Counsel



# Technologies

Northampton Internal Medicine
Lawrence S. Schiffman, MD
190 Nonotuck Street
Florence, MA 01062
(413)584-9511


September 13, 2004

Dear Dr. Schiffman,

In response to your letter dated August 30, 2004 regarding a request for reimbursement, GE Healthcare remains focused on the issues outlined. We understand there were periods of time wherein claim reimbursements were not received timely. As a result, we dedicated considerable resources, including a site visit to your office to ensure we fully understood the problems and were applying maximum effort to finding swift resolutions on your behalf. Because you were not included in the many conversations with your practices, we felt it prudent to provide you with a little history.

Our support organization was made aware of your claims filing issues in November 2003. At that time we designated Lisa Brown, Senior Support Engineer, to work with your staff to determine the amount of outstanding claims and the impact to your business. Through research and evaluation of your database she learned BC of MA and Tufts were the most problematic and most impacting to your revenue stream. Your staff informed Lisa that her focus should be on Tufts because she would be able to address the issues surrounding those claims remotely. BC of MA would be worked by your office because the denials were hard copy and the staff was unsure of the source of the issues and the total dollar amount surrounding them.

The results of Lisa's initial research indicated $35K in outstanding claims for Tufts. This total included recently filed claims as well as those past the filing deadline. Lisa's focus has been on the claims encompassing the $35K for the past ten months. To date, you office has posted $23K in payments against those claims. Of the remaining $12K, Tufts is reviewing $6K and the balance is being reviewed and reworked by your staff. Many causes for the timely filing issues were uncovered. Some of these included, claims actually not filed within 90 days of the date of service, for claims filed – reports were not being worked which left rejected claims unattended and claims filed for patients who were not covered at the time of their visit.

On several occasions throughout the past ten months, Lisa has offered assistance with recouping the BC of MA claims. She has repeatedly been told by Roxanne, her assistance was not necessary as the timely filing packets had to be completed in-house and GE could not provide assistance. However, the staff did provide Lisa with a set of claims totaling $30K to address. To date, these visits have been paid or written off.   Lisa was able to obtain this information from the Adjustment Report within your Centricity database.

As a good faith measure and because we didn't feel enough progress was being made with the filing issues, Lisa visited your office in April 2004. During her visit, she trained Liz on EDI reports and billing workflow. In addition, she extensively reviewed the database for charges filed in 2003 as these would be approaching or past the filing deadline. Approximately 50 BC of MA claims totally over $20K were waiting for a referral number as indicated on the notes tab of the visit.

General Electric Company
3330 Keller Springs Rd, Ste 201     T 214-273-7500
Carrollton, TX 75006-5157              T 800-645-0982
U.S.A.                                        E gehealthcare.com

Centricity Physician Office
Support: 888-436-8491

# Technologies

This finding was very concerning due to the age of the claim and was discussed with Liz and Roxanne. Lisa was informed the person obtaining referrals for the visits was out of the office. Lisa suggested placing these visits in a status of "Hold" to give Amy the ability to easily identify these aging visits in need of the referral number.

While on site, Lisa performed a detailed Site Evaluation. Due to the impact of your cash-flow, it was deemed imperative to perform this service to outline any problems within your system. Lisa was able to determine there were rejections on 2003 carrier reports that were not addressed, based on the visits not being refiled and a sound understanding of the billing work-flow. Lisa provided the Site Evaluation to Roxanne Haber and Elizabeth Russell on April 23, 2004. I have attached the Site Evaluation for your review.

On June 24, 2004, Lisa discovered the BC of MA claims that was researched while on site, were still in a status of "Hold" and had not been worked. At this time, she notified Roxanne via email that these claims needed to be researched and there was a substantial amount of claims to be worked.

When moving to a new practice management system, it is understandable that a practice might notice a change in their reimbursements. We feel these changes are due to a learning curve and the staff adapting to new workflows, not to mention the new HIPAA compliancy laws. The practice must maintain responsibility for filing deadline awareness, researching-correcting-refiling rejected claims, contacting technical support and an understanding of deficits in cash flow (what payers, how much, etc). GE ensures that the system is configured properly through the EDI Implementation team. Claims are tested and filed in accordance to the payer's requirements. GE cannot ensure, claims are filed timely with respect to the date of service, determine if a referral is needed or rejected claims are being re-worked and refiled.

GE Healthcare Information Technologies worked with your practice to evaluate, correct, and resubmit claims, as problems were identified. During the past ten months GE has provided the following, to assist your practice in resolving the claim issues.

- GE has dedicated one resource, as a single point of contact. This step includes:
    - Daily/weekly phone calls, as needed, or requested by your staff
    - Immediate access to Support Engineer, intimately familiar with your organization and its needs
    - Approximately 400 hours working with your staff, researching with the payers, and alerting your staff of concerns.
    - Approximately 35 hours working with the clearinghouse and payer
    - Clarifying incorrect workflows
    - Improving filing procedures by your staff
- Sent a Senior Support Engineer on-site for 2 days (GE's expense)
    - Work side-by-side with your staff, to observe workflows
    - Address issues, as they occur
    - Provide one-on-one training, where necessary
    - Answer questions from staff members
    - Improved understanding of your organization and its workflows



General Electric Company
3330 Keller Springs Rd, Ste 201      T 214-273-7500
Carrollton, TX 75006-5157            T 800-645-0982
U.S.A.                               E gehealthcare.com



# Technologies

GE prides itself on service and the management team thoroughly investigates all escalations to determine ways of preventing them from occurring. We are able to take a good look at our processes and procedures to ensure that we have provided our customers with the level of service that they expect. In doing so, we feel that the overall software implementation could have been smoother and more responsive. Therefore, in addition to the services bulleted above, GE will reimburse you $30K.

Our organization remains dedicated to assisting your staff with identifying, resolving, and assisting with issues as we became aware of them.  This effort, along with our Support Department and Engineering Department, remain available to your team, to continue to ensure timely filing of claims, and that your team understands the functionality of the Centricity Physician Office Practice Management software package.  We hope you will see further benefit from using this system, and allow us to work with you, to gain the maximum value from your decision to use the product.

Sincerely,

Melissa Madison
Manager of Customer Services, New Direct Customer Team
Physician Office
Phone: (214) 273-7555   Fax: (214) 273-7855
Melissa.madison@med.ge.com

encl:

cc:  David Henriksen, General Manager, Centricity Physician Office
     John Geller, Director Customer Service

General Electric Company
3330 Keller Springs Rd, Ste 201     T 214-273-7500
Carrollton, TX 75006-5157           T 800-645-0982
U.S.A.                              E gehealthcare.com

# Technologies

December 8, 2004

Dr. Lawrence S. Schiffman, M.D.
Northampton Internal Medicine Associates, P.C.
190 Nonotuck Street
Northampton, MA 01062-1999

Dear Dr. Schiffman:

Thank you for your letters of September 23, 2004 and April 5, 2004 in which you have outlined certain issues (the "Northampton Complaints"). As we have stated in our letters dated May 5, 2004 and September 13, 2004, we empathize with you in your frustration over electronic claims processing issues. When moving to a new practice management solution, it is understandable that a practice might notice a change in its reimbursements. These changes are due to the staff adapting to new workflows and, in this case, the added complexity of complying with the new HIPAA laws. However, it is the practice's responsibility to ensure that it meets filing deadlines, identifies rejected claims on a timely basis and analyzes material changes in cash flow. Notwithstanding the practice's ultimate responsibility for this matter and as a gesture of goodwill, GE Healthcare has been devoting substantial resources to assist Northampton in collecting accounts receivable from payers that may have delayed payment due to user errors in processing. GE Healthcare provided this assistance above and beyond any contractual requirements.

In addition, in the sincere interest to put these issues behind us, GE Healthcare is prepared to do the following. Provided that you accept the provisions of this letter by signing in the space below before December 10, 2004, we agree to provide a refund to Northampton in the aggregate amount of thirty thousand dollars ($30,000). The full amount of this refund will be provided in the form of a credit to be applied against any outstanding invoices that are currently due and payable to GE Healthcare by Northampton and any excess amount that cannot be so applied shall be paid to Northampton by check within fourteen (14) days after GE Healthcare receives a copy of this letter signed by an authorized representative of Northampton.

In consideration for the refund of fees and payment extensions as described in this letter, Northampton, on its behalf and on behalf of its subsidiaries, affiliates and related entities, predecessors, heirs, personal representatives, successors and assigns and all of its past and present officers, directors, shareholders, attorneys, partners, agents and employees, hereby releases, acquits and forever discharges GE Healthcare and its subsidiaries, affiliates and related entities, predecessors, heirs, personal representatives, successors and assigns and all of its past and present officers, directors, shareholders, attorneys, partners, agents and employees from and against any and all claims, demands, offsets, payments, debts, sums of money, costs, attorneys fees, responsibilities, rights, liabilities, actions, causes of action, suits and causes of suit, charges, expenses, contracts, promises, or agreements whatsoever, direct or indirect, at law or in equity, known or unknown, regardless of the legal theory upon which they are based, which arise from, or may be based upon or are related to any act, omission, event, promise, agreement, contract or understanding made or occurring from the beginning of time to the date this letter is signed by Northampton, related to the Northampton Complaints.

The contents of this letter constitute confidential information subject to the terms of the license and support agreements between Northampton and GE.

General Electric Company
3330 Keller Springs Rd, Ste 201     T 214-273-7500
Carrollton, TX 75006-5157             T 800-645-0982
U.S.A.                                 E gehealthcare.com

# Technologies

Dr. Schiffman, GE believes that the actions described above should bring a satisfactory conclusion to the issues raised. If you have any questions or need additional information, please do not hesitate to contact me.

Please indicate your acceptance of the terms of this letter by signing where indicated below.

Sincerely,

David Henriksen
General Manager, Physician Office
GE Healthcare, Clinical Information Technologies

ACCEPTED AND AGREED TO BY:

NORTHAMPTON INTERNAL MEDICINE ASSOCIATES, P.C.

By: _____

Print Name: _____

Title: _____

Date: _____

General Electric Company
3330 Keller Springs Rd, Ste 201    T 214-273-7500
Carrollton, TX 75006-5157          T 800-645-0982
U.S.A.                             E gehealthcare.com



**EXHIBIT**
2

**GE Medical Systems**
Information Technologies

General Electric Company
3330 Keller Springs Road, Suite 201
Carrollton, TX 75006-5157
214 273-7500, Fax: 214 273-7899
800 645-0982
gemedical.com

January 9, 2004

Dear Centricity Physician Office Customer:

As you know, since GE Medical Systems *Information Technologies* acquired Millbrook® and Logician, we've been working hard to unify Millbrook Practice Manager® and Logician® Ambulatory into the new Centricity® Physician Office suite. Centricity Physician Office helps practices do more with their information, work more efficiently, provide better patient care, and improve their financial health.

To help you realize all of these benefits and to better service your needs, GE must offer the best possible support network. That's why we are reorganizing our network of value-added resellers (VARs) in 2004. The new VAR network will feature a small number of VARs who are capable and committed to supporting an entire region. This change will give us a much stronger VAR channel and reinforces our commitment to our VAR's customers.

These VARs' services will also be supplemented by GE's own training and support capabilities. The new arrangement will provide the VAR's customers with deeper technical expertise and more responsive support.

We selected the new regional VARs carefully, based on our experience with these companies. We're confident that they have the knowledge and staff expertise necessary to install and support systems as complex and multi-faceted as Centricity Physician Office. And, of course, their service will always be backed up by the full capabilities of GE.

Since your practice is a direct customer of GE, you do not need to do or change anything. We just wanted to let you know about this change as it occurs. Please feel free to call Jeanne Hanson at (503) 531-7139 if you have any questions.

Sincerely,


Bernd Brust
General Manager
Centricity Information Systems



# Technologies

**EXHIBIT**

**3**

Date: April 23, 2004

Contact Name: Roxanne Haber/Elizabeth Russell
Client Name: Northampton Internal Medicine

Dear Roxanne,
Thank you for giving us the opportunity to perform a site evaluation on your database.
The results of the evaluation will allow areas of the product that your staff was not using either to its fullest capabilities or using it incorrectly. After careful review of the database, the following was determined. We have listed our findings by component based on the items reviewed during the evaluation. Listed first are the concerns or comments that we noted after performing the site evaluation.  We have listed our findings based on the items reviewed during the site evaluation.

# System Evaluation Report

## Billing Component – *Visit by Status*

### *New:*
Millbrook recommends that only visits for the current date be in a status of New.  When we identify more than the recommended amount we become concerned about the practice's understanding of the billing workflow processes.

In this particular database we identified 117 visits created between 04/02/03-04/22/04. Fifteen of these visits are dates over a month old.  This total includes visits created by placing a patient on the schedule or creating a new visit.
To verify if a patient was actually seen, right click on the visit/ patient information / appointments / locate the visit / right click and open schedule. This eliminates the process of charges being "lost."

### *In Progress*
This status represents visits where either charges have been posted or something was updated on the visit when the status was New.  In most cases, this status represents visits with charges ready for the next step, Approval and filing processes.  We recommend no more than 2-3 days of visits to remain in this status. When we identify more than the recommended amount we become concerned about the practice's understanding of the billing workflow processes.

General Electric Company
3330 Keller Springs Rd, Ste 201    T 214-273-7500
Carrollton, TX 75006-5157    T 800-645-0982
U.S.A.    E gehealthcare.com



Centricity Physician Office
Support: 888-436-8491

# Technologies

We identified over 12 visits having this status ranging from 09/19/03-03/30/04. This normally indicates charges or payments have been posted. Most of these visits are waiting to be filed to secondary or tertiary insurances.

**Approved Failed:**
These visits represent claims that have failed the first level of Centricity claim edits. These edits represent the most basic information required to file a claim on paper. Any visits in this status are therefore assumed not filed. The notes tab should be reviewed to determine why the visit failed the approval process
In this particular database, there are no claims currently in this status.

**Approved**
This status represents visits that have passed the first level of Centricity claim edits. These edits represent the most basic information required to file a claim on paper. Visits having this status are ready to be filed either on paper or electronically. We recommend no more than 2-3 days of visits to remain in this status. When we identify more than the recommended amount we become concerned about the practice's understanding of the billing workflow processes.
In this database 3 visits were identified. D.O.S ranging from 02/17/04-04/22/04. Two of these visits are self-pay patients with no filing to the insurance company.

**Filed:**
This status represents visits that have been filed on paper for either primary or secondary insurance carriers.
We identified 1360 visits in this status. The oldest last filed date was 04/07/03-04/22/04. 318 of these visits have a last filed date in 2003.

Ticket 022905 has a zero dollar balance on it and tickets 011777, 003885, 001446 have balances of less than $1.00 and have payments posted from the carrier you last filed to.

**Hold:** ~ lisa told us to use t put Accounts that noted u for referals ..
This status is considered miscellaneous and its meaning varies among practices. We are not certain of its use in this particular practice. It is important to note that visits having this status cannot effectively be managed in the scope of daily billing workflow. Ticket # 002215 was filed to Health New England on 5/13/03 but then the entire balance was transferred to Hampshire Health Access on 12/06/03 but it has never been filed to this carrier. Ticket 011907 is a TUFTS claim that is being appealed for timely filing but the balance was transferred to the patient on 10/27/03. This claim did not end up on the spreadsheet to TUFTS because it is showing as patient responsibility. Ticket 008716 needs to be billed to the secondary, BCBS MASS HMO, but the entire balance was transferred to the patient on 09/18/03. This means that when the claim was filed to paper on 12/23/03 and 02/19/04, there was no balance for the insurance to pay. This needs to be submitted for timely filing per the note in the charges tab. Ticket 020658 has a zero dollar balance.
We identified 7 visits between D.O.S. 05/12/03-03/24/04.

General Electric Company
3330 Keller Springs Rd, Ste 201     T 214-273-7500
Carrollton, TX 75006-5157           T 800-645-0982
U.S.A.                              E gehealthcare.com   Page 2 of 6



Centricity Physician Office
Support: 888-436-8491

# Technologies

## *Waiting Patient Payment:*

This status represents visits with only patient balances. We identified 1180 visits with this status D.O.S 05/11/01-04/20/04. Ticket 022223 has a visit balance and total balance of $2.09 and Ticket 020252 has a visit and total balance of $0.93. According to your statement criteria; this does not meet the requirements to receive a statement. Ticket 001043 has $6.05 allocated to the insurance but is in this status. This visit balance will not show up on the statement unless the remaining amount is transferred to the patient. There is a large group of claims with this same issue, please see the list below.

| | | |
|---|---|---|
| Ticket 000568 $3.05 | Ticket 004682 $6.78 | Ticket 010403 $7.78 |
| Ticket 008403 $7.79 | Ticket 014091 $10.00 | Ticket 000367 $10.00 |
| Ticket 001217 $10.00 | Ticket 000849 $10.44 | Ticket 009337 $10.88 |
| Ticket 002872 $102.60 | Ticket 021620 $355.38 | Ticket 015993 $250.00 |
| Ticket 003406 $246.00 | Ticket 001817 $245.34 | Ticket 016717 $225.00 |
| Ticket 003441 $225.00 | Ticket 006891 $225.00 | Ticket 001596 $203.00 |
| Ticket 013216 $200.40 | Ticket 004983 $175.00 | Ticket 013069 $155.00 |
| Ticket 012347 $130.00 | Ticket 021513 $115.26 | Ticket 001768 $110.00 |

There are an additional 65 visits with the same problem that need to be corrected. I filtered for All Waiting Patient Payment, and did a sort ascending on Visit Patient Balance. I scrolled through all zero dollar visits in this status and compared it to the balance that was sitting in Visit Insurance Balance.

## *Refile:*

This status was designed to assist in managing claims that needed to be refiled so that they are easy to locate in the Billing component. This status must be manually assigned to a visit by a user. Upon locating these claims in Billing, one would Approve them and file to the carrier via paper or electronically. The visit statuses would then change accordingly resulting in those visits no longer having a status or Refile.

Some practices consider it a miscellaneous status and its meaning varies among practices. We are not certain of its use in this particular practice. We are assuming that the intention was to mark these claims to be refiled to the insurance carrier.

In this database 3 visits were identified however 2 of the 3 claims were filed to paper, but not since 12/03. Ticket 004504 is a BC claim that reached its filing limit and the appeal was sent in on 1/14/03.

## *File Succeeded:*

This status is where your claims live once they have been transmitted electronically to the clearinghouse and you are waiting payment. Its important that site's closely work their CR reports in order to keep this status manageable and up to date. In this database there are visits with D.O.S ranging from 04/04/03-04/20/04. Not including BC Mass or TUFTS, there are 141 visits from other various carriers that have a last filed date ranging from 04/04/03-12/31/03. These carriers include Medicare, Harvard Pilgrim, Aetna, Connecticare, Health New England, Health Plans Inc, Cigna, and GHI. The majority of them are Medicare claims.

General Electric Company
3330 Keller Springs Rd, Ste 201    T 214-273-7500
Carrollton, TX 75006-5157    T 800-645-0982
U.S.A.    E gehealthcare.com

# Technologies

In reviewing the Medicare claims within this time frame (total $13391.43), I found that these claims had rejected on CR reports. Below are a few patient examples.

| | | | |
|---|---|---|---|
| 012173 Roxeene Parker | CR 102703 | REJECTED | Invalid Relationship Code |
| 012246 Marilyn Spofford | CR 102703 | REJECTED | Invalid Relationship Code |
| 013556 Marilyn Spofford | CR 111403 | REJECTED | Invalid Relationship Code |
| 013583 Marilyn Marchessault | CR 111403 | REJECTED | Invalid Relationship Code |
| 004070 Marilyn Marchessault | CR 061303 | REJECTED | Invalid Relationship Code |
| 013576 Doris Bergeron | CR 111403 | REJECTED | Invalid Relationship Code |
| 012302 Doris Bergeron | CR 102703 | REJECTED | Invalid Relationship Code |
| 008385 Doris Bergeron | CR 090903 | REJECTED | Invalid Relationship Code |
| 009097 Doris Bergeron | CR 081503 | REJECTED | Invalid Relationship Code |
| 003593 Doris Bergeron | CR 061903 | REJECTED | Invalid Relationship Code |
| 004018 Alfred Abeles | CR 061303 | REJECTED | Invalid Relationship Code |
| 009555 Alfred Abeles | CR 091703 | REJECTED | Invalid Relationship Code |
| 013870 Alfred Abeles | CR 061303 | REJECTED | Invalid Relationship Code |
| 009276 Doris Bixby | CR 091703 | REJECTED | Invalid Relationship Code |
| 009567 Eva Brown | CR 091703 | REJECTED | Invalid Relationship Code |
| 009568 Eva Brown | CR 091703 | REJECTED | Invalid Relationship Code |
| 013707 Jovita Hart | CR 111403 | REJECTED | Invalid Relationship Code |
| 009030 Jovita Hart | CR 111403 | REJECTED | Invalid Relationship Code |
| 009031 Jovita Hart | CR 090903 | REJECTED | Invalid Relationship Code |
| 005948 Jovita Hart | CR 071403 | REJECTED | Invalid Relationship Code |
| 005927 Margo Cooley | CR 111403 | REJECTED | Invalid Relationship Code |
| 005141 Margo Cooley | CR 111403 | REJECTED | Invalid Relationship Code |
| 012438 Margo Cooley | CR 102703 | REJECTED | Invalid Relationship Code |
| 012472 Anne Defillippo | CR 102703 | REJECTED | Invalid Relationship Code |
| 012504 Anne Defillippo | CR 103003 | REJECTED | Invalid Relationship Code |
| 010991 Anne Defillippo | CR 111403 | REJECTED | Invalid Relationship Code |
| 009108 Anne Defillippo | CR 111403 | REJECTED | Invalid Relationship Code |
| 003230 Margaret Shannon | CR 111403 | REJECTED | Invalid Relationship Code |

In reviewing the Harvard Pilgrim claims within this time frame, I found that these claims had rejected on CR reports. Here are a few examples.

| | | | |
|---|---|---|---|
| 008443 Amy Cerullo | CR 082703 | REJECTED | Invalid Member # |
| 001512 Amy Cerullo | CR 101703 | REJECTED | Invalid Member # |
| 012356 Amy Cerullo | CR 102703 | REJECTED | Invalid Member # |
| 003087 Mary Korup | CR 111403 | REJECTED | Invalid Member # |
| 009802 Laurie Benoit | CR 092203 | REJECTED | Invalid Member # |
| 009860 Virginia Machey | CR 092203 | REJECTED | Invalid Member # |

General Electric Company
3330 Keller Springs Rd, Ste 201    T 214-273-7500
Carrollton, TX 75006-5157    T 800-645-0982
U.S.A.    E gehealth...    Page 4 of 6



# Technologies

## Administration Component

### *Allocation Sets & Types*
This area of the Administration component is reviewed to ensure that monies are being allocated to insurance and patient responsibility. Our findings are based on the assumption that the name is a true description of the desired behavior.

### Types:
Allocation types are designed to work with Allocation sets. The role of the type is to actually define insurance and patient responsibility.

We identified 12 Allocation types in this database. Eight are marked "do not use." The additional 14 Allocation Types are set up correctly.

### Sets:
We identified 14 allocation sets all of which are set up correctly.

### *Transaction Column Sets:*
Transaction Column Sets (TCS) allow you to create a transaction distribution screen containing all the elements users need to quickly process payments. You can make multiple payments, adjustments, and transfer distributions to a single visit or multiple visits during a single payment entry session. In order to do this, you must create Transaction Column Sets that contain the necessary data fields. *This is the single most important task for ensuring your payment posting process is fast and efficient.*

We identified 2 TCS. The TCS all contain a payment, adjustment and transfer column which is necessary to post transactions correctly and the insurance TCS does contain a contractual adjustment.

### *Closing Date:*
Closing the system ensures that any financial activity posted to an account is locked and cannot be modified or deleted without a series of adjustments or voids. This ensures data/financial integrity as well as protects the practice.
It is important to note statements and some reports print only through the designated closing date. For your statements and reports to reflect the most current information, you must perform the closing operation on a consistent basis.
You should run both the *Daily Balance Report* (lists all your charges, payments, adjustments input into Practice Manager) and the *Deposit Slip Report* (identifies actual monies received and that will be deposited). These reports should balance *before* you close the day.
Hard Close : Your system closing date currently is: ( DATE )
Soft Close: Open batches from 04/21/04-04/22/04  5  batches open

General Electric Company
3330 Keller Springs Rd, Ste 201
Carrollton, TX 75006-5157
U.S.A.

T 214-273-7500
T 800-645-0982
E gehealthcare.com



# Technologies

## Transaction Management Component:

This component was designed to allow the user to identity, select, and review transactions by a variety of criteria.

Once a transaction is identified, you can:
• Balance daily transactions entries.
• Identify/correct errors in payment posting or distribution.
• Continue the distribution of a transaction.

This component is reviewed to locate unapplied funds. Unapplied funds are monies that have not been distributed to the patient/procedure level. Batches containing unapplied funds cannot be closed. Days with batches containing unapplied transactions may not be closed.
Upon examining this database, there were no batches with unapplied funds.

## Collections Component:

This component allows you to search for and work with patient visits that are overdue. Whenever an account remains unpaid and the status of the visit has been set to collection, you can use this component to track all communications between the office and the patient or insurance carrier.
This component is not currently being utilized.

## Statement Options/Criteria:

Upon examination of the Statement Options we find it to be set up correctly. There are 4 statement batches.  These batches have interval days of 28 and minimum days between statement of 7.  Your batches are set up as Week 1, Week 2, Week 3, and Week 4..

## SQL Server Standard Jobs

Nightly routine maintenance tasks are performed against the database.  We confirmed that the Backup and Daily jobs are running on a daily basis and the last run date was successful.

---

We have scheduled to discuss the Site Evaluation on **04/23/04**. We look forward to working with you and your staff.

Sincerely,

Lisa K. Brown
GE Healthcare
General Electric Company
3330 Keller Springs Rd, Ste 201     T 214-273-7500
Carrollton, TX 75006-5157            T 800-645-0982
U.S.A.                               E gehealthcare.com

EXHIBIT

D

## GE Medical Systems
### Information Technologies

*gemedicalsystems.com*

CUSTOMER LICENSE AGREEMENT

*This Customer License Agreement, including the Quotation covering the Licensed Software licensed under this Agreement ("Agreement") is a legal agreement between Customer and GE Medical Systems Information Technologies, Inc., including its subsidiaries ("GEMS IT"). Customer agrees to be bound by the terms of the Agreement by installing, copying or otherwise using the Licensed Software or by executing the Agreement or, if applicable, by clicking "I Agree" below or by breaking the sealed package containing the Licensed Software. "Customer" means the entity that has entered into the Agreement with GEMS IT. Other terms used in the Agreement are defined in Paragraph 11. Customer agrees that the Agreement is the complete agreement for the Licensed Software and the Agreement supersedes all prior or contemporaneous agreements or representations, or any terms and conditions that might be included with Customer's purchase order or in any other document, concerning the subject matter of the Agreement. The Agreement may not be amended, modified or altered except in a writing executed by authorized representatives of GEMS IT and Customer. The Agreement is governed by the laws of the State of Customer's principal corporate offices, without regard to conflicts of law principles. The Agreement specifically excludes the application of the Uniform Computer Information Transactions Act (UCITA).*

1.  **SOFTWARE LICENSE AND LIMITATION.**

a.  *License.* As long as Customer complies with the terms and conditions of the Agreement, GEMS IT grants to Customer a limited, non-exclusive, non-transferable, perpetual (unless otherwise specified in the Quotation) license to use the Licensed Software and Documentation solely for Customer's internal business operations, on the Designated Equipment, only within the Scope and Term (if specified in the Quotation) for which Customer has paid the appropriate license fee. Customer may make one copy of the Licensed Software solely for back up purposes; provided that all original proprietary notices are reproduced on such copy made. If Customer installs any upgrades or new versions of the Licensed Software, Customer shall promptly replace, cease using and destroy all superseded copies; provided that Customer may retain one copy solely for backup purposes. The Agreement does not include implementation, training, support or maintenance services for the Licensed Software. Such services may be available for additional fees pursuant to the terms and conditions of such services as GEMS IT may make available from time to time.

b.  *Third Party Software.* To the extent permitted by applicable law, licensors of Third Party Software shall be third party beneficiaries of the Agreement with respect to products licensed to GEMS IT by such licensors. Customer agrees that it may use Third Party Software only together with the Licensed Software and only with the Designated Equipment and subject to other restrictions of which GEMS IT makes Customer aware.

c.  *Ownership and Restrictions.* GEMS IT and its third party licensors, as applicable, retain all ownership and intellectual property rights to the Licensed Software and Documentation. If Customer or its personnel acquire any right, title or interest in or to such Licensed Software and/or Documentation, Customer hereby assigns all such right, title and interest to GEMS IT. The structure, sequence, organization, algorithms and code of the Licensed Software and other trade secrets embodied in the Licensed Software are the valuable trade secrets and confidential information of GEMS IT and its third party licensors, as applicable. The Licensed Software and Documentation are protected by United States Copyright Law, international treaty provisions and other applicable laws. Customer acquires only the right to use the Licensed Software and does not acquire any title or other

rights or interests, express or implied, in the Licensed Software other than those specified in the Agreement. *Customer may not and may not allow any third party to:*

•   Take any action that is outside the Scope of the license granted in the Agreement;

•   Copy the Licensed Software or any Documentation except as specifically permitted herein;

•   Sublicense, assign, delegate, rent, lease, provide service bureau or subscription services, sell, time-share or otherwise transfer the Licensed Software or any licenses granted under the Agreement or any of its related rights or obligations, for any reason;

•   Reverse engineer, decompile, disassemble or otherwise attempt to learn the source code, structure, algorithms or ideas underlying the Licensed Software;

•   Release the results of any testing or benchmarking of the Licensed Software without the prior written consent of GEMS IT;

•   Remove or modify any markings, labels or any notice of the proprietary rights, including copyright, patent and trademark notices, of GEMS IT from any media or Documentation provided under the Agreement;

•   Modify, adapt, translate or create derivative works based on the Licensed Software, except that the Licensed Software may be configured as specifically permitted in the Documentation.

Any information supplied by GEMS IT or obtained by Customer pursuant to the Agreement constitutes confidential information of GEMS IT and may only be used by Customer for the purpose described herein and may not be disclosed to any third party. Customer shall be fully responsible for any breach of the Agreement by any Permitted Users. Customer shall immediately notify GEMS IT of any unauthorized use of or access to the Licensed Software or any portions thereof. Customer shall be solely responsible for supervising and controlling the use of the Licensed Software by Customer's Permitted Users to ensure that such use takes place in accordance with the terms of the Agreement. Customer shall use commercially reasonable efforts to ensure that no unauthorized person or entity will have access to the Licensed Software. Any violation of these responsibilities by Customer shall be sufficient cause for GEMS IT to terminate the Agreement as provided in Section 8 and shall

1

CONFIDENTIAL AND PROPRIETARY

void any warranty obligations provided hereunder.

Customer acknowledges that certain Licensed Software is Commercial Computer Software provided with RESTRICTED RIGHTS under Federal Acquisition Regulations and agency supplements to them. Use, duplication or disclosure by the U.S. Government is subject to restrictions as set forth in the Agreement and in the Rights in Commercial Computer Software or Commercial Computer Software Documentation clause at DFAR 227.7202-3 or subparagraphs (c)(1) and (2) of the Commercial Computer Software Restricted Rights clause at FAR 52.227-19, as applicable. Contractor is GE Medical Systems Information Technologies, Inc., 8200 W. Tower Avenue, Milwaukee, Wisconsin 53223.

d. *Audit Rights.* Upon 45 days written notice, GEMS IT may audit Customer's use of the Licensed Software. Customer agrees to cooperate with GEMS IT's audit and to provide reasonable assistance and access to information. If the audit uncovers underpaid or unpaid fees owed to GEMS IT, Customer agrees to pay those fees and GEMS IT's costs incurred in conducting the audit within 30 days of written notification of the amounts owed. If Customer does not pay the amounts owed, GEMS IT may terminate the Agreement as provided in Section 8. Customer agrees to permit GEMS IT to obtain certain reasonable information regarding the Permitted Users and other use information regarding the Licensed Software. All of such information shall be treated as confidential information and shall be used solely for the purposes of technical support and auditing the use of the Licensed Software and shall not be disclosed to any third party (other than vendors of Third Party Software), without Customer's consent.

e. *Third Party Consultants.* Upon prior written approval from GEMS IT, Customer may permit a third party consultant to access the Licensed Software solely for the purpose of providing systems integration, disaster recover, consulting, facilities management or outsourcing services solely for providing services to Customer in connection with the internal business operations of Customer solely within the Scope and Term for which Customer has paid the appropriate fees. Customer shall ensure that such third party consultants agree in writing, prior to accessing the Licensed Software that (1) the third party consultant's access to the Licensed Software shall be limited to and governed by all the terms and conditions of the Agreement that apply to Customer (and such writing shall specifically set forth the substance of Sections 1 of the Agreement, and (2) GEMS IT may enforce such written agreement directly against such third party consultant

2. DELIVERY. Delivery of the Licensed Software to Customer may be either by delivery of the media containing the Licensed Software to Customer's address as set forth on the Quotation or delivery of the Licensed Software by electronic transmission to Customer's computer system.

3. PAYMENT AND TERMS. Customer agrees to pay to GEMS IT all fees for all Licensed Software licensed by Customer under the Agreement at the prices set forth in the applicable Quotation. Unless otherwise provided in the Quotation, the fees for Licensed Software shall be invoiced to Customer upon shipment or electronic transmission of the Licensed Software, as applicable, and shall be payable in full within 30 days of date of invoice. Customer shall be solely responsible for all sales, value-added or other similar taxes that GEMS IT must pay as a result of the Agreement.

4. COMPLIANCE WITH LAWS. GEMS IT and Customer agree to materially comply with all applicable federal, state and local laws and ordinances, rules and regulations of which GEMS IT or Customer, respectively, is aware and as may apply to GEMS IT or Customer, respectively, in its performance and obligations under the Agreement.

GEMS IT and Customer acknowledge that certain portions of the Administrative Simplification section of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. § 1320d through d-8 ("HIPAA") and the federal privacy regulations as contained in 45 CFR Part 164 (the "Federal Privacy Regulations") may apply to GEMS IT, Customer, and their relationships and operation under the Agreement. GEMS IT and Customer acknowledge that they will enter into a Business Associate Agreement, which will address the relative obligations of both GEMS IT and Customer under HIPAA and the Federal Privacy Regulations, and to the extent the terms thereof relate to GEMS IT's performance under the Agreement, the provisions of such Business Associate Agreement shall control. Customer shall be responsible for implementing and maintaining security measures to protect the security of Customer's network, the Licensed Software, and all data and images displayed, transmitted and stored therein.

Customer agrees that US export control laws and other applicable export and import laws govern Customer's use of the Licensed Software. Customer agrees that neither the Licensed Software nor any direct product thereof will be exported, directly, or indirectly, in violation of these laws, nor will be used for any purpose prohibited by these laws, including, without limitation, nuclear, chemical, or biological weapons proliferation.

5. WARRANTIES, REMEDIES AND INDEMNIFICATION.
a. *Warranties.* GEMS IT warrants that from the Go-Live Date and continuing for a period of ninety (90) days that the Licensed Software will perform substantially in accordance with the applicable Documentation when operated on the Designated Equipment; and (2) GEMS IT will use reasonable commercial efforts consistent with industry standards to scan for and remove any viruses from the Licensed Software before installation. If GEMS IT cannot substantially correct a breach of these warranties in a commercially reasonable manner within ninety days after receiving written notice from Customer, Customer may terminate the Agreement and obtain a refund of the applicable license fee. This paragraph states Customer's exclusive remedy for a breach of the warranties set forth herein .
b. *Warranty Exclusions.* GEMS IT DOES NOT GUARANTEE THAT THE LICENSED SOFTWARE WILL PERFORM ERROR-FREE OR UNINTERRUPTED OR THAT GEMS IT WILL CORRECT ALL LICENSED SOFTWARE ERRORS. EXCEPT AS SET FORTH HEREIN, NO OTHER WARRANTY WITH RESPECT TO THE SOFTWARE IS MADE BY GEMS IT AND GEMS IT EXPRESSLY DISCLAIMS ANY OTHER WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, DATA ACCURACY OR INTEGRITY, NONINFRINGEMENT OR QUIET ENJOYMENT. GEMS IT does not warrant the accuracy of codes, prices, or other data contained in Third Party Software that has been incorporated into or included in the Licensed Software. Pricing information provided by such Third Party Software does not constitute an offer to sell or to purchase.

If Customer transfers or relocates the Licensed Software without the express, written permission of GEMS IT, all obligations under the warranties described in this Section 5 terminate. The warranties do not cover: (a) failure to follow in all material respects GEMS IT's written recommendations or instructions; (b) using or combining the Licensed Software with products or services of others or with products or services

incompatible with products or services of GEMS IT; or (c) Licensed Software installed outside of the United States and Canada.

c.  *Infringement Indemnification.* GEMS IT will defend or settle any lawsuit brought against Customer to the extent arising out of any U.S. copyright or patent infringement claim of a third party arising from Customer's use of the GEMS IT Software in accordance with the Agreement; provided that with respect to a patent claim such claim is based upon a third party patent that existed as of the date such GEMS IT Software was delivered to Customer. If any such lawsuits materially interfere with Customer's use of the GEMS IT Software, GEMS IT shall either: (i) substitute functionally equivalent non-infringing software; (ii) modify or request the third-party vendor to modify, if applicable, the GEMS IT Software so that it no longer infringes but remains functionally equivalent; (iii) obtain for Customer at GEMS IT's expense the right to continue to use the infringing GEMS IT Software; or (iv) if none of the options listed above can be accomplished within a reasonable time or are otherwise not commercially reasonable, refund to Customer the Price, as depreciated, for the GEMS IT Software, as applicable, which gives rise to the lawsuit. Depreciation of the Price shall be calculated based upon three years' straight-line depreciation from the time the GEMS IT Software, as applicable, is delivered. The foregoing remedies are Customer's sole and exclusive remedies for such third party claims. The above indemnification obligation is conditional upon Customer providing GEMS IT written notice of any infringement claim by a third party to which this indemnity may relate within thirty (30) days after receipt of notice of such third party claim. Notwithstanding the foregoing, GEMS IT shall not have any obligation to Customer hereunder if the infringement claim results from or arises out of the use of the GEMS IT Software in combination with any computer software, tools, hardware, equipment, or any other materials, or any part thereof, or services, not furnished or recommended in writing by GEMS IT; the use of such GEMS IT Software in a manner or environment, or for any purpose, for which GEMS IT did not design or license it, or in violation of GEMS IT's recommendations or instructions on use; or any modification or enhancement of the GEMS IT Software by Customer or any third party not authorized or approved by GEMS IT. THE FOREGOING STATES THE ENTIRE OBLIGATION OF GEMS IT WITH RESPECT TO INFRINGEMENT OF PROPRIETARY RIGHTS.

6.  LIMITATION OF LIABILITY.  IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, INCIDENTAL, OR CONSEQUENTIAL, INCLUDING WITHOUT LIMITATION, DAMAGES FOR LOSS OF BUSINESS, PROFIT(S), REVENUES, USE AND/OR DATA OR COSTS OF PROCUREMENT OF SUBSTITUTE GOODS OR SERVICES, INCURRED BY SUCH PARTY OR ANY THIRD PARTY ARISING IN ANY WAY OUT OF THE USE OF THE LICENSED SOFTWARE OR THIS AGREEMENT UNDER ANY CAUSE OF ACTION, WHETHER OR NOT IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND EVEN IF A REMEDY SET FORTH HEREIN IS FOUND TO HAVE FAILED OF ITS ESSENTIAL PURPOSE. GEMS IT'S LIABILITY FOR DAMAGES HEREUNDER SHALL IN NO EVENT EXCEED THE PRICE PAID BY CUSTOMER FOR THE LICENSED SOFTWARE GIVING RISE TO THE LIABILITY.

7.  CUSTOMER RESPONSIBILITY FOR MEDICAL DIAGNOSIS AND TREATMENT AND FINANCIAL/MANAGEMENT INFORMATION. *Customer acknowledges and agrees that:*

•  the Licensed Software does not make final clinical, or other decisions and is not a substitute for competent, properly trained

and knowledgeable staff who bring professional judgment and analysis to the information presented by the Licensed Software.
•  Customer, and specifically not GEMS IT, is solely responsible for verifying the accuracy of all patient information and determining the data necessary for Customer to make medical and diagnostic decisions, as well as for complying with all laws, regulations and licensing requirements applicable to Customer's delivery of healthcare services.
•  the desirability of establishing and maintaining reasonable quality control procedures to ensure the accuracy of input to the Licensed Software.
•  its employees will be obliged to consider the reasonableness and accuracy of the information presented by the Licensed Software in light of other information available to them, and may disregard information produced by the Licensed Software in the performance of their functions for Customer.
•  any and all financial and management information produced by the Licensed Software must be tested for reasonableness and accuracy before any actions are taken or reliance placed on it.
•  it has reviewed and will communicate any Licensed Software Information, if applicable, with Permitted Users who work with the Licensed Software.

8.  TERMINATION.  Unauthorized use or copying of the Licensed Software or otherwise failing to comply with the terms of the Agreement will result in automatic termination of the Agreement and will entitle GEMS IT or its vendors to other legal remedies. Upon termination of the Agreement for any reason: (a) all licenses granted hereunder shall terminate; (b) Customer shall pay all amounts owed to GEMS IT that have accrued prior to the date of termination; (c) Customer shall cease Customer's use of the Licensed Software; and (d) Customer shall certify in writing to GEMS IT within 30 days after such termination that Customer has either destroyed, permanently erased, or returned to GEMS IT all Licensed Software, Documentation, and confidential information, including all copies thereof, in all forms, partial and complete, and in all types of media, including computer memory and storage. The following provisions of the Agreement shall survive termination of the Agreement: Paragraphs 1(c), 6, 8, 9, 10 and 11.

9.  DISPUTE RESOLUTION.  Any claim or controversy arising out of or relating to the Agreement must be submitted and settled as set forth in this Section 12. If any party to this Agreement alleges that any other party to this Agreement has breached any of the terms of this Agreement, then the party alleging breach will inform the other party of such breach in writing. Upon receipt of such notice, the allegedly non-performing party will have 30 days to cure the alleged breach. If the parties do not agree that effective cure has been accomplished by the end of the 30-day period, then upon written request of any party, a senior manager from each party will meet in person and confer in good faith to resolve the dispute within 15 days of the expiration of the prior 30-day period. If, after the above procedure, the dispute remains unresolved, either party may submit the dispute to the office of the American Arbitration Association ("AAA") located closest to the largest metropolitan area of the State where Customer's principal corporate offices are located for binding arbitration in accordance with the AAA's Commercial Arbitration Rules then in effect, as amended by this Agreement. The law applicable to the arbitration, including the administration and enforcement thereof, is the Federal Arbitration Act, 9 U.S.C. §§ 1-16, as amended from time to time. The cost of the arbitration, including the fees and expenses of the arbitrator(s), will be shared equally by the parties, with each party paying its own attorneys' fees. The arbitrator(s) will have the authority to apportion liability between the parties, but will not have the authority to award any damages or remedies not

available under the express terms this Agreement. The arbitration award will be presented to the parties in writing, and upon the request of either party, will include findings of fact and conclusions of law. The award may be confirmed and enforced in any court of competent jurisdiction. Any post-award proceedings will be governed by the Federal Arbitration Act. Nothing in this Section 12 shall preclude either party from seeking interim equitable relief in the form of a TRO or preliminary injunction. A request by a party of a court for interim equitable relief shall not be deemed a waiver of the obligation to arbitrate hereunder.

10. MISCELLANEOUS. Customer may not assign the Agreement or the license granted by it without the express, written consent of GEMS IT. GEMS IT may assign the Agreement to any of its affiliates or subsidiaries, or to any person or entity that acquires all or substantially all of the stock or assets of the business of GEMS IT to which the Agreement relates, provided the assignee agrees in writing to be bound by the Agreement. Except as otherwise provided in the Agreement, notices, demands, requests or other communications which are given or required pursuant to the Agreement shall be in writing and shall be delivered by first class, registered or certified mail, postage prepaid, or by hand (including third-party courier or nationally recognized overnight service) or facsimile to a party's address indicated in the Agreement. Each party agrees to provide the other notice of any address change. If any term of the Agreement is found to be invalid or unenforceable, the remaining provisions will remain effective. If either party fails to require performance by the other party of any provision, it shall not affect the right to require performance at any time thereafter nor shall it be held to be a waiver of the provision itself. Except for payment obligations, neither party will be responsible for performance of its obligations hereunder where delayed or hindered by war, terrorism, riots, embargoes, strikes or acts of its vendors, suppliers, accidents, acts of God, or any other event beyond its reasonable control. Customer acknowledges and agrees that, due to the unique nature of the Licensed Software there can be no adequate remedy at law for a material breach of the Agreement and that such breach would cause irreparable harm to GEMS IT; therefore, GEMS IT shall be entitled to seek immediate equitable relief, in addition to whatever remedies GEMS IT might have at law or under the Agreement. The Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together will constitute one agreement. Each party waives their rights to a jury trial of any claim or cause of action based upon, relating to or arising out of the Agreement. The Agreement may be filed as a written consent to a trial by the court.

11. DEFINITIONS.

"Designated Equipment" means the computer or other equipment identified in the relevant Quotation or otherwise identified in writing by Customer to GEMS IT and on which the Licensed Software will be installed and operated for the term of the Agreement.

"Documentation" means GEMS IT's manuals, technical specifications and user instructions describing the capabilities, features, operation, installation, maintenance, and use of the Licensed Software provided to Customer in whatever form, including without limitation on GEMS IT's web site or in the applicable Licensed Software online help functions.

"GEMS IT Software" means the software included in the Licensed Software that is owned by GEMS IT.

"Go-Live Date" means the date the Licensed Software is ready for use in a production environment..

"Licensed Software" means the software identified in the Quotation, which may include Third Party Software, and any Updates for which Customer has paid, which is licensed to Customer under the Agreement.

"Licensed Software Information" means important information associated with the use of Licensed Software that, if applicable, is attached to the Agreement.

"Permitted Users" means employees, agents and other individuals authorized by Customer to have access to and use of the Licensed Software solely within the Scope and Term for which Customer has paid the appropriate license fee.

"Price" means fees for the Licensed Software.

"Quotation" means the document(s) attached to the Agreement that contains specific information regarding the Licensed Software.

"Scope" means the scope of license for the particular type of Licensed Software obtained by Customer as specified in the Quotation.

"Support Services" mean the software maintenance and support services for the Covered Product as defined in the Quotation and an Attachment.

"Term" means the term of use of the Licensed Software, if specified in the Quotation.

"Third Party Software" means third party software included with the Licensed Software.

"Updates" means any updates, upgrades, enhancements, modifications, or new versions of the Licensed Software that are purchased by Customer from time to time for additional fees for the applicable Licensed Software.